Niel Prosser (TN Bar No. 11647/CO Bar No. 58650)
Kyle Johnson (TN Bar No. 36066/CO Bar No. 58644)
Alex Bunn (TN Bar No. 40490/CO Bar No. 58512)
(*pro hac vice application forthcoming*)
**PROSSER & JOHNSON, PLLC**
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
Telephone: (901) 820-4433
Facsimile: (901) 767-0704
np@prosserlaw.com
kjohnson@prosserlaw.com
abunn@prosserlaw.com

Alexander P. McLaughlin (ISB No. 7977)
Robert B. White (ISB No. 4438)
**GIVENS PURSLEY LLP**
601 W. Bannock St.
Boise, ID 83702
Telephone: (208) 388-1200
Facsimile: (208) 388-1300
alexmclaughlin@givenspursley.com
rbw@givenspursley.com

**Counsel for Plaintiff, First Technology Federal Credit Union**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FIRST TECHNOLOGY<br>FEDERAL CREDIT UNION | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR INJUNCTIVE<br>RELIEF** |
| LPL FINANCIAL, LLC,<br>OSAIC WEALTH INC.,<br>ALFRED "JACK" JACKSON,<br>SAGE KENDALL,<br>KRISTINA HERNANDEZ,<br>FAMILY TREE FINANCIAL, LLC,<br>and JACKSON HOLDINGS, LLC, | |
| Defendants. | |

COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, First Technology Federal Credit Union (herein "Plaintiff" or "First Tech"), files this Complaint[1] against Defendants, Alfred "Jack" Jackson ("Mr. Jackson"), Kristina Hernandez ("Ms. Hernandez"), Jackson Holdings, LLC d/b/a/ Riverside Financial Planning ("Riverside"), and LPL Financial, LLC ("LPL") (collectively the "Jackson/LPL Defendants"), and Sage Kendall ("Mr. Kendall"), Family Tree Financial, LLC ("Family Tree"), Osaic Wealth, Inc. ("Osaic") (collectively the "Kendall/Osaic Defendants"), seeking immediate injunctive relief as to all Defendants and permanent injunctive relief and damages as to those Defendants who are not subject to mandatory arbitration.

## I.    PARTIES

1.  Plaintiff, First Tech, is a not-for-profit, member-owned financial cooperative with a principal place of business in San Jose, California. First Tech has offices across the country including an office in Eagle, Idaho located at 47 E. Riverside Drive.

**The Jackson/LPL Defendants**

2.  Defendant, Jack Jackson, is a citizen of Idaho, and lives at 1428 East Braemere Road, Boise, Idaho. Mr. Jackson is currently a registered representative of LPL.

3.  Defendant, Kristina Hernandez, is a citizen of Meridian, Idaho, and lives at 943 East Hawk Street. Ms. Hernandez is currently a registered representative of LPL.

4.  Defendant, Riverside, is an Idaho limited liability company created by Mr. Jackson in June of 2025, with its principal place of business in Eagle, Idaho. It operates under the assumed business name of Riverside Financial Planning.

---

[1] Contemporaneous with the filing of this Complaint, Plaintiff is also filing a Motion for Temporary Restraining Order/Preliminary Injunction and a Motion for Expedited Discovery.

COMPLAINT FOR INJUNCTIVE RELIEF - 1

5.  Defendant, LPL, is a Delaware corporation with its principal place of business located in San Diego, California. LPL has offices throughout the country, including several locations across Idaho. LPL is one of the largest broker-dealers in the country, boasting a headcount of more than 29,000 financial advisors, whose client assets total some $2.26 trillion. LPL is a member of the Financial Industry Regulatory Authority, Inc. ("FINRA") and is registered with the Securities and Exchange Commission ("SEC"). LPL currently holds the securities registrations for both Mr. Jackson and Ms. Hernandez.

**The Kendall/Osaic Defendants**

6.  Defendant, Sage Kendall, is a citizen of New Meadows, Idaho, and resides at 3697 Meadow Drive. Mr. Kendall is currently a registered representative of Osaic.

7.  Family Tree is an Idaho limited liability company with its principal place of business located at 379 East Shore Drive, Suite 110 in Eagle, Idaho. It holds out Chris Eggleston as its "founding partner" and Mr. Kendall as its "newest Partner," making Mr. Eggleston responsible for all of Mr. Kendall's acts. Plaintiff reserves the right to add Mr. Eggleston in the future under this or other theories of direct and/or vicarious liability.

8.  Osaic is a Delaware corporation with its principal place of business located at 30 Union St. in Elizabeth, New Jersey. Osaic has offices throughout the country, including several locations across Idaho. It is also a massive enterprise, with over 11,000 financial advisors and net client assets exceeding $700 billion. Osaic is also a FINRA member and is registered with the SEC. Osaic currently holds the securities registrations for Mr. Kendall and Mr. Eggleston.

## II.    JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, specifically the Defend Trade Secrets Act

("DTSA").

10. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11. This Court has personal jurisdiction over Mr. Jackson, Mr. Kendall and Ms. Hernandez because they are all residents of Idaho. The Court likewise has personal jurisdiction over LPL, Osaic, Family Tree, and Riverside because those entities have sufficient minimum contacts with the District of Idaho due to, among other things, being based there and/or conducting substantial business in Idaho.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events and acts giving rise to the claims occurred in this District.

## III.    ARBITRATION

13. Mr. Kendall, Mr. Jackson and Ms. Hernandez (the "Ex-Employees") each entered into a separate "Financial Advisor Agreement" (herein the "FA Agreement(s)") with First Tech wherein they agreed to arbitrate any dispute in front of a Financial Industry Regulatory Authority ("FINRA") panel.[2] As a member firm of FINRA, LPL and Osaic are also required to arbitrate disputes of this nature in front of FINRA.[3] Moreover, LPL, Osaic, Family Tree and Riverside are also bound to arbitration under theories of agency, alter ego and/or as a third-party beneficiary of one of the agreements at issue.

---

[2] See the FA Agreements, entered between First Tech, Raymond James Financial Services, Inc. – Financial Institutions Division and each of the Ex-Employees attached hereto as **Exhibits 1**, **2** and **3** for Mr. Jackson, Mr. Kendall and Ms. Hernandez, respectively.

[3] FINRA Rule 13200 mandates arbitration "if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." See a copy of FINRA Rule 13200 attached hereto as **Exhibit 4**.

14. First Tech seeks a temporary restraining order and a preliminary injunction from this Court as contemplated by FINRA Rule 13804(a), prior to a hearing on permanent injunctive relief in the FINRA arbitration. As required by this FINRA Rule, First Tech has contemporaneously filed a Statement of Claim with FINRA, which seeks damages, permanent injunctive relief and all other relief allowed by law. In the event that any Defendant(s) is *not subject* to arbitration, First Tech reserves its right to seek any and all remedies in this Court action.

## IV. <u>INTRODUCTION</u>

15. This case is about the Defendants' deliberate misappropriation of trade secrets and their reckless breach of – or interference with – First Tech's contracts. Mr. Jackson, Mr. Kendall and Ms. Hernandez (collectively the "Ex-Employees") were long-time employees with First Tech, working as Financial Advisors exclusively with First Tech's member-customers through a collaboration with the securities firm, Raymond James. After conspiring for months between themselves – and with their soon-to-be new firms – the Ex-Employees resigned on September 9, 2025 – by email and without notice. Mr. Jackson and Ms. Hernandez immediately affiliated with the LPL securities firm and Jackson's own newly formed company, Riverside (collectively the "Jackson/LPL Defendants"), while Mr. Kendall immediately affiliated with the Osaic securities firm and Family Tree (collectively the "Kendall/Osaic Defendants"). The Ex-Employees, however, did not leave cleanly or properly. Instead, they took detailed client lists, along with other highly confidential trade secret information owned or possessed by First Tech. These client lists contained the names and contact information for all 683 of their assigned customers, whose assets held by First Tech totaled more than **$520,000,000**.

16. By the time the markets opened the next day, the Ex-Employees had already done irreparable harm to First Tech by sending solicitations to all 683 of First Tech's clients by email, and

doubling up with a letter to most of these clients as well. This rapid contact, using First Tech's stolen information, has been incredibly successful. Within just a month, the Jackson/LPL Defendants have transferred nearly 60% of the $271 million in assets held by the clients on his stolen customer list (i.e. some $154 million), at the same time the Kendall/Osaic Defendants have transferred some 21% of the $249 million assets for the clients on his stolen list (i.e. some $54 million). In total, First Tech has already lost over **$205,000,000 in assets** and more than **$1,100,000 in recurring annual revenue** because of the Defendants' misconduct. This irreparable harm will continue unless and until the Court enjoins the Defendants from further enjoying the fruits of their thefts.

17. The Defendants have attempted to justify the Ex-Employees' misappropriation of First Tech's customer lists based on the Protocol For Broker Recruiting (the "Broker Protocol"). This supposed justification is a reference to an agreement among a relatively small number of securities firms in which they prospectively waive claims against an ex-employee's use of a client list if the employee complies with certain requirements and leaves to go to work for another firm that is also a Broker Protocol member. First Tech, however, has never seen the benefit of waiving its rights and has never joined this industry club. This fact is publicly available, and moreover, was well known to all the Defendants. Instead, their invocation of the Broker Protocol is merely to provide cover and a plausible excuse to justify their naked misappropriation of trade secret information directly owned, licensed and/or contractually possessed by First Tech.

18. In addition, each of the Ex-Employees have contractually agreed with First Tech not to use the very customer information at issue via a Financial Advisor Agreement that each signed at the start of their employment. Further, Mr. Kendall has yet another agreement to not use/disclose

confidential information and to not solicit or divert away any customer he serviced at First Tech for two (2) years following his termination. (<u>See</u> discussion about the FA Agreements at para.s 33-34, infra; <u>see also</u> discussion about Mr. Kendall's Agreement at para.s 31-32 infra.)

19. First Tech promptly made demand on all the Defendants to cease and desist any further use of the stolen information and Defendants immediately agreed. Defendants also agreed to return all such information, in whatever form, and the Ex-Employees agreed to the forensic imaging of their affected electronic devices so that all traces of the stolen information could be removed. Unfortunately, the Defendants failed to follow through with any of these commitments, and it is now apparent that their true objective was to move over as many assets as possible before they could be stopped. Indeed, since the time of these apparent agreements, the number of clients that have submitted transfer requests has gone from nine (9) on or about September 15, 2025, to over one hundred sixty (160) as of October 9, 2025. The total value of the assets lost to First Tech in these transferring accounts has increased from $18,898,477 as of September 15, 2025 to $205,866,314 as of October 9, 2025.

## V.    <u>FACTS</u>

22. **First Tech.** First Tech is a federally chartered, member-owned credit union with over 700,000 members across the country. (<u>See</u> Declaration of Stephen Poole, para. 4, attached hereto as **Exhibit 5**.) Its customers must be members, and membership has historically centered on employees of technology companies. (<u>Id.</u>) First Tech offers a wide range of financial and banking-related services, including investment brokerage and wealth management advice through its investment division – Addison Avenue Investment Services ("Addison").[4] (<u>Id.</u>, at

---

[4] Addison is simply a division within First Tech – not a separate legal entity. (<u>Id.</u>, at para. 3.) First Tech and Addison are thus collectively referred to herein as "First Tech."

para. 3.) Because First Tech is neither a broker-dealer nor a registered investment advisor itself, it offers these services through the Financial Institutions Division of Raymond James Financial Services, Inc. and Raymond James Financial Services Advisors, Inc., which are FINRA and SEC registered, respectively (these entities are individually and collectively referred to as "RJFS-FID"). (Id., at para. 5.) While First Tech's financial advisors are employees of First Tech, paid exclusively by First Tech, work out of First Tech's banking locations, and restrict their services almost exclusively to First Tech members, the securities registrations of its financial advisors are held by RJFS-FID and all securities sales and investment advice are transacted through RJFS-FID. (Id.) The relationship between First Tech and RJFS-FID is not unusual, and it allows credit unions/banks to offer one-stop shopping to their customers while allowing their members' investments to remain profitably deployed at the credit union. (Id.)

23. **Jack Jackson.** Until September 9th of this year, Mr. Jackson was a First Tech Financial Advisor providing investment services to First Tech's members through RJFS-FID. (See Declaration of Alex Assaf, para. 11 attached hereto as **Exhibit 6**.) While Mr. Jackson has been in the financial services industry since 2005, he has only worked as a Financial Advisor since 2019, all at First Tech. His prior 14 years were split between working in the Raymond James Compliance Department, and working as a Raymond James wholesaler, where he called on financial advisors to market fee-based models. Through this work, Mr. Jackson would have called on hundreds of financial advisors, including one at First Tech as well as other employees. (Id. at para. 5.) Mr. Jackson would thus have become familiar with the fact that many financial advisors – particularly those at banks and credit unions – do not own their client relationships (i.e., their "book of business"), and consequently have no right to take a client list if they leave their firm. (Id.) Mr. Jackson knew that First Tech was such a firm for any

number of reasons, including the fact that the confidentiality of client lists was plainly addressed in First Tech's policy manuals – manuals with which Mr. Jackson affirmed annually he would comply. (See Declaration of Stephen Poole, para.s 16-17, attached hereto as **Exhibit 5**.) Mr. Jackson would have also been familiar with the Broker Protocol, and had no reasonable basis for believing that First Tech was a member or that it excused his theft of First Tech's client list.  (See Declaration of Alex Assaf, para. 5 attached hereto as **Exhibit 6**.) (First Tech's policies and the Broker Protocol will be discussed in more depth, *infra.* at para.s 35-42 and 53-56, respectively)

24. Unlike most financial advisors who enter the job with few, if any, clients, Mr. Jackson's situation was quite the opposite. Instead of going through a long training period – cold calling prospective clients and building a book from scratch – Mr. Jackson's book was largely handed to him. (See Declaration of Alex Assaf, para. 6 attached hereto as **Exhibit 6**.) Indeed, Mr. Jackson was recruited to First Tech to take over a large portion of the accounts then handled by Bert Browen, a long-time advisor who was retiring (the "Browen Accounts").[5] (Id.) These accounts – which now make up the core of Mr. Jackson's book – had assets back in 2019 of over $116 million, and had produced at least $410,000 in revenue during the prior 12 months. (Id.)  The assignment of these accounts to Mr. Jackson thus gave him an enviable book of clients right away. (Id.) Moreover, the prior year's revenue from these accounts – i.e. $410,000 – was seen as artificially low because few of Mr. Browen's clients were in managed accounts,

---

[5] The remainder of the Browen Accounts were assigned to Mr. Kendall and one other advisor in the Boise branch. First Tech agreed to pay Mr. Browen a set sum for his assistance and support in convincing clients to embrace their newly assigned advisors, and the newly assigned advisors – including Mr. Jackson and Mr. Kendall – were to pay a stated sum out of the revenues these clients generated back to First Tech. (Id. at para. 10.)

which typically charge higher fees. (Id.)  Thus, to the extent that Mr. Jackson could persuade clients to switch to managed accounts, he could double or even triple the yearly revenue these accounts generated, thereby turning $410,000 in annual revenue into $1.2 million. (Id.) Over the ensuing six (6) years, most of the Browen Accounts Mr. Jackson received, in fact, were converted into managed accounts. (Id.)

25. First Tech also provided Mr. Jackson with additional deep support that included:

- Payment during his first two (2) years of a guaranteed salary on top of what he earned from commissions and fees, thereby adding tens of thousands of dollars to his income; (Id. at para. 7).

- Providing a continuing flow of referrals from the Bowen Accounts, as well as leads from the Credit Union side of the firm – referrals and leads which collectively resulted in tens of millions in new assets (Id.);[6]

- Providing a dedicated sales assistant plus access to a back-office team that handled routine client issues/requests so that First Tech's Financial Advisors could spend their time more productively (Id.);

- Providing a sizeable annual budget to largely spend how Mr. Jackson saw fit to both entertain his current clients as well as market to new ones (Id.); and

- Providing access to First Tech's trade secrets, including client lists and other confidential information. (See Declaration of Stephen Poole, para.s 11-15 attached as **Exhibit 5**.)

---

[6] Indeed, Mr. Mr. Jackson's book of business generated nearly $17 million in new assets in 2025 alone from existing client additions, existing client referrals and referrals from other business units within First Tech. See Snapshot of Mr. Jackson's new business for 2025 attached as **Exhibit 7**.

26. Given this and other support, instead of following the normal trajectory – in which it takes many years for a rookie financial advisor to build a sizeable book – Mr. Jackson's success was immediate. Indeed, in just five (5) years his income went up approximately fivefold (5 x) to exceed $500,000 annually. (<u>See</u> Declaration of Alex Assaf, at para. 8, attached as **Exhibit 6**.) By the time he resigned, Mr. Jackson had approximately 428 clients, whose accounts had assets totaling nearly $270 million and which generated revenue over the prior 12 months of more than $1.6 million. (<u>Id.</u>)

27. **<u>Kristina Hernandez.</u>** Ms. Hernandez was hired by First Tech as a Client Services Associate (i.e. a sales assistant) in November of 2023. (<u>Id.</u> at para. 9.) While after a year, she was promoted to Associate Financial Advisor in November of 2024, Ms. Hernandez had few, if any, of her own clients. (<u>Id.</u>) Instead, her job at First Tech primarily involved assisting Mr. Jackson with his clients. (<u>Id.</u>) Just like Mr. Jackson, Ms. Hernandez was also provided largely the same tools and resources – including access to First Tech's trade secrets. (<u>Id.</u>)

28. **<u>Sage Kendall.</u>** Like Mr. Jackson, until September 9th of this year, Mr. Kendall was a First Tech Financial Advisor providing investment services to First Tech's members through RJFS-FID. (<u>Id.</u> at para. 10.) Mr. Kendall has been in the financial services industry since 2007 – bouncing between several firms before joining a predecessor to First Tech in 2009. First Tech subsequently merged with that predecessor firm,[7] and Mr. Kendall has been an employee of First Tech since. (<u>Id.</u>)

29. Due to the assistance and support of First Tech, Mr. Kendall, by the time he resigned, enjoyed a large and lucrative practice. Like Mr. Jackson, Mr. Kendall's client base was built with

---

[7] First Tech merged with Addison Avenue Federal Credit Union on or about June 2011, with the new entity retaining the First Tech name post-merger. The investment division of First Tech was thereafter known as Addison Avenue Investment Services, which is now a DBA of First Tech.

referrals he received from the Credit Union side of First Tech, as well as from the existing clients he had only *because* of his association with First Tech. (Id.) Mr. Kendall also enjoyed the other support First Tech provided, such as direct and indirect support staff, his own discretionary budget, and access to First Tech's confidential and trade secret information. (Id.) Also, like Mr. Jackson, Mr. Kendall was assigned a substantial group of clients when Bert Browen retired in 2019 – i.e., some 43 clients with account assets totaling over $48 million, which had produced roughly $144,000 in revenue over the prior 12 months. (Id.) This assignment helped put Mr. Kendall in the upper echelon of advisors at First Tech. By the time he resigned, Mr. Kendall had approximately 250 clients, whose account assets totaled some $249 million, and which generated more than $1.1 million in revenue over the prior 12 months. (Id.)

30. All of this support came with a price: Because First Tech had largely supplied his clients (as well as those of Mr. Jackson), it considered the client relationship to be an asset of the Credit Union, not an asset of Mr. Kendall (or Mr. Jackson). This was apparent to Mr. Kendall in numerous ways, including from his long tenure in the industry, from First Tech's policies that explicitly prohibited the taking of confidential client lists, and the fact that First Tech never joined the Broker Protocol. (See Declaration of Stephen Poole, at para. 8, attached as **Exhibit 5**.)

31. **The Kendall Agreement.** Perhaps the most obvious reason Mr. Kendall knew it was improper to take customer information is the fact that he had contractually promised not to do so. (See the Kendall Agreement, at pp. 2-3, para. 7, attached hereto as **Exhibit 8**.) In this contract – which Mr. Kendall executed on December 10, 2012 – he promised not to "use, communicate, disclose, divulge, release, remove, …misappropriate or commercially exploit," among other

things, information "containing or regarding member, client, or prospective clients records (including but not limited to, contact names, addresses, telephone numbers, email addresses, and/or social security numbers.") (Id.) Thus, Mr. Kendall had no reasonable basis to believe that he was entitled to take a client list that included most of that exact information when he resigned on September 9th.

32. Not only did Mr. Kendall promise to respect the confidentiality of First Tech's non-public customer information, he also promised not to "solicit, divert, or otherwise take away" any business from the clients he serviced for First Tech. (See the Kendall Agreement, at pp. 3-4, para. 10(a), attached hereto as **Exhibit 8**.) Specifically, he made this promise as follows:

> **To protect the Confidential Information and Trade Secret Information regarding AAIS' clients** and prospective clients, **including their identities**, Employee agrees that while Employee is employed by AAIS and for two (2) years thereafter, **Employee will not, directly or indirectly**, as a principal agent, contractor, employee, employer, partner or shareholder (other than as an owner of 2% or less of a public corporation) or in any other capacity, **solicit, divert or otherwise take away from AAIS** (or attempt to solicit, divert or otherwise take away from AAIS) **any business of a current** or prospective **client ….**

(Id.) (**bolding** added.)[8] Mr. Kendall therefore, had made two significant and unambiguous contractual commitments to First Tech – to not steal client information and to not solicit/divert First Tech clients if he were to leave. As explained below, Mr. Kendall blatantly violated both of these commitments – in addition to others – within hours of resigning from First Tech.

33. **The Ex-Employees' FA Agreements.** As part of their employment with First Tech and their securities registration with RJFS-FID, all three Ex-Employees entering into a Financial Advisor Agreement (herein the "Jackson FA Agreement", the "Kendall FA Agreement" and

---

[8] First Tech is not currently seeking to enforce Mr. Kendall's Agreement beyond the First Tech clients that he serviced.

COMPLAINT FOR INJUNCTIVE RELIEF - 12

the "Hernandez FA Agreement" and collectively the "FA Agreements")[9] – which was a three-party contract between the employee, First Tech and RFJS-FID. While each FA Agreement was entered into at a different time,[10] the substance and relevant provisions are largely the same including a nearly identical restriction prohibiting the theft of First Tech's customer information as follows:

> **Financial Advisor agrees not to disclose**, either directly or indirectly, **to any person** (e.g., individual, firm or business) **any information obtained** from clients of RJFS or **customers of Institution**…

See Mr. Kendall's FA Agreement at para. 20 attached as **Exhibit 2**.[11] Thus given the similar language in the agreements of Mr. Jackson and Ms. Hernandez, there is no doubt that the Ex-Employees agreed and understood that they could not disclose the non-public information about First Tech's clients.

34. As also noted throughout the FA Agreements, the Ex-Employees also agreed to protect and not to disclose the information that clients provided to RJFS-FID. Given the interwoven nature of First Tech's credit union business with the investment-related business of RJFS-FID, the two entities operate under an information-sharing regime where they have agreed **not to disclose** each other's confidential information (e.g. non-public customer information) to unaffiliated third parties (e.g. competitors like LPL or Osaic), as follows:

> (b) **Each party agrees not to disclose to any unaffiliated third party any non-public personal information, including customer**

---

[9] Jackson FA Agreement is attached hereto as **Exhibit 1**. The Kendall FA Agreement is attached hereto as **Exhibit 2**. The Hernandez FA Agreement is attached hereto as **Exhibit 3**.

[10] The Kendall FA Agreement was entered in January of 2012, the Jackson FA Agreement was entered in January of 2019 and the Hernandez FA Agreement was entered in August of 2024.

[11] While the Kendall FA Agreement predates both the Jackson and Hernandez FA Agreements by some years, this restriction is identical in all three. Compare **Exhibits 1**, **2** and **3** at para. 20.

COMPLAINT FOR INJUNCTIVE RELIEF - 13

> **financial information**, that it receives under this Agreement regarding **any customer of the other party** unless required to do so by a valid order of a court, other governmental body, or SRO (as defined below). **The parties further agree not to use such information for any purpose other than as provided in this Agreement** and to establish procedures to protect the security and confidentiality of such information.

See the "Non-Deposit Investment Product and Brokerage Service Networking Agreement" (the "NDIP Agreement") entered into by First Tech and RJFS-FID at para. 9(b), attached as **Exhibit 9**. (**bolding** added.)[12] Thus, any non-public customer-related information shared between First Tech and RJFS-FID is licensed/possessed between them and equally protected from disclosure to third parties by the NDIP Agreement.

35. **The Broker Protocol – Generally.** For years large brokerage firms sued each other over the recruitment of experienced brokers, suing to enforce both restrictive covenants – and when customer lists were taken – suing for the clear misappropriation of the firm's trade secrets. In the early 2000s, three of the country's largest brokerage firms (i.e., Merrill Lynch, Smith Barney and UBS) entered into a voluntary agreement – dubbed the "Protocol for Broker Recruiting" (herein referred to as the "Broker Protocol") – in which they prospectively agreed, as among themselves, to waive their rights to sue the hiring firm (and their ex-broker) under certain specified conditions. (A copy of the Broker Protocol is attached hereto as **Exhibit 10**).

36. **Pre-Conditions Before the Broker Protocol Can Apply**. Among these pre-conditions, first and foremost is the requirement that *both firms* be *signatories* to the Broker Protocol, itself. (See Broker Protocol at p. 1 attached as **Exhibit 10**) ("When RRs move from one firm to another and **both firms are signatories to this protocol**…") (**bolded** added.)  Because the

---

[12] This information-sharing regime has been in place since at least 2011 – before any of the Ex-Employees worked for First Tech.

Broker Protocol functions as a waiver of claims, it recognizes that a firm cannot be stripped of its statutory and contractual rights unless it has so agreed. See e.g. Bank of Am., N.A. v. Immel, 2010 WL 2380877, at *2 (N.D. Cal. June 11, 2010). ("[T]he Protocol applies, by its express terms, only to 'firms [that] are signatories'").  In addition to the participating firm's explicit agreement, waiver of the losing firm's rights under the Broker Protocol is also conditioned on the departing broker taking only a very limited amount of customer information. The Broker Protocol describes this information as follows:

> When RRs move from one firm to another and both firms are signatories to this protocol, they may take **only** the following account information**: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information")** and are prohibited from taking **any other documents or information**.

Broker Protocol, at p. 1, **Exhibit 10**. (emphasis added). Implicit in this list of "Client Information" is the recognition of its intrinsic value – i.e., that it is the information which is *the most necessary* to quickly and successfully transfer clients. Additionally, the Broker Protocol limits who the departed broker can share Client Information with at the new firm, stating as follows:

> To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client information to the solicitation by the RR of his or her former clients and **will not permit the use of the Client Information by any other RR or for any other purpose**.

Id. (emphasis added).

37. **Only a small percentage of firms have joined the Broker Protocol**. While the Broker Protocol originally started with just three firms, joinder was opened up to any financial firm, and today roughly 2,500 firms are members. This, however, still represents only a small

fraction (i.e., less than 10%) of the over 35,000 broker-dealers which are registered with FINRA or the advisory firms which are registered by either the SEC or the states.[13]

38. **First Tech is Not A Member of the Broker Protocol.** Critical to this case is the fact that the Broker Protocol is only applicable to the firms that have taken affirmative steps to join it – which requires the execution and submission of a written joinder agreement (the "Protocol Joinder Agreement"). (See screenshot of the Protocol website attached as **Exhibit 11**) ("A firm interested in joining the Broker Protocol must complete and sign the Joinder Agreement…") Historically, many of the largest securities firms have been members, and joinder arguably makes sense only if the firm expects to hire experienced brokers from competitors who are also Broker Protocol members. (See Declaration of Stephen Poole, attached as **Exhibit 5**.) First Tech, however, is not a large firm – it only has about 40 financial advisors total. (Id. at para. 8.) It also traditionally *does not* hire experienced brokers away from competing firms. (Id.) Not surprisingly, First Tech has not seen value in joining the Broker Protocol, and thus it has never chosen to do so. (Id.) This choice is no secret. Rather, it is well understood among advisors at First Tech that it is not a Broker Protocol member and, consequently, that its employees are not allowed to steal customer lists. (Id.) Moreover, the current membership in the Broker Protocol is public knowledge, and any question as to First Tech's participation could be answered with a few clicks to the Broker Protocol website.[14] Defendants thus had no

---

[13] See Excerpt of the 2025 FINRA industry Snapshot attached as **Exhibit 12**.

[14] A complete list of firms that *are currently* signatories/members of the Protocol is publicly available at the website of J. S. Held, the firm that maintains the registry of Broker Protocol members, at the following website: https://jsheld-prod.imgix.net/Copy_of_Broker_Protocol.pdf. Indeed, because any member can withdraw at will with 10 days' notice, an employee who planned to rely on it would have to check this site before resigning.

basis to believe that First Tech was bound by the Broker Protocol – yet they knowingly took

and used First Tech's client lists anyway.[15]

39. **Raymond James' Joinder of the Broker Protocol Cannot Operate to Waive First Tech's**

**Rights.** While the Ex-Employees were *employees* of First Tech, they were simultaneously

*registered* with RJFS-FID, which has joined the Broker Protocol. This fact, however, does not

impact First Tech's rights to enforce its contractual or statutory rights to prohibit employee

theft of its customer lists. While RJFS-FID may be able to waive its own rights, it lacks the

authority to waive the rights of others, such as First Tech. Indeed, RJFS-FID's Joinder

Clarification Letter t is *conditioned* to make that very point, noting that its bank/credit union

clients are independent entities that are free to protect their customer base. Indeed, RJFS-FID's

September 13, 2017 Joinder Clarification Letter thus states as follows:

> **This letter hereby clarifies the inclusion of FID within the Protocol**. FID provides professional support for established financial institutions, such as banks and credit unions and their affiliated registered representatives. These registered representatives are **not employees of the FID, but are employees** or independent contractors **of the banks, credit unions or other financial institutions with which they are affiliated. These registered representatives may be bound by separate, restrictive covenants with their respective financial institutions. FID's participation in the Protocol is not intended to and does not bind or prohibit these separate, unaffiliated, non-signatory institutions from enforcing their restrictive covenants with these registered representatives**, and FID will cooperate in such enforcement as **requested and/or as required in accordance with RJFS/FID's agreements with the non-signatory financial institutions.**

RJFS-FID's Joinder Clarification Letter, at **Exhibit 13**. RJFS-FID thus acknowledges: a) that

the financial advisors that are registered with it may have legal obligations to their actual

---

[15] To argue otherwise – which First Tech expects from the Defendants – would mean that First Tech is being held to a contract that it has never signed.

employers; and b) that RJFS-FID's joinder of the Protocol does not affect these obligations. Even further RJFS-FID states that it will co-operate with its financial institution-clients (such as First Tech) in enforcing these obligations both as "requested" "and/or as required" by its agreements with those financial institution clients. (Id.) That latter language is significant because the underlying agreement between First Tech and RJFS-FID that governs their collaboration *prohibits the disclosure to third parties* of "any non-public personal [customer] information, including customer financial information, that [a party] receives under this Agreement regarding any customer of the other party…." See the "Non-Deposit Investment Product and Brokerage Service Networking Agreement" (herein the "NDIP Agreement") entered by First Tech and RJFS-FID and attached as **Exhibit 9** at Section 9(b).  RJFS-FID's joinder in the Broker Protocol thus does not affect First Tech's ability to enforce its contractual or statutory rights against its ex-employees.

40. **Both LPL and Osaic Are Members of the Broker Protocol and Likewise Had No Reasonable Basis to Believe the Ex-Employees Could Take a Client List.** Both Defendants LPL and Osaic are members of the Broker Protocol. (See Excerpt of the Broker Protocol member database attached as **Exhibit 14**.) They are also both enormous firms that collectively hired thousands of financial advisors over the past several years by offering them large payments to entice them to join. Indeed, LPL – the firm that Mr. Jackson and Ms. Hernandez have now joined – booked some **$2.81 billion** for recruiting "loans" in just 2024.[16] Osaic,

---

[16] See Miriam Rozen, "Recruiting Loan Balances Soar at LPL, Tick Up at Ameriprise, Fall at Stifel," AdvisorHub (February 28, 2025), https://www.advisorhub.com/recruiting-loan-balances-soar-at-lpl-tick-up-at-ameriprise-fall-at-stifel/, attached at **Exhibit 15**.

COMPLAINT FOR INJUNCTIVE RELIEF - 18

likewise entices financial advisors with large upfront bonuses and other payments.[17] Upon information and belief, the "loans" and other recruiting enticements offered to Mr. Jackson and Mr. Kendall *each* total in the hundreds of thousands of dollars, if not more.

41. Over the last several years, LPL and Osaic have recruited and transitioned *thousands* of financial advisors. In each of those recruitments, each firm has had to answer one critical question: Is the potential hire employed by a firm that is a member of the Broker Protocol? Given their intimate familiarity with the Protocol – coupled with the public nature of who is a Protocol member – it is unquestionable that both LPL and Osaic knew that First Tech was not a Broker Protocol member – yet each knowingly allowed their new hires to take and use a complete customer list anyway. LPL and Osaic did this in order to ensure that each of their respective new hires – who they were paying handsomely to recruit – was successful in taking as many First Tech clients as possible, even though it was being done by improper means. LPL and Osaic are each vicariously liable for the acts of their new agents, as well as directly liable for their own respective misappropriations, including having teams of transition associates available to help in the rapid transfer of accounts.

42. **Mr. Jackson and Mr. Kendall ask First Tech to give them their book of business for free.** In 2024, First Tech launched a new pilot program with a handful of advisors for an "independent sales channel" called Addison Independent. (See Declaration of Scott Hamaguchi, para. 5 attached as **Exhibit 17**.) Through this new independent channel program,

---

[17] Osaic appears to offer an upfront bonus based on a percentage of the advisor's assets under management ("AUM"), with Osaic reportedly paying anywhere from 1.15% to 1.5% (i.e., "115 basis points") of the total AUM. (See Diana Britton, "Large IBDs Sweeten Their Recruiting Deals for Commonwealth FAs," WealthManagement.com (April 10, 2025) https://www.wealthmanagement.com/ibd-news/large-ibds-sweeten-their-recruiting-deals-for-commonwealth-fas , attached as **Exhibit 16**.)

COMPLAINT FOR INJUNCTIVE RELIEF - 19

these advisors went from being standard W-2 employees of First Tech to independent contractors. (<u>Id.</u>) In return, the advisors received a greater percentage of the revenue they generated, but had to pay for expenses that First Tech traditionally paid (office rent, administrative staff, etc.) out of their own pockets. (<u>Id.</u>) As a sweetener, the advisors in this new program were simply given their book of business, and thus could take their clients' names and contact information with them if they were ever to leave First Tech. (<u>Id.</u>)

43. In January of this year, Mr. Jackson and Mr. Kendall jointly approached First Tech as a potential "team" and asked if they could join this new pilot program. (<u>Id.</u> at para. 6.) First Tech denied this request because, among other things, the program was merely a pilot, and they did not otherwise qualify.  (<u>Id.</u>) Later, they demanded that First Tech at least commit in writing that they would be allowed to join later. (<u>Id.</u>) Given that the future status of the program was unknown and with a management change on the horizon, First Tech denied that request as well. (<u>Id.</u>) Angry that they could not get their books of business for free, Mr. Jackson and Mr. Kendall set about how they could simply steal their assigned clients instead.

44. **<u>Pursuant to a coordinated plan, Mr. Jackson, Mr. Kendall and Ms. Hernandez resign without notice while stealing customer lists.</u>** Early on the morning of September 9, 2025, the Ex-Employees each resigned without notice, providing only an email/letter to their respective managers at First Tech. (<u>See</u> Declaration of Stephen Poole, at para. 10 attached hereto as **Exhibit 5**).  Although Mr. Jackson and Mr. Kendall were going to different firms, the language of their resignation letters was largely identical, and unquestionably drafted with the assistance of the same law firm. (Copies of their respective emailed resignation email and letter are attached hereto as **Exhibit 18** for Mr. Jackson and **Exhibit 19** for Mr. Kendall.) Embracing the expediency that asking for forgiveness is easier than for permission, their respective

resignation emails – using identical language – nonchalantly referenced the location in their now-former offices of: "My list of clients pursuant to the Protocol for Broker Recruiting." (Id.) Since the Broker Protocol requires the departing broker to leave such a list for the old firm,[18] this invocation of the Protocol was done simply to provide an excuse for why client lists were being stolen – even though in reality they each knew that First Tech was not a member and that taking a list was improper.

45. A review of the client lists found in the respective offices of Mr. Jackson's and Mr. Kendall's (herein individually or collectively the "Stolen List(s)") showed that they contained the most important information a financial advisor would need to quickly contact and solicit his assigned clients:  the name, phone numbers, physical address, and email address for each of their respective assigned clients. Mr. Jackson's Stolen List spanned 17 pages and included the contact information for **428 First Tech clients**,[19] while Mr. Kendall's Stolen List spanned 7 pages and included the contact information for **250 First Tech clients**.[20] The Ex-Employees created the Stolen Lists by accessing and utilizing First Tech's password-protected computers. (See Declaration of Stephen Poole, para. 13 attached hereto as **Exhibit 5**.) Both of the Stolen Lists contain non-public customer information regarding First Tech's members/customers – information which is owned/possessed by First Tech and/or licensed to First Tech by RJFS-

---

[18] The Broker Protocol states: "[r]esignations will be in writing delivered to local branch management and shall include a copy of the Client Information [the client list] that the RR is taking with him or her." (See Broker Protocol, **Exhibit 10** at p. 1.)

[19] Given its trade secret nature, a heavily redacted copy of Mr. Jackson's Stolen List is attached hereto as **Exhibit 20**. First Tech will submit an unredacted copy to the Court in support of its Motion for TRO under seal.

[20] Given its trade secret nature, a heavily redacted copy of Mr. Kendall's Stolen List is attached hereto as **Exhibit 21**. First Tech will submit an unredacted copy to the Court in support of its Motion for TRO under seal.

FID, which is possessed by First Tech, and which constitute enforceable trade secrets of First Tech under both federal and Idaho law.[21] (Id. at para.s 11-12.) First Tech derives significant economic value from both knowing and having readily available, individually and collectively, the names, phone numbers, and email addresses of its clients – information which is not public, individually or as a compilation. (Id.) In addition, the Stolen Lists – which are simply exported using First Tech's computers – are subject of reasonable efforts to maintain its secrecy as described more fully below. (Id. at para.s 13-20.)

46. For the reasons set forth above, Mr. Jackson, Mr. Kendall and Ms. Hernandez all knew they had no right – pursuant to the Broker Protocol or otherwise – to take or use the Stolen Lists. Indeed, despite all the contrary indications that such conduct would be improper, they displayed no confusion on the issue, and prior to the morning of their coordinated resignation, never sought clarity from First Tech as to the Broker Protocol's applicability or if the taking of a list of assigned clients was somehow acceptable. (See Declaration of Stephen Poole, para. 8 attached hereto as **Exhibit 5**.) Mr. Jackson and Mr. Kendall each willfully and maliciously took his respective Stolen List in order to benefit himself as well as his new employers. This

---

[21] Courts in Idaho and around the country have held that a customer list is a trade secret. See Rapid Hot Flow, LLC v. Rocky Mountain Oilfield Servs., LLC, 2011 WL 902137, at *4 (D. Idaho Mar. 15, 2011) ("Customer lists are a type of information that can be protected as a trade secret." (internal citations omitted); Wesco Autobody Supply, Inc. v. Ernest, 149 Idaho 881, 898 (2010) (noting customer lists and related customer-specific data may constitute trade secrets under ITSA); see also Northwest Bec-Corp v. Home Living Serv., 136 Idaho 835, 839, 41 P.3d 263, 267 (2002) (explaining that it was undisputed the customer list was a trade secret); Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1332-1333 (9th Cir. 1980) (observing that customer lists may be trade secrets even when the general class of customers is obvious and accessible); MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993) (stating that misappropriation of a trade secret occurs when information from a customer database is used to solicit customers); Heyman v. AR. Winarick, Inc., 325 F.2d 584, 590 (2d Cir. 1963) (holding that customer lists are trade secrets when disclosed in the course of a confidential relationship).

intentional misappropriation was done with the aid, assistance, and in conspiracy with Ms. Hernandez, as well as their respective new firms – LPL/Riverside, and Osaic/Family Tree.

47. **Within Hours of the Ex-Employees' Resignations, All the Defendants Used the Stolen Information to Solicit Hundreds of First Tech's Clients.** The Ex-Employees began working for their new firms – LPL/Riverside and Osaic/Family Tree, respectively – on the very day they resigned and wasted no time in capitalizing on the Stolen Lists.[22] Indeed, within a day, Mr. Jackson and Mr. Kendall each sent a mass solicitation email out from their new work email addresses to their former First Tech clients. (A copy of Mr. Jackson's mass September 9th e-mail, the "Jackson Mass Email," is attached hereto as **Exhibit 22** and a copy of Mr. Kendall's mass September 10th email, the "Kendall Mass Email," is attached hereto as **Exhibit 23**.) The text of these Mass Emails also shows tell-tale signs of joint coordination.[23]

A. **Mr. Jackson's Immediate Misuse of First Tech's Trade Secrets.** Mr. Jackson sent the Jackson Mass Email to every client contained on his Stolen List – i.e., some 428 clients in total – a fact since confirmed by his attorney.[24]  In his Mass Email, Mr. Jackson told First Tech's clients of the deliberate and calculated nature of his move, stating that it was the product of "considerable thought, planning, and months of due diligence." This statement

---

[22] LPL (for Mr. Jackson and Ms. Hernandez) and Osaic (for Mr. Kendall) serve in a variety of regulatory and supervisory capacities for the Ex-Employees and in return for same get a cut of every dollar of First Tech business that is transferred to their respective firms.

[23] While the verbiage is not as exact as their resignation emails, it is clear that Mr. Kendall and Mr. Jackson had coordinated on what they would say to clients beforehand. (Compare **Exhibits 22** and **23**.) For example, both Mr. Kendall and Mr. Jackson start these mass communications off with their references to "exciting news", how they made this decision after "months of due diligence", while also starting the second paragraph off with what "industry regulations" require of them. (Id.)

[24] See the September 15th Letter from Ryan Mitso, Counsel for Mr. Jackson, attached as **Exhibit 24**) ("Jack, Kristina, and/or Riverside sent email communications, of which you are already aware, and physical letters to the clients listed in his Protocol List.")

alone demonstrates that Mr. Jackson's supposed belief in the applicability of the Broker Protocol was entirely feigned since *any due diligence* would have revealed that First Tech was not a member. The long-running nature of his plans was also starkly reflected by one of the attachments to his email – the Form ADV "Brochure Supplement" that is regulatorily required to be sent to new customers. This apparently printed document – which is supposed to provide potential clients with detailed information about Mr. Jackson's role at LPL – affirmatively states that "Your financial advisor provides brokerage services as a registered representative of LPL Financial…" (See ADV Brochure Supplement included with the Jackson Mass Email attached as **Exhibit 22**.) This ADV Brochure Supplement, however, is dated August 19, 2025 – three (3) weeks before he actually resigned from First Tech. Mr. Jackson's loyalties had thus clearly switched long before his quit. And Mr. Jackson's Mass Email was not merely an announcement, but a full-throated solicitation, complete with LPL marketing materials,[25] and the promise that he had a team from LPL standing by to help:

> Rest assured, I truly value our relationship and look forward to answering all of your questions at your convenience. Additionally, **LPL has provided me with a team of transition associates to help bring your accounts to the new firm.**

Id. (**bolding** added.) And for good measure – again, using his Stolen List – Mr. Jackson followed up his Mass Email with a similar letter that he actually *mailed* to more clients. (See Mr. Jackson's Mass Letter attached as **Exhibit 25**.) This, upon information and belief,

---

[25] The LPL Marketing material attached to Mr. Jackson's Mass Email promoted LPL's "Unparalleled Support For [the client's] Financial Future," described LPL's enormous size – $1.8 trillion dollars in AUM and employing 29,000 advisors, and highlighting the "tools, technology and support" it can offer. (See Mr. Jackson Mass Email attached as **Exhibit 22**.)

was intended to ensure that none of his former First Tech clients were overlooked and to provide all of them with a second reminder that he would be calling them personally to move.

B. **Mr. Kendall's Immediate Misuse of First Tech's Trade Secrets to Solicit First Tech Clients.** Mr. Kendall – despite explicitly agreeing with First Tech not to "solicit, divert or otherwise take away" his former clients[26] – followed the same script as Mr. Jackson. Using his Stolen List, he too sent a copy of his Mass Email to solicit every one of his First Tech clients – some 250 clients in total – and then, for good measure, followed up with a physical letter mailed to at least some of his former clients.[27] (See Mr. Kendall's Mass Email dated September 10, 2025 attached hereto as **Exhibit 23**.) These facts have likewise been acknowledged by his attorney, who, significantly, is at the same law firm *as Mr. Jackson's attorney*.[28] Mr. Kendall – as had Mr. Jackson – accomplished most, if not all, of this prodigious work *within a day of his resignation* – ensuring that First Tech would have no chance to prevent his illegal acts. In his Mass Email, Mr. Kendall likewise tells his former First Tech clients of the considerable "thought, careful planning, and months of due diligence" that preceded his move – painstaking work that supposedly failed to reveal that

---

[26] See para.s 31-32, supra.

[27] LPL and Osaic unquestionably knew and approved of these mass communications by Mr. Jackson and Mr. Kendall because each has a regulatory obligation to approve such correspondence. See FINRA Rule 2210(a)-(b) (which requires any communication going to 25 or more clients to be approved by an "appropriate qualified registered principal" of LPL/Osaic.)

[28] See October 2, 2025 Letter from Theodore Harman, Counsel for Mr. Kendall and in the same law firm as Ryan Mitsos, who represents Mr. Jackson, attached as **Exhibit 26**). ("Attached is the template email with attachments which was sent by Mr. Kendall to the clients on the protocol list. In certain instances, we understand that the letter attached to the email was mailed to clients. The text of [the] letter is identical to the text of the email.")

First Tech's was not a member of the Broker Protocol. (<u>See</u> Mr. Kendall's Mass Email attached hereto as **Exhibit 23**.)

C. **<u>Mr. Kendall's Improper Solicitation also violated his Non-Solicitation Agreement.</u>**

Mr. Kendall's Mass Email was also a *clear solicitation* that violated the non-solicitation provisions of his Agreement with First Tech. (<u>See</u> the Kendall Agreement attached as **Exhibit 8**.) Indeed, Mr. Kendall stated in his Mass Email that it was his "priority" is to ensure a "seamless" transition to Family Tree and that his "team" would help with the transition paperwork. (<u>See</u> Mr. Kendall's Mass Email attached hereto as **Exhibit 23**.) It, too, included promotional material extolling the virtues and capabilities of both Family Tree (his immediate employer) and Osaic (the combined broker-dealer/registered investment advisory firm through which he would now be providing securities and investment advice).[29] This Mass Email was sent out with the advance approval of both Osaic and Family Tree – further demonstrating the conspiracy between Mr. Kendall and his new firms to misappropriate First Tech's trade secrets, as well as to interfere with its contracts – including both the contract between First Tech and Mr. Kendall (prohibiting, inter alia, his solicitation of customers), and the contracts/expectations of future business between First Tech and its clients. The Kendall Defendants' solicitation, upon information and belief, did not stop with Mr. Kendall's Mass Email. Rather, the solicitation continued and included multiple other outreaches by personal visit, call, text, and/or follow-up email, all of which will be revealed in discovery. The theft of the Stolen List coupled with these solicitations have been very impactful, and Mr. Kendall has successfully moved numerous clients to Osaic/Family Tree. Indeed, as of October 9, 2025, at least 32 of the First Tech

---

[29] <u>See</u> the attachments to Kendall's Mass Email attached hereto as **Exhibit 23**.

clients have moved accounts containing more than **$51,000,000** in assets and representing over $281,000 in annual revenue. (See First Tech's "ACAT Transfer List as of October 9, 2025" which reflects the clients that have moved attached as **Exhibit 27**.)[30]  Every single one of these account transfers was the product of Mr. Kendall's improper theft of First Tech's trade secret client information and his illegal solicitation of First Tech's clients for the benefit of himself and his new firms.

48. Mr. Jackson was likewise only able to solicit his former Fist Tech clients with such lightning speed because of his and Ms. Hernandez's theft – and the Jackson/LPL Defendants' immediate use – of First Tech's trade secrets. And this speed has already paid them rich dividends – even more so than Mr. Kendall. As of October 9, 2025, $154 million of the $271 million (almost 60%) of Mr. Jackson's assets at First Tech have transferred out – representing nearly $880,000 in annual recurring revenue lost. (See "ACAT Transfer List as of October 9, 2025" attached as **Exhibit 27**.) Every single one of these transfers was the product of Mr. Jackson's improper and illegal use of First Tech's client information to benefit himself and his new firms. Remarkably, all these transfers happened in just one month, something that is unusual. (See Declaration of Stephen Poole at para. 24 attached as **Exhibit 5**). So too is the fact that transfer requests (known as "ACAT" requests – named after the industry form used to initiate a transfer) began to be received *just two days after* Mr. Jackson resigned, when typically there would be a lag of a week or longer before any quantity of ACAT requests is received. Here, however, First Tech received transfer requests from over a dozen of Mr. Jackson's customers within just a week. (Id.) These facts all point to further cheating by the Jackson/LPL Defendants moving client accounts that will be uncovered in discovery.

---

[30] Given the information contained, this exhibit is being submitted with redacted.

49. **The Ex-Employees' departure was part of a coordinated effort to steal First Tech's trade secrets in the months leading up to their resignation.** In addition to their Stolen Lists, counsel's preliminary investigation has revealed the theft of other confidential and/or trade secret information, along with further highly suspicious activity that points to possible additional thefts. This includes the following:

A. **Suspicious Document Printing the Evening Before Quitting.** First Tech's security records show that Mr. Jackson, Mr. Kendall, and Ms. Hernandez were all in the First Tech Boise office after business hours on September 8 – the evening before their resignation. Video footage even shows Mr. Kendall and Mr. Jackson near the copy machine and walking away with stacks of documents. (See Screenshots of video of Mr. Jackson and Mr. Kendall at First Tech Boise office on September 8, 2025, the evening before their resignation, attached as **Exhibit 28**; see also Declaration of Scott Hamguchi, attached as **Exhibit 17**.) There could be no legitimate business purpose – at least for the benefit of First Tech – for these employees to access and copy documents on the very eve of their departure – particularly when Mr. Jackson was also listed as an LPL Financial Advisor in its Form ADV dated three weeks before. See para. 47A, supra,

B. **Mr. Jackson's Suspicious Access to Client Information.** First Tech has also uncovered unusual login activity via Mr. Jackson's First Tech-issued laptop. While Mr. Jackson did not log into "Practice Center" portal[31] at all for the first four months of the year, he logged

---

[31] The Practice Center portal contains detailed analytics and customer financial information about First Tech's joint clients with RJFS-FID, including specific information about clients' securities holdings, as well as a wealth of information about Mr. Jackson's First Tech book of business generally. (See Declaration of Matt Mehltretter attached hereto as **Exhibit 29**).

COMPLAINT FOR INJUNCTIVE RELIEF - 28

into it over 60 times thereafter. This sustained spike, which ends only with his resignation, is reflected in the following chart:

| Month | Mr. Jackson's unique logins to Practice Center |
|---|---|
| January 2025 | 0 |
| February 2025 | 0 |
| March 2025 | 0 |
| April 2025 | 0 |
| May 2025 | 3 |
| June 2025 | 19 |
| July 2025 | 18 |
| August 2025 | 18 |
| September 2025[32] | 6 |

(See Declaration of Matt Mehltretter, para. 7 attached hereto as **Exhibit 29**.) Significantly, this login activity perfectly corresponds to the time frame when Mr. Jackson and Mr. Kendall, having unsuccessfully demanded to be given their respective books of business, instead apparently resolved to steal them. The timing also aligns with the date that Mr. Jackson's new operating company – Defendant Jackson Holdings LLC – was incorporated and its DBA "Riverside Financial Planning" was reserved, i.e., June 12, 2025, which would have been totally unnecessary if Mr. Jackson was not planning to leave First Tech. Finally, on September 8, 2025, the day before Mr. Jackson abruptly resigned, his login activity included a "Contacts" search that displayed the below information for all of his assigned clients:

- Birthdate Anniversary Date
- Last Name
- First Name
- Preferred Name
- Age

---

[32] Mr. Jackson was only employed for eight days in September so these six logins are essentially daily.

- Birthday Date
- Contact Type (Client/Interested Party)
- Contact Status (Active/Closed)
- Lead FA (Primary Advisor #)
- Address
- Address Type
- Email Address
- Relationship Name
- Telephone Number
- Telephone

<u>See</u> Declaration of Matt Mehltretter at para. 7, attached as **Exhibit 29**. These sudden and sustained logins are also consistent with the "months of due diligence" Mr. Jackson acknowledged pursuing in the lead-up to his surprise resignation. (<u>See</u> Mr. Jackson's Mass Email attached as **Exhibit 22**.) Only discovery – including a thorough forensic investigation of Mr. Jackson's computer and electronic devices – will reveal what suddenly drew Mr. Jackson to these and other sources of customer/ confidential information as he prepared to leave.

C. **<u>Mr. Kendall's theft of an additional customer list – the "Kendall Spousal List</u>**." While Mr. Jackson and Mr. Kendall have acknowledged taking a *printed* Broker Protocol customer list in conjunction with their resignations, the proof will show that Mr. Kendall also stole a different – and even more detailed customer list containing, among other things, spousal names. Unknown to First Tech until counsel for Mr. Kendall acknowledged it, Mr. Kendall stole this additional list via a USB thumb drive from his First Tech computer at some unknown time prior to his resignation (hereinafter the "Kendall Spousal List"). (<u>See</u> September 23, 2025 Email from Theodore Harman, Counsel for Mr. Kendall, attached hereto as **Exhibit 30**.) The Kendall Spousal List contains the names, cell phone numbers, and email addresses associated with both client spouses for the **250 households** that Mr.

Kendall serviced at First Tech.[33] While this is clearly valuable information for the departed advisor, it is beyond the information allowed by the Broker Protocol. (<u>See</u> para. 36, supra.) Its theft thus further puts the lie to the claim that the Ex-Employees wanted only to adhere to the Protocol for their move – particularly when the Spousal List was pilfered by use of an illicit USB drive. (<u>See</u> September 23, 2025 Email from Theodore Harman, Counsel for Mr. Kendall, attached hereto as **Exhibit 30**.)

D.  **<u>Mr. Kendall's theft of yet more confidential customer information – the "Kendall Client Holdings List."</u>**  On August 5, 2025 – over a month before he resigned – Mr. Kendall sent a spreadsheet from his First Tech-issued email (sage_kendall@addisonavenue.com) to his personal email (sagekendall@gmail.com). (<u>See</u> Mr. Kendall's August 5, 2025 email with a redacted copy of the referenced spreadsheet attached as **Exhibit 32**.) This spreadsheet (herein the "Kendall Client Holdings List") contained detailed, non-public customer information about the securities in the accounts of Mr. Kendall's assigned clients, including the securities holdings across all accounts, the product type (e.g., stock, bond, mutual fund), the number of clients that held that security, the number of shares held by each client, and the total amount these clients had invested in each such security. (<u>Id.</u>) The Kendall Client Holdings List totals 878 lines of data for Mr. Kendall's former First Tech clients. (<u>Id.</u>) This list clearly qualifies as a trade secret and unquestionably would have value in helping Mr. Kendall to recruit his former clients to join him at Osaic/Family Tree.

---

[33] Given its trade secret nature, a heavily redacted version of Mr. Kendall's stolen Spousal List is attached hereto as **Exhibit 31**. First Tech will submit an unredacted copy to the Court in support of its Motion for TRO under seal.

COMPLAINT FOR INJUNCTIVE RELIEF - 31

50. Mr. Kendall has said nothing about the Client Holdings List despite First Tech's repeated demands through Counsel that Mr. Kendall, and his co-conspirators, acknowledge the full extent of their misappropriations. While the Ex-Employees originally agreed to do so, this cooperation evaporated when it came time to actually perform. Indeed, their refusal to answer this simple question as to whether there was other undisclosed pilfered information led to the breakdown of the discussions between the parties, since all the while, more and more customers were being diverted by the Defendants. (See October 6, 2025 Email from First Tech's Counsel to Defendants' Counsel attached as **Exhibit 33**.)

51. Viewed collectively, these acts demonstrate an intentional plan by the Ex-Employees, aided and abetted by their firms, to steal First Tech's information in order to improperly compete for its clients. In addition, Defendants refusal to admit to the full extent of their theft – as demonstrated by their failure to acknowledge the theft of the Client Holdings List – highlights the need for a thorough forensic review in order:  a) to determine what other confidential and/or trade secret information was taken or retained by Defendants, b) to determine how all such information was used by the Defendants, and c) to be able to thoroughly purge all such information from where ever it may now be housed in Defendants' systems and devices.

52. LPL/Riverside and Osaic/Family Tree are liable for these acts both directly based, upon information and belief, their direct involvement and/or direction to misappropriate or, alternatively, upon the basis of vicarious liability for the acts of their employees and/or agents.

53. **First Tech took reasonable and appropriate measures to protect its trade secrets.** First Tech invests substantial time, money, and resources to develop – and protect – its confidential, proprietary, and trade secret information, including the customer name and contact information contained in the above-referenced lists. (See Declaration of Stephen Poole at para.s 16-24

attached hereto as **Exhibit 5**.) First Tech also takes reasonable and appropriate measures to maintain the secrecy of this information including: (i) the use of a password to access First Tech's computers, (ii) encryption requirements for transmitting sensitive information, and (iii) FOB/keycard access to the physical First Tech office in Boise.  (See Declaration of Grant Gaines at para. 3 attached hereto as **Exhibit 34**.)  Non-public customer/member information of First Tech is similarly protected by RJFS-FID. (See Declaration of Matt Mehltretter at para. 5 attached as **Exhibit 29**.)

54. First Tech also required the Ex-Employees to promise and reaffirm annually that each of them would adhere to First Tech's policies, including the requirement to protect and not disclose First Tech's confidential and trade secret information. (See the 2025 attestation for each of the Ex-Employees attached hereto as **Exhibits 35, 36 and 37**.) For example, the 2025 First Tech Employee Handbook states in no uncertain terms that client lists are considered confidential, must be kept in the "strictest confidence" and should not be "disseminated outside of First Tech and/or for personal gain" as follows:

> **203d Confidential Information**
>
> During employment, employees may have access to confidential information including member-identifying information, business plans and related documentation, work product, client lists, and other information that First Tech considers confidential or proprietary. Employees are required to keep this information in the strictest confidence, and under no circumstances should employees discuss this information with individuals, including friends, relatives, or other employees who do not have a business need to know.
>
> *In addition, employees should comply with the following:*
> - Never disclose or disseminate member information, even to law enforcement, unless management authorizes you to do so
> - Lock all member- or employee-sensitive documents in a secured location
> - Lock desks and computers when away from the work area
>
> The mishandling of confidential information can seriously damage First Tech's reputation. Confidential information obtained or used during the course of employment, like member or employee account information, is the sole property of the Credit Union and should not be used or disseminated outside of First Tech and/or for personal gain. Information may not be discussed with any person, including co-workers, without a legitimate business need to do so. The practice of account surfing, using the Credit Union's core system's inquiry function or any other means to review account information, of any member or employee without a legitimate business need to do so, further constitutes the mishandling of confidential information. Violation of this policy will result in discipline up to and including immediate termination and criminal prosecution.

<u>See</u> excerpt of the 2025 First Tech Handbook attached as **Exhibit 38**. Yet, Mr. Jackson, Mr. Kendall and Ms. Hernandez all clearly disregarded this policy by taking and thereafter using for their own benefit – as well as that of their new firms – the Stolen Lists, among other things. Furthermore, this policy was violated multiple times by Mr. Kendall through his improper use of a USB drive to download and steal the Kendall Spousal List, and to email the Kendall Client Holdings List to himself.

55. Additionally, Mr. Kendall agreed to protect the confidential information of First Tech in his 2012 Agreement, as follows:

7. **Confidentiality and Trade Secret Information**
   a. As an employee of First Tech, Employee will have access to, obtain, create, compile, develop and be exposed to certain non-public information that is confidential, proprietary, trade secret or otherwise constitutes First Tech and AAIS intellectual property. All such information and work product are the sole and exclusive property of First Tech and Employee does not have, and will not acquire, any right, title, or interest in such information. In addition, Employee may not use, communicate, disclose, divulge, release, remove, supply, product, misappropriate or commercially exploit such information except in the course of performing the duties of the Employee's position. Confidential information is described as, but not limited to:
      i. Information containing or regarding member, client or prospective clients records (including, but not limited to, contact names, addresses, telephone numbers, email addresses and/or social security numbers), any account, personal business, financial and other information relating in any way to current or prospective clients of AAIS, lists of current and/or prospective clients in any form, and any information related to the assets and obligations carried in an account by an AAIS client, a client's positions, and/or account valuations;
      ii. AAIS' or its clients' market, financial, research, trade and sales information and data pricing, financial models or formulae analytical tools and inventions, business plans, financial and business forecasts and estimates, investment and other strategies, account valuation, and information about costs, profits, products and services; and
      iii. Personnel, compensation or financial information pertaining to current and former employees of First Tech, list of First Tech employees, employees skills sets, AAIS or First Tech policies, procedures and training materials.
   b. "Trade Secret" as used in this document, means without limitation, any data or other business information which (i) has economic value, actual or potential, from not being generally known nor being readily ascertainable through proper means by other persons who can obtain economic value from its use; and (ii) is the subject of reasonable efforts on the part of AAIS to maintain its secrecy; and/or (iii) otherwise qualifies as a trade secret under applicable state law.
   c. Employee agrees that AAIS owns all such Confidential Information and Trade Secrets and that such information is entrusted to Employee for the sole and exclusive purpose of enabling Employee to perform Employee's job for the sole benefit of AAIS and its business.

See Kendall Agreement, **Exhibit 8** at p. 2. Mr. Kendall ignored each of these provisions by creating and stealing the Stolen List as well as pilfering other information alleged herein and thereafter using them to benefit himself and his new firms – Osaic and Family Tree.

56. First Tech also had a "Mobile Device Security Policy" which stated in relevant part:

> **The Credit Union's confidential information and intellectual property, including member-identifying information**, business plans and related documentation, work product, **client lists,** and other information **are extremely valuable to the Credit Union. You must treat them accordingly and not jeopardize them**

> **through your use of any Device granted access to Credit Union information**.

See excerpts of the December 2024 Mobile Device Security Policy attached as **Exhibit 39** (**bolding** added). While First Tech allowed its employees the ability to use their personal devices, such as their cellphones, that allowance came with the explicit requirement that employees like Mr. Jackson and Mr. Kendall protect any of the firm's confidential information that came to be on those devices – a requirement that, upon information and belief, both Mr. Kendall and Mr. Jackson chose to ignore in taking client contact information that existed on their personal cellphones. It also came with the explicit understanding that to the extent an employee mixed confidential First Tech information with their own personal information, the employee lost any expectation of privacy to his/her personal information as First Tech's Mobile Device Security Policy makes clear:

> As a result of using Devices, employees' personal information may become co-mingled with Credit Union information. Any information that comes into contact with the Credit Union's information systems may be cached, stored, or subject to monitoring. Accordingly, **you should have no expectation of privacy with respect to any Device, regardless of where the data is stored on the Device.** Violations of the BYOD Policy may be discovered by routine maintenance and monitoring of the Credit Union's electronic communication systems and network, any method stated in this BYOD Policy, or pursuant to any legal means.
>
> **The Credit Union reserves the right to review, retain or release personal and Credit Union-related data on Devices** to government agencies or third parties during an investigation or litigation.

See excerpts of the December 2024 Mobile Device Security Policy attached as **Exhibit 39** (**bolding** added).

57. **Despite repeated demand from First Tech, the Defendants have refused to even acknowledge the extent of their thefts, let alone cease all use of First Tech's stolen**

**information, fully return all such information, and fully purge such information from their systems.** For several weeks now, First Tech has made repeated demand upon Defendants: a) to immediately cease use of its stolen information; b) in the case of the Kendall/Osaic Defendants, to immediately stop soliciting/diverting business in violation of the Kendall Agreement; c) to return all stolen information; d) to purge all stolen information from the Defendants' electronic systems and devices; and e) to allow for a thorough forensic review of all affected systems and devices in order to discover and account for the use and current location of all stolen First Tech confidential and trade secret information. (See e.g., the September 11, 2025 and September 13, 2025 Cease and Desist Letters to the Kendall/Osaic Defendants and Jackson/LPL Defendants, attached hereto as **Exhibits 40** and **41**, respectively.) Remarkably, despite the Ex-Employees' *admissions* that they took and used First Tech's highly confidential client lists – and with only the transparent excuse that their thefts were justified by the Broker Protocol – Defendants have refused to do little more than provide lip service to First Tech's legitimate demands for a return to the status quo ante. Indeed, despite Defendants' apparent interest in resolving First Tech's legitimate concerns about the disclosure and use of its confidential and trade secret information initially, Defendants have since left the following issues outstanding:

- While Defendants claim to have stopped any use of the information pilfered from First Tech, the velocity of outward-bound account transfers shows otherwise;

- While Defendants have agreed to return all stolen information, they have so far failed to do anything other than to make a token return of the original Stolen Lists – while not returning any of the downstream documents infected with this tainted information;

- While the Ex-Employees have agreed to the forensic imaging of their electronic devices, they have refused to follow through and instead have thrown up roadblocks designed to frustrate this process. This includes imposing a legion of unreasonable restrictions so as to make the review largely meaningless, as well as insisting that the review be conducted by their own hand-picked consultant; and

- While the Ex-Employees repeatedly agreed to fully disclose the scope of their misappropriations, when pressed to do so, they have simply chosen to remain silent so that other material that was secretly taken would not have to be returned, such as the Kendall Client Holdings List, which Defendants have yet to acknowledge Mr. Kendall's theft thereof.

58. It is now apparent that the Defendants have strung First Tech along while improperly taking north of **$205,000,000** in clients' assets. First Tech's patience is now exhausted, and this suit follows. As for relief, First Tech seeks immediate and preliminary injunction relief from this Court, as well as for damages against any party not subject to arbitration.

## VI.    CAUSES OF ACTION

### Count I—Misappropriation Of Trade Secrets Under The Defend Trade Secrets Act ("DTSA") And The Idaho Uniform Trade Secrets Act ("ITSA") Against All Defendants

59. First Tech hereby incorporates by reference the allegations above as if fully restated herein.

60. The Defend Trade Secret Act ("DTSA"), 18 U.S.C. § 1836(b)(1), provides civil remedies for the conversion/misappropriation of trade secrets. The Defendants' misappropriation of First Tech's trade secrets as discussed herein constitutes violations of DTSA.

61. The Idaho Uniform Trade Secrets Act ("ITSA"), Idaho Code § 48-801 et. seq., also provides civil remedies for the misappropriation of trade secrets under Idaho law. The Defendants'

misappropriation of First Tech's trade secrets as discussed herein constitutes violations of ITSA as well.

62. The elements of a claim under both DTSA and ITSA are largely the same[34] and thus can be analyzed together.

63. "To succeed on a DTSA claim, a plaintiff must prove: (1) that the plaintiff possessed a trade secret; (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." See Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc., 149 F.4th 1081 (9th Cir. 2025) (internal citation omitted).

64. First Tech is the owner, licensee and/or possessor of valuable information – specifically including non-public information about its clients, which includes the names, phone numbers, email addresses, and home addresses contained in the Stolen Lists. The same goes for the other information secretly taken by Mr. Kendall on the Spousal List and the Client Holdings List, as described above. (Id.)

65. This information is not generally known or readily ascertainable by proper means. Further, First Tech derives a significant economic and competitive advantage by having access to this information. Because of this, all of the stolen Lists qualify as a trade secret.

66. First Tech takes reasonable measures to preserve the secrecy of its trade secret information, including, *inter alia*, i.) requiring employees to enter contracts – i.e. the FA Agreements and the Kendall Agreement – that contractually requires employees to keep non-public confidential and trade secret information in the strict confidence and not to disclose it; (ii) requiring employees to attest on a yearly basis that they will follow First Tech's policies and procedures

---

[34] See e.g. BigRentz, Inc. v. KGM Enterprises, LLC, 2023 WL 7496726 at *2 (D. Idaho Nov. 13, 2023) ("Courts have analyzed claims brought under the DTSA and state trade secret acts, such as the ITSA, together because the elements are substantially similar.").

which require protection of confidential and trade secret information; (iii) the use of passwords to access First Tech's computers; (iv) encryption standards for sensitive information; and (v) requiring key card access to First Tech offices.

67. The Defendants have already admitted to accessing and thereafter using the information contained in the Stolen Lists – which contained information related to hundreds of First Tech clients. (See para.s 47(A)-(B), supra.) The use of the Stolen Lists and the other information taken by Mr. Kendall qualifies as a misappropriation under both DTSA and ITSA.

68. Mr. Jackson's and Mr. Kendall's removal and/or use of First Tech's trade secrets occurred while they were acting within the scope of their employment/agency with LPL/Riverside and Osaic/Family Tree, respectively, and for the benefit of those firms. LPL/Riverside and Osaic/Family Tree are thus viciously liable to First Tech for their agent's violations of DTSA and ITSA.

69. LPL/Riverside, as well as Osaic/Family Tree are also directly liable to First Tech for their own violations of DTSA and ITSA, because, upon information and belief, they each: a) directed, aided, abetted and/or ratified their agents misappropriation of First Tech's trade secrets; and/or b) through their agents and employees, have ingested First Tech's trade secret information into their systems (email, contact management systems, client profiles, etc.). Moreover, LPL/Riverside and Osaic/Family Tree were unquestionably on notice of the misappropriation of First Tech's trade secret when they received the Cease and Desist letters from First Tech just days after the Ex-Employees resigned. (See the September 11, 2025 Cease & Desist Letter to the Kendall/Osaic Defendants attached as **Exhibit 40**; see also the September 13, 2025 Cease & Desist Letter to Jackson/LPL Defendants attached as **Exhibit 41**.)

70. As a direct and proximate result of the Defendants' misappropriation of First Tech's trade

secrets, First Tech has suffered enormous damages including the loss of more than 160 clients and the transfer out of over $205,000,000 in client assets. As a result of this misconduct, First Tech is entitled to preliminary injunctive relief in the first instance,[35] as well as all damages available under Idaho and federal law, including, at its option, a royalty on all clients it lost and/or all profits/revenue it has lost and will continue to lose, other statutory damages, and attorney's fees as allowed under DTSA and/or ITSA.

71. Finally, the Defendants are still in possession of the information at issue and have been unwilling to adequately purge themselves – and their various systems – of this information. Because of this ongoing misappropriation of First Tech's trade secrets, First Tech has suffered and will continue to suffer irreparable harm, which entitles it to an injunction.

## Count II—Breach Of Duty Of Loyalty/Fiduciary Duty

### Against Mr. Jackson

72. First Tech hereby incorporates by reference the allegations set forth above as if fully restated herein.

73. While Mr. Jackson was an employee of First Tech, he owed the firm a fiduciary duty of loyalty under Idaho common law – which required that he at all times, *inter alia*, act in First Tech's best interests and refrain from competing with First Tech while still employed. See generally Wesco Autobody Supply, Inc. v. Ernest, 243 P.3d 1069, 1080 (Idaho 2010) (Recognizing that "the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal...")

---

[35] The law is clear "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." See Idaho Code Ann. § 48-802(1); see also 18 U.S.C.A. § 1836(3)(A).

74. In violation of his duties to First Tech, Mr. Jackson placed his interest above those of First Tech by, *inter alia*, recruiting Ms. Hernandez to join him at LPL/Riverside while they were still employed by First Tech and conspiring with Ms. Hernandez to steal and use the non-public customer information of First Tech. These and other acts that discovery will reveal were transparent efforts to both directly and improperly compete against First Tech while Mr. Jackson was still employed, in violation of his duties to First Tech.

75. First Tech has suffered damages as a direct and proximate result of this unlawful conduct which includes the loss of a promising, trained employee of First Tech as well as the salary and benefits paid to her and Mr. Jackson during their period of disloyalty.

### Count III – Breach of Contract (FA Agreements) by the Ex-Employees

76. First Tech hereby incorporates by reference the allegations above as if fully restated herein.

77. Under Idaho law, a claim for breach of contract requires the following elements: (1) the existence of a contract; (2) breach by the defendant; (3) the breach caused damages; and (4) the amount of damages. Edged In Stone, Inc. v. Northwest Power Sys., LLC, 321 P.3d 726, 731 (Idaho 2014).

78. In exchange for, inter alia, continued employment with First Tech and the ability to service clients on the RJFS-FID platform, the Ex-Employees each entered into their own FA Agreement. (See the FA Agreements for Mr. Jackson, Mr. Kendall and Ms. Hernandez attached as **Exhibits 1, 2** and **3**, respectively.) The FA Agreement required the Ex-Employees to keep confidential and not disclose to third parties any non-public customer information that they obtained about First Tech's clients. (Id. at para. 20.) ("Financial Advisor agrees not to disclose...to any person...any information obtained from clients of RJFS or customers of Institution [First Tech].") First Tech owns and/or licenses all such non-public customer

COMPLAINT FOR INJUNCTIVE RELIEF - 42

confidential information covered under each Ex-Employees' FA Agreement.

79. The Ex-Employees each violated their respective FA Agreements by stealing confidential information (i.e. the Stolen Lists and Kendall's Spousal List) either belonging to and/or licensed by First Tech. Thereafter, the Ex-Employees improperly disclosed such information to their new firms – Osaic, LPL, Riverside and Family Tree – given it was used to send the Mass Emails and Mass Letters discussed herein. (See para.s 47(A)-(C), infra.)

80. The post-employment restrictions agreed to by the Ex-Employees under the FA Agreements are reasonable and necessary to protect First Tech's legitimate business interests, including but not limited to First Tech's customer relationships and customer goodwill, confidential and trade secret information, and investments in each Ex-Employee for the length of their careers with First Tech.

81. As a direct and proximate result of the Defendants' breaches of the FA Agreements, First Tech has suffered enormous damages including the loss of 160 clients and the transfer out of over $205,000,000 in client assets. First Tech has suffered, and will continue to suffer, irreparable harm as a result of the Ex-Employees' ongoing breaches of the FA Agreements until such time that they, and others acting in concert with them, including Riverside and LPL (Jackson/Hernandez) and Family Tree and Osaic (Kendall), are ordered to cease such actions in violations and return all confidential and proprietary information belonging to First Tech. Injunctive relief is necessary given that monetary damages are difficult to calculate, given that the harm is ongoing in nature and would not fully compensate First Tech for Mr. Kendall's breaches of his Agreement.

82. Each Ex-Employee also agreed that, in the event of their breach of their respective FA Agreements, First Tech shall be entitled to injunctive relief as follows:

> Financial Advisor agrees that RJFS and Institution and their successors and assigns shall be entitled to seek a remedy at law for any breach by Financial Advisor of the agreements and covenants made by this Agreement, that such remedy at law will be inadequate, and RJFS or Institution shall be entitled to an injunction to enforce applicable agreements and covenants herein, without limitation of any right to damages.

<u>See</u> the Ex-Employees' FA Agreements attached hereto as **Exhibits 1, 2** and **3**.[36] Given the undisputed breach of the FA Agreements, First Tech is entitled to a temporary restraining order and later preliminary injunction to restrain each Ex-Employee – and their respective firms who also have this information – from any further actual or threatened breaches of their FA Agreements. Moreover, and given the misappropriation of First Tech's confidential information to unfairly compete for First Tech's clients, First Tech seeks a TRO and preliminary injunction both requiring the return of its confidential and trade secret information as well as disallowing each Ex-Employee and anybody working in concert with them from any further acceptance of First Tech's business from their former clients for a period to be determined by the Court.

### <u>Count IV – Breach of Contract by Mr. Kendall</u>

83. First Tech hereby incorporates by reference the allegations above as if fully restated herein.

84. In addition to the FA Agreement, Mr. Kendall entered into an additional contract where he agreed to employment and post-employment restrictions. (<u>See</u> para.s 31-32, supra; <u>see also</u> Kendall Agreement at p. 2, para. 7(a)(i), **Exhibit 8**.) These restrictions prohibit stealing or using First Tech's confidential and trade secret information for his own benefit. First Tech's confidential information, specifically including clients' "names, addresses, telephone numbers,

---

[36] While each Ex-Employees' FA Agreement was made effective at differing times, this provision is identical in each of the Ex-Employee's respective FA Agreement. The quoted language comes from the Hernandez FA Agreement.

COMPLAINT FOR INJUNCTIVE RELIEF - 44

email addresses" of clients, as well as "lists of current and/or prospective clients in any form." (See Kendall Agreement at p. 2, para. 7(a)(i), **Exhibit 8**.) Mr. Kendall also agreed to "keep confidential, and not disclose to any third party or to make any use of Confidential Information or Trade Secrets" except for First Tech's benefit. (Id.) Mr. Kendall breached his Agreement via the theft of at least the Stolen List, the Spousal List, the Client Holdings List and, upon information and belief, other confidential or trade secret information.

85. Mr. Kendall has also agreed to not solicit, divert or otherwise take away from First Tech's clients for two years after the end of his employment. (See para. 47(C), supra; see also Kendall Agreement at pp. 3-4, para. 10(a), attached as **Exhibit 8**.) While Mr. Kendall's Agreement even extends to potential clients, First Tech is only currently seeking to enforce this provision as to the clients Mr. Kendall's formerly serviced at First Tech.

86. Mr. Kendall violated his non-solicitation clause by admittedly sending the Kendall Mass Email to all his clients and a mass letter to at least some of these clients. (See para. 47(B), supra; see also the Kendall Mass Email attached as **Exhibit 23**.) Upon information and belief, Mr. Kendall has also violated the non-solicitation clause by either directly or indirectly making other communications with the clients he formerly serviced at First Tech.

87. The post-employment restrictions agreed to by Mr. Kendall under the Kendall Agreement are reasonable and necessary to protect First Tech's legitimate business interests, including but not limited to First Tech's customer relationships and customer goodwill, confidential and trade secret information and First Tech's investments in Mr. Kendall for more than a decade.

88. As a direct and proximate result of Mr. Kendall's breaches of the Kendall Agreement– as well as the aid, abetting and conspiring of Osaic/Family Tree – First Tech has suffered enormous

damages including the loss of more than 30 clients and the transfer out of over $54 million in client assets.

89. First Tech has suffered irreparable harm as a result of Mr. Kendall's violations of his Agreement and will continue to suffer until such time that Mr. Kendall, and others acting in concert with him (Family Tree and Osaic), are ordered to cease such actions. Injunctive relief is necessary given that monetary damages are difficult to calculate and that the harm is ongoing in nature and would not fully compensate First Tech for these breaches.

90. Moreover, Mr. Kendall specifically agreed to the imposition of injunctive relief due to any breach of his Agreement as follows:

> Employee agrees that AAIS [First Tech] shall be entitled to temporary or permanent injunctive relief to restrain Employee from such breach or threatened breach.

See Kendall Agreement at p. 3, para. 8 attached as **Exhibit 8**. Given the clear breach of his Agreement, First Tech is entitled to a temporary restraining order and later preliminary injunction to restrain Mr. Kendall from any further actual or threatened breaches of the Kendall Agreement. Accordingly, First Tech seeks a TRO and preliminary injunction both enforcing the non-solicitation clause in the Agreement but also disqualifying Mr. Kendall from any further acceptance of business from his First Tech clients until the 2-year non-solicitation period expires.

### Count V – Tortious Interference With Contract
### By LPL/Riverside and Osaic/Family Tree

91. First Tech hereby incorporates by reference the allegations above as if fully restated herein.

92. Under Idaho law, a claim for tortious interference requires the following elements: "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting

from the breach." <u>Wesco Autobody Supply, Inc. v. Ernest</u>, 243 P.3d 1069, 1083 (Idaho 2010).

93. As discussed above, the Ex-Employees and First Tech entered into the FA Agreements. The Ex-Employees have each breached their confidentiality restrictions in their respective FA Agreements, and each Ex-Employee remains in breach as well. (<u>See</u> para.s 33-34, supra).

94. Separately, Mr. Kendall and First Tech entered into the Kendall Agreement – where he has breached both the confidentiality and client non-solicitation restrictions therein. (<u>See</u> para.s 31-32, supra.)

95. These First Tech Agreements and the breach of the same came despite each of the Defendants (including LPL/Riverside and Osaic/Family Tree) receiving a copy of First Tech's Cease and Desist Letter no later than September 13, 2025. (<u>See</u> the September 11, 2025 Cease & Desist Letter to the Kendall/Osaic Defendants attached as **Exhibit 40**; <u>see also</u> the September 13, 2025 Cease & Desist Letter to Jackson/LPL Defendants attached as **Exhibit 41**.) While First Tech highlighted the confidentiality obligations that the Jackson/LPL Defendants owed in the September 13th Cease and Desist, it thereafter followed up with a copy of Mr. Jackson's FA Agreement. (<u>See</u> October 3, 2025 email from N. Prosser to S. Mauch attached as **Exhibit 42**.) By the same token, Osaic's in-house Counsel was provided a copy of the Kendall Agreement on September 12, 2025. (<u>See</u> September 12, 2025 email from N. Prosser to G. Curley attached as **Exhibit 43**.) Thus, there is no doubt that the firm Defendants (LPL/Riverside and Osaic/Family Tree) had actual knowledge of the First Tech contracts at issue. Moreover, Osaic and LPL were on constructive notice of agreements of this type, given their status in the industry as two of the largest broker-dealers in the country that hire hundreds of advisors a year. Across the securities industry, firms routinely have confidentiality clauses in contracts as well as in their policies and procedures. (<u>See</u> Declaration of Stephen Poole, para. 16 attached

COMPLAINT FOR INJUNCTIVE RELIEF - 47

hereto as **Exhibit 5**.)

96. Despite knowing about the contract between the Ex-Employees and First Tech, LPL/Riverside and Osaic/Family Tree have intentionally caused the Ex-Employees to breach those agreements. LPL/Riverside and Osaic/Family Tree each provided their new hires with monetary incentives – upon information and belief – to take First Tech's confidential and/or trade secret information and to use this information to solicit, divert, or otherwise move First Tech's client relationships to LPL/Riverside or Osaic/Family Tree. Moreover, although both LPL/Riverside and Osaic/Family Tree are in a position to stop the Ex-Employees' breaches of their contract(s), each defendant group has to date refused to affirm that Ex-Employees will abide by any of the restrictions in their contracts.

97. As a direct and proximate result of the use of First Tech's confidential and trade secret information to solicit/divert First Tech clients to LPL/Riverside and Osaic/Family Tree, First Tech has suffered enormous damages including the loss of at least 160 clients and the transfer out of over $205,000,000 in client assets between the Defendants. As a result of this misconduct, First Tech is entitled to all damages available under Idaho and federal law, including a royalty on all clients it lost, all profits/revenue it has lost and will continue to lose, other statutory damages, and attorney's fees as allowed under DTSA and/or ITSA.

98. First Tech has suffered, and will continue to suffer, irreparable harm as a result of the above-described breaches of the Ex-Employees' various agreements until such time as the LPL/Jackson Defendants and the Osaic/Kendall Defendants, as well as any others acting in concert with them (including the Ex-Employees themselves) are ordered to cease such actions. Such irreparable harm includes, but is not limited to, the loss of First Tech's client relationships and client goodwill, harm to its ability to fairly compete in the market, and harm to the value

COMPLAINT FOR INJUNCTIVE RELIEF - 48

of its confidential and trade secret information, among other harms.

<u>**Count VI – Tortious Interference With Prospective Economic
Advantage By All Defendants**</u>

99. First Tech hereby incorporates by reference the allegations above as if fully restated herein.

100.    Under Idaho law, the elements for a claim for tortious interference with prospective

economic advantage are: "(1) the existence of a valid economic expectancy, (2) knowledge of

the expectancy on the part of the interference, (3) intentional interference inducing termination

of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the

interference itself, and (5) resulting damage to the plaintiff whose expectancy has been

disrupted." <u>Wesco Autobody Supply, Inc. v. Ernest</u>, 243 P.3d 1069, 1081-82 (Idaho 2010).

101.    First Tech has a clear economic expectancy in its longstanding customer relationships –

specifically the 650+ clients serviced by the Ex-Employees until their abrupt resignations.

Most – if not all – of which are also members of the credit union. Importantly, these client

relationships *are with First Tech and not the Ex-Employees*.

102.    The Defendants were unquestionably aware of the relationships that First Tech had with

these clients because: a) the Ex-Employees serviced them before resigning; and b) the Ex-

Employees' new firms (Osaic, LPL, Riverside and Family Tree) hired the Ex-Employees with

the expectation they would be taking First Tech clients. Indeed, upon information and belief,

LPL and Osaic each enticed the Ex-Employees (Mr. Jackson and Ms. Hernandez for LPL and

Mr. Kendall for Osaic) with enormous financial incentives to entice them to solicit First Tech's

clients to LPL and Osaic.

103.    The Defendants have each – either directly through their own acts or vicariously through

the acts of their agents – intentionally and improperly interfered with First Tech's relationships

with their clients by taking and thereafter using the information contained in the Stolen Lists

and Mr. Kendall's other lists as described herein. (<u>See</u> para.s 47-52, supra). As well as interfering with the Ex-Employees' contracts with First Tech, as alleged above. The unauthorized theft of First Tech's information to use thereafter to solicit First Tech's clients and the interference with First Tech's contracts was wrongful and intentional.

104.    Moreover, although the firms Defendants (LPL, Osaic, Family Tree and Riverside) are each in a position to stop their wrongful interference with First Tech's client relationships, they have refused to do so, and instead accepted millions of dollars of assets from First Tech's clients over the past month – despite being on notice of the improper nature of how these clients were solicited.

105.    As a direct and proximate result of the Defendants' interference, First Tech has suffered enormous damages including the loss of at least 160 clients and the transfer out of over $205 million in client assets collectively. As a result of this misconduct, First Tech is entitled to all damages available under Idaho and federal law.

106.    First Tech has suffered, and will continue to suffer, irreparable harm as a result of the above-described interference with its client relationships until such time as the Defendants are ordered to cease such actions.  Such irreparable harm includes, but is not limited to, the loss of First Tech's client relationships and client goodwill, harm to its ability to fairly compete in the market, and harm to the value of its confidential and trade secret information, among other harms.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, First Tech, in addition to the relief described above, prays for the following relief against the Defendants:

1.    Compensatory damages in an amount to be determined at the final trial;

2.  Attorney's fees, costs and expenses;

3.  Pre-judgment interest at the highest rate allowed by law;

4.  A judgment that is entered jointly and severally;

5.  Entry of a temporary restraining order and, after expedited discovery, a preliminary injunction, as appropriate, pursuant to Fed. R. Civ. P. 65 against all Defendants and those acting in concert, as requested in First Tech's forthcoming Motion for TRO/Preliminary Injunction;

6.  Expedited discovery as requested in First Tech's forthcoming filed Motion for Expedited Discovery; and

7.  Such other, further, additional, or different relief to which First Tech may be entitled at law or in equity.

Respectfully submitted this 16th day of October, 2025.

PROSSER & JOHNSON, PLLC

/s/ Niel Prosser
Niel Prosser
Kyle Johnson
Alex Bunn

GIVENS PURSLEY LLP

/s/ Robert B. White
Alexander P. McLaughlin
Robert B. White

*Attorneys for First Technology Federal Credit Union*