Niel Prosser (TN Bar No. 11647/CO Bar No. 58650)
Kyle Johnson (TN Bar No. 36066/CO Bar No. 58644)
Alex Bunn (TN Bar No. 40490/CO Bar No. 58512)
(*pro hac vice application forthcoming*)
**Prosser & Johnson, PLLC**
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
Telephone: (901) 820-4433
Facsimile: (901) 767-0704
np@prosserlaw.com
kjohnson@prosserlaw.com
abunn@prosserlaw.com

Alexander P. McLaughlin (ISB No. 7977)
Robert B. White (ISB No. 4438)
**Givens Pursley LLP**
601 W. Bannock St.
Boise, ID 83702
Telephone: (208) 388-1200
Facsimile: (208) 388-1300
alexmclaughlin@givenspursley.com
rbw@givenspursley.com

*Counsel for Plaintiff, First Technology Federal Credit Union*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FIRST TECHNOLOGY FEDERAL CREDIT UNION,<br><br>                       Plaintiff,<br><br>v.<br><br>LPL FINANCIAL, LLC, OSAIC WEALTH INC., ALFRED "JACK" JACKSON, SAGE KENDALL, KRISTINA HERNANDEZ, FAMILY TREE FINANICAL, LLC, AND JACKSON HOLDINGS LLC,<br><br>                     Defendants. | CASE NO. 1:25-cv-00582 BLW<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR TEMPORARY RESTRAINING ORDER AND TO SET LATER HEARING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff, First Technology Federal Credit Union ("First Tech" or "Plaintiff"), respectfully moves the Court to: (1) issue a Temporary Restraining Order ("TRO") against all the Defendants,[1] providing the relief set forth herein and (2) after a period for expedited discovery, issue a preliminary injunction extending that relief as well as awarding any additional, different or other relief to which Plaintiff may then be entitled, until the issue of permanent injunctive relief is decided by the arbitration panel or this court, as the case may be.

## I.  INTRODUCTION AND BACKGROUND[2]

This case is about the Defendants' deliberate misappropriation of trade secrets and their reckless breach of – or interference with – First Tech's contracts. Mr. Jackson, Mr. Kendall and Ms. Hernandez (collectively the "Ex-Employees") were long-time employees with First Tech, working as Financial Advisors exclusively with First Tech's member-customers through a collaboration with the securities firm, Raymond James. (See Declaration of A. Assaf at para.s 3-10, attached to the Complaint as **Exhibit 6**.) After conspiring for months between themselves[3] – and with their soon-to-be new firms – the Ex-Employees resigned on September 9, 2025 – by

---

[1] The "Defendants" refer collectively to all Defendants, Alfred "Jack" Jackson ("Mr. Jackson"), Kristina Hernandez ("Ms. Hernandez"), Jackson Holdings, LLC d/b/a Riverside Financial Planning ("Riverside"), LPL Financial, LLC ("LPL") (this group of defendants collectively referred to as the "Jackson/LPL Defendants"), as well as Sage Kendall ("Mr. Kendall"), Family Tree Financial, LLC ("Family Tree") and Osaic Wealth, Inc. ("Osaic") (this group of defendants collectively referred to as the "Kendall/Osaic Defendants").

[2] For ease of the Court, Plaintiff is only providing a short summary of the facts and background and instead relies on its Complaint for Injunctive Relief (the "Complaint"). Plaintiff therefore incorporates the Complaint verbatim by reference.

[3] This conspiracy started earlier this year after First Tech was unwilling to give Mr. Kendall/Mr. Jackson their books of business for free via a new independent channel that First Tech had started. However, Mr. Kendall and Mr. Jackson did not qualify nor did First Tech want to add more advisors given its unknown future.  (See Declaration of Scott Hamaguchi, at para. 6 attached to the Complaint as **Exhibit 17**.) Mr. Jackson and Mr. Kendall instead decided to steal their books of business.

email and without notice. (See Declaration of S. Poole at para. 10 attached to the Complaint as **Exhibit 5**.) Mr. Jackson and Ms. Hernandez immediately affiliated with the LPL securities firm and Jackson's own newly formed company, Riverside (collectively the "Jackson/LPL Defendants"), while Mr. Kendall immediately affiliated with the Osaic securities firm and Family Tree (collectively the "Kendall/Osaic Defendants"). The Ex-Employees, however, did not leave cleanly or properly. Instead, they took detailed client lists, along with other highly confidential trade secret information owned or possessed by First Tech. (See Declaration of S. Poole at para.s 10-11, attached to the Complaint as **Exhibit 5**.) These client lists contained the names and contact information for all 683 of their assigned customers, whose assets held by First Tech totaled more than **$520,000,000**. (Id. at FN 2.)

By the time the markets opened the next day, the Ex-Employees had already done irreparable harm to First Tech by sending solicitations to all 683 of First Tech's clients by email, and doubling up with a letter to most of these clients as well. (Complaint at paras. 47(A)-(C).) This rapid contact, using First Tech's stolen information, has been incredibly successful. Within just a month, the Jackson/LPL Defendants have transferred nearly 60% of the $271 million in assets held by the clients on his stolen customer list (i.e. some $154 million), at the same time the Kendall/Osaic Defendants have transferred some 21% of the $249 million assets for the clients on his stolen list (i.e. some $54 million). (See Declaration of S. Poole at para.s 23-24, attached to the Complaint as **Exhibit 5**.) In total, First Tech has already lost over **$205,000,000 in assets** and more than **$1,100,000 in recurring annual revenue** because of the Defendants' misconduct. (Id. at para. 25.) This irreparable harm will continue unless and until the Court enjoins the Defendants from further enjoying the fruits of their thefts.

The Defendants have attempted to justify the Ex-Employees' misappropriation of First

Tech's customer lists based on the Protocol For Broker Recruiting (the "Broker Protocol"). (Complaint at para.s 35-38.) This supposed justification refers to an agreement among a relatively small number of securities firms. In this agreement, they prospectively waive claims against an ex-employee's use of a client list if the employee complies with certain requirements and leaves to work for another firm that is also a Broker Protocol member. (Id. at para.s 39-41.) First Tech, however, has never seen the benefit of waiving its rights and has never joined this industry club. (See Declaration of S. Poole at para. 8 attached to the Complaint as **Exhibit 5**.) This fact is publicly available, and moreover, was well known to all the Defendants. (Id.; see also Declaration of A. Assaf at para. 5, attached to the Complaint as **Exhibit 6**.) Instead, their invocation of the Broker Protocol was merely designed to provide cover and a plausible excuse to justify their naked misappropriation of trade secret information owned, licensed and/or contractually possessed by First Tech.

In addition, each of the Ex-Employees has contractually agreed with First Tech not to use the very customer information at issue via a Financial Advisor Agreement that each signed at the start of their employment. Further, Mr. Kendall has yet another agreement not to use/disclose confidential information and not to solicit or divert away any customer he serviced at First Tech for two (2) years following his termination. (See discussion about the FA Agreements and Mr. Kendall's Agreement at para.s 31-34 in the Complaint.)

First Tech promptly made demand on all the Defendants to cease and desist any further use of the stolen information and the Defendants immediately agreed. Defendants also agreed to return all such information, in whatever form, and the Ex-Employees agreed to the forensic imaging of their affected electronic devices to remove all traces of the stolen information. Unfortunately, the Defendants failed to follow through with any of these commitments, and it is

now apparent that their true objective was to move over as many assets as possible before they could be stopped. Indeed, since the time of these apparent agreements, the number of clients that have submitted transfer requests has gone from nine (9) on or about September 15, 2025, to over one hundred sixty (160) as of October 9, 2025. The total value of the assets lost to First Tech in these transferring accounts has increased from $18,898,477 as of September 15, 2025 to $205,866,314 as of October 9, 2025. (See First Tech's ACAT Transfer List as of October 9, 2025 attached to the Complaint as **Exhibit 27**.)

## II.   IMMEDIATE HEARING & ORAL ARGUMENT

Plaintiff requests oral argument on its request for a Temporary Restraining Order and respectfully requests that it be scheduled at the Court's earliest availability.

## III.   LEGAL STANDARD

"The standard for issuing a TRO is 'substantially identical' to the standard for issuing a preliminary injunction." BrightView Landscape Dev., Inc. v. Howard, 2025 WL 1345080 at *2 (D. Idaho May 8, 2025) (quoting Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n. 7 (9th Cir. 2001)).  A plaintiff seeking a TRO must establish the following: "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Id. (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, (2008). In order to demonstrate a need for preliminary injunctive relief, Plaintiff "need[s] only [to] establish a likelihood of succeeding on the merits of any one of its claims." Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers, 826 F.3d 1030, 1040 (8th Cir. 2016) (internal citation omitted).

"The purpose of a temporary restraining order is to preserve an existing situation in status

quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." Brightview, 2025 WL 1345080 at *2 (internal citation omitted). "The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy." See e.g. Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 378 (4th Cir. 2012) (internal quotes omitted).

## IV.   ARGUMENT

### 1.  First Tech will be irreparably harmed without the Court's intervention.

"Irreparable harm has been described as perhaps the single most important prerequisite for the issuance of a preliminary injunction." All. for the Wild Rockies v. United States Forest Serv., 2016 WL 3349221 at *3 (D. Idaho June 14, 2016) (quoting 11A Wright & Miller, Fed. Prac. & Proc. § 2948). Moreover, "[t]he harm suffered from the revelation and use of one's trade secret can be difficult to quantify and, thus, could form the basis for finding the injury to be irreparable." See e.g. Sky Capital Grp., LLC v. Rojas, WL 1370938 at *14 fn. 3 (D. Idaho May 14, 2009). Indeed, "[a]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." Pac. Aerospace & Elecs., Inc. v. Taylor, 295 F. Supp. 2d 1188 (E.D. Wash. 2003). The violation of a non-solicitation covenant can also clearly constitute irreparable harm. WGI Heavy Mins., Inc. v. Gorrill, 2006 WL 637030, at *4 (Idaho Dist. Mar. 1, 2006) (describing that "irreparable injury can be inferred from the breach of a restrictive covenant if the former employee came into contact with the employer's customers in a way which obtains a personal hold on the good will of the business" and that "systematic solicitation of former employer's customers supports inference of irreparable harm." (quoting Medtronic. V. Advanced Bionics Corp., 630 N.W.2d 438, 452

(Minn. App. 2001)).

As more fully described in the Complaint and the declarations attached therein, Mr. Jackson and Mr. Kendall stole detailed customer lists[4] containing information about the 650 clients they formerly serviced. (See Complaint at para.s 47-47(A); see also Declaration of S. Poole at para.s 10-13 attached to the Complaint as **Exhibit 5**.) Defendants used this stolen information within hours to unfairly compete with First Tech by sending out mass solicitation emails and letters to their former First Tech clients. (Id.) The Ex-Employees stole this information in violation of: (a) the contractual obligations each owed to First Tech;[5] (b) First Tech policies and procedures governing the handling and use of the firm's confidential information; and (c) Idaho and federal trade secret statutes. While Defendants have since "returned" the Stolen Lists to First Tech (i.e. simply having their Counsel send First Tech a copy of the lists back), they have been unwilling to commit to any adequate search, return and purge of this information from all places this information would reside.[6] Worse yet, the Defendants have never admitted the full extent of their thefts of First Tech's confidential information – a refusal apparently born of necessity given that First Tech has already discovered more stolen information than they have acknowledged. (Complaint at paras. 49(iv)- 51.) Indeed, Mr.

---

[4] These lists include:
- The "Stolen Lists" for both Mr. Kendall and Mr. Jackson – which are attached hereto in unredacted form and under seal as **Exhibits A** and **B** respectively;
- The "Kendall Spousal List" – which is attached hereto in unredacted form and under seal as **Exhibit C**; and
- The "Kendall Client Holdings List" – which is attached hereto in unredacted form and under seal as **Exhibit D**.

First Tech is contemporaneously filing a Motion to Seal for these Exhibits.

[5] This includes the FA Agreement for each Ex-Employee as well as the Kendall Agreement for Mr. Kendall. (See Complaint at para.s 31-34.)

[6] This would include the various electronic systems that are used by their respective firms (LPL/Riverside and Osaic/Family Tree) such as their contact management and note-taking systems, the email inboxes for the Ex-Employees that sent the Mass Email and all other e-mail boxes that have been involved with helping the Ex-Employees transition.

Kendall's acknowledged theft of the Kendall Client Holdings List standing alone is extremely concerning and by itself independently warrants a finding of irreparable harm. (See Kendall Client Holdings List, attached hereto as **Exhibit D**.) Moreover, the rapid and continuing transfer of accounts out of First Tech demonstrates the ongoing benefit defendants are enjoying from their thefts and/or use of first tech's confidential information – as well as their continuing use of same.[7] The use of First Tech's trade secrets and other confidential information – as well as the on-going solicitation of clients – constitutes ongoing irreparable harm as sworn to by S. Poole – Senior Vice President and Program Director for First Tech's Investment Services Division – stating:

> The on-going threat of losing more clients – including the goodwill First Tech has created with those clients – will only continue if the Defendants are allowed to continue using and benefitting from the information they took from First Tech and if Mr. Kendall is allowed to continue soliciting his former clients.

See Declaration of S. Poole at para. 26, attached to the Complaint as **Exhibit 5**. As Mr. Poole states, this harm comes via multiple avenues, including the theft of trade secrets, the violation of the Ex-Employees' contracts addressing confidentiality and Mr. Kendall's Agreement where he committed to not solicit, divert or otherwise take business away from the firm for two years. (Id. at para. 26.) Defendants have already used – and continue to use – the stolen information to unfairly compete for First Tech's clients, causing this loss of client relationships and goodwill in the process. As Mr. Alex Assaf describes, a large number of the clients predate Mr. Kendall and Mr. Jackson's time at First Tech and were provided to the Ex-Employees, including from retiring advisors. (See Declaration of A. Assaf at paras. 6 and 10, attached to the Complaint as **Exhibit 6**.) The continuation of such longstanding client relationships and goodwill, along with the

---

[7] As of October 9, 2025, over 150 clients representing a combined AUM of over **$205 million** have left First Tech and moved to do business with the Defendants. See Declaration of S. Poole at para. 25, attached to the Complaint as **Exhibit 5**.

benefits of the same, constitutes harm to First Tech that is difficult, if not impossible to fully calculate. (See Declaration of S. Poole at para. 26, attached to the Complaint as **Exhibit 5**.) The lack of injunctive relief here would leave First Tech "with the Hobson's choice of either filing a separate lawsuit for damages… each time one of the defendants solicited away another… customer[,] or waiting until [First Tech's] customers and goodwill had been completely drained away." N.I.S. Corp. v. Swindle, 724 F.2d 707, 710 (8th Cir. 1984).

For the reasons discussed herein, First Tech submits that it has met its burden of showing irreparable harm.

## 2. First Tech is likely to succeed on the merits of its claims.

### a. *First Tech is likely to succeed in its claims for misappropriation of trade secrets under both DTSA and ITSA.*

For many of the reasons discussed above as well as in the Complaint, First Tech is very likely to prevail on its claims for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and the Idaho Trade Secrets Act ("ITSA"). (See Count 1 in the Complaint at para.s 59-71) "Courts have analyzed claims brought under the DTSA and state trade secret acts, such as ITSA, together because the elements are substantially similar." BigRentz, Inc. v. KGM Enterprises, LLC, 2023 WL 7496726 at *2 (D. Idaho Nov. 13, 2023). The elements of a trade secret misappropriation are "(1) that the plaintiff possessed a trade secret[;] (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." See e.g. Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc., 149 F.4th 1081, 1087 (9th Cir. 2025). For information to qualify as a "trade secret" it must meet the following criteria:

"Trade secret" means information, including a formula, pattern, compilation, program, computer program, device, method, technique, or process, that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Idaho Code Ann. § 48-801(5); <u>see also</u> 18 U.S.C.A. § 1839(3). Misappropriation of a trade secret occurs "when a person, **who knows or has reason to know the trade secret was acquired by improper means**, acquires the trade secret or when a person with the requisite knowledge of the trade secret uses or discloses it without express or implied consent." <u>BigRentz, Inc. v. KGM Enterprises, LLC</u>, 2023 WL 7496726 at *2 (D. Idaho Nov. 13, 2023) (citing Idaho Code Ann. § 48-801(2)) (**bolding** added); <u>see also</u> 18 U.S.C.A. § 1839(5). To show a misappropriation of a trade secret, "[Plaintiff] must show that a trade secret existed and that [Defendants] acquired, disclosed, or used the trade secret by improper means." <u>BigRentz</u>, 2023 WL 7496726 at *2. The "improper means" for a showing of misappropriation can include "theft, bribery, misrepresentation, **breach or inducement of a breach of a duty to maintain secrecy**." Idaho Code Ann. § 48-801(1) (**bolding** added); <u>see also</u> 18 U.S.C.A. § 1839(6).

Here, the trade secrets that were improperly removed by the Ex-Employees – i.e., multiple customer lists with contact information[8] and a listing of the securities holdings of Mr. Kendall's First Tech clients[9] – constitute a protectible trade secret under both Idaho and federal law. Customer lists are routinely protected as trade secrets in Idaho courts and in the 9th Circuit. <u>See</u> <u>Rapid Hot Flow, LLC v. Rocky Mountain Oilfield Servs., LLC</u>, 2011 WL 902137, at *4 (D. Idaho Mar. 15, 2011) ("Customer lists are a type of information that can be protected as a trade

---

[8] This includes the Stolen Lists as well as the Kendall Spousal List – which are attached hereto as **Exhibits A, B** and **C**.
[9] This includes the Kendall Client Holdings List attached hereto as **Exhibit D.**

secret.") (internal cites omitted); <u>Wesco Autobody Supply, Inc. v. Ernest</u>, 243 P.3d 1069, 1086 (Idaho 2010) (noting customer lists and related customer-specific data may constitute trade secrets under ITSA); <u>Hollingsworth Solderless Terminal Co. v. Turley</u>, 622 F.2d 1324, 1332-1333 (9th Cir. 1980) (observing that customer lists may be trade secrets even when the general class of customers is obvious and accessible). Other Courts around the country have come to a similar conclusion. <u>See e.g.</u> <u>IDS Fin. Servs., Inc. v. Smithson</u>, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (finding that "the Illinois Trade Secrets Act… protects IDS's interest in the confidential information such as customer identity, addresses, and financial data…"). Additionally, the ITSA protects compilations of information, even if parts of the compilation are findable in the public domain. <u>Basic Am., Inc. v. Shatila</u>, 992 P.2d 175, 186 (Idaho 1999). ("Information consisting of multiple elements which are each readily ascertainable may still be trade secrets when considered as a whole."). Thus, the customer lists at issue are clearly trade secrets under Idaho and federal law.

The Kendall Client Holdings List – which contains security holdings-related information that would be valuable to competitors (like Family Tree and Osaic) – is also a trade secret. <u>See e.g.</u> <u>Rapid Hot Flow, LLC v. Rocky Mountain Oilfield Servs., LLC</u>, 2011 WL 902137 at *6-7 (D. Idaho Mar. 15, 2011) (finding that plaintiff demonstrated that its customer pricing and financial information, as well as its contracts with its customers, were protectible as trade secrets); <u>ClearOne Advantage, LLC v. Kersen</u>, 756 F. Supp. 3d 30, 42 (D. Md. 2024) (holding that customer lead database was a trade secret that employer was likely to succeed in showing was misappropriated by former employee).

The non-public customer information contained in these lists are not generally known or readily ascertainable by legitimate means, and First Tech enjoys substantial economic and

competitive advantage from the use and protection of the information contained in the compilations stolen by the Ex-Employees. (<u>See</u> Declaration of S. Poole at paras. 11-12, attached to the Complaint as **Exhibit 5**.) Client relationships are the lifeblood of financial institutions like First Tech, and the firm spent many years and immeasurable time, effort and resources cultivating these relationships through its advisors. This is particularly true of the lion's share of Mr. Jackson's clients, as First Tech transferred those clients to him and facilitated him working with those clients after their long-time advisor Bert Browen, retired back in 2020. <u>See</u> Declaration of A. Assaf at para.s 6 and 10, attached to the Complaint as **Exhibit 6**.) Thus, the Ex-Employees, in stealing First Tech's client information, have effectively converted to themselves the myriad resources that First Tech has invested over the years to obtain a book of business for free – something First Tech had refused to allow just a few short months ago.

Finally, First Tech invests substantial time, money, and resources to protect the confidentiality of its trade secret information, including the customer names and contact information contained in the above-referenced lists. (<u>See</u> Declaration of S. Poole, at para. 15 attached to the Complaint as **Exhibit 5**.) First Tech takes reasonable measures to preserve the secrecy of its trade secret information, including, *inter alia*, i.) requiring employees to enter contracts – e.g. the FA Agreements[10] and the Kendall Agreement[11] – that contractually require employees to keep non-public confidential and trade secret information in strict confidence; (ii) requiring employees to attest on a yearly basis that they will follow First Tech's policies and procedures which require protection of confidential and trade secret information and restricting access to a need to know basis; (iii) the use of passwords to access First Tech's computers; and (iv) requiring key card access to First Tech offices. (<u>See</u> Declaration of G. Gaines at para.s 3-4,

---

[10] <u>See</u> para. 20 of the FA Agreements attached to the Complaint as **Exhibits 1**, **2** and **3**.
[11] <u>See</u> para. 7 of the Kendall Agreement attached to the Complaint as **Exhibit 8**.

attached to the Complaint as **Exhibit 34**; <u>see also</u> Declaration of S. Poole at para.s 16-20 attached to the Complaint as **Exhibit 5**.)

These types of protections are well-recognized as reasonable measures to protect trade secret information. <u>See e.g.</u> <u>WWMAP, LLC v. Birth Your Way Midwifery</u>, 711 F. Supp. 3d 1313, 1322 (N.D. Fla. 2024) (finding that Plaintiff's utilization of, *inter alia*, secured user accounts, password protection and limits on employee access to trade secrets based on need for access constituted reasonable measures to ensure the secrecy of its alleged trade secrets).

Defendants may argue that First Tech is not the "owner" of the trade secrets because First Tech transferred technical ownership of certain customer information related to the joint securities customers[12] to RJFS-FID.[13] The actual ownership of the trade secret, however, makes no difference here because both the federal and state trade secret laws allow a licensee[14] or other

---

[12] Because First Tech is neither a broker-dealer nor a registered investment advisor itself, it offers these services through the Financial Institutions Division of Raymond James Financial Services, Inc. and Raymond James Financial Services Advisors, Inc., which are FINRA and SEC registered, respectively (these entities are individually and collectively referred to as "RJFS-FID").

[13] Pursuant to the FA Agreements, First Tech, RJFS-FID and the Ex-Employees agreed to protect customer information while also acknowledging it was the property of RJFS.

> Financial Advisor agrees to not remove any of the original records or documents of RJFS from the premises of the Investment Center at which Financial Advisor is employed unless authorized to do so in advance by RJFS. **Financial Advisor further acknowledges that any customer-related information provided to Financial Advisor or about which Financial Advisor may become aware during the term of this Agreement, whether written or not, is proprietary information of RJFS ("RJFS Property").** RJFS Property is and shall remain the property of RJFS at all times, including during the term and after termination of this Agreement.

<u>See</u> the Ex-Employees' FA Agreements at p. 3, para. 20 (for Mr. Kendall) and at p. 4, para. 20(a) (for Mr. Jackson and Ms. Hernandez), a copy of each is attached to the Complaint as **Exhibits 1**, **2** and **3** (bolding added).

[14] <u>See</u> 18 U.S.C.A. § 1839(4) ("[T]he term "owner", with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, **or license in,** the trade secret is reposed.") (bolding added).

possessor of a trade secret[15] to sue for misappropriation. First Tech effectively is a licensee/possessor of the confidential client information at issue by virtue of its underlying agreement with RJFS-FID, which obligates both parties to share the customer information "deemed necessary to perform their respective responsibilities," which specifically includes non-public customer information such as customer names and addresses. See Section 9(a) of the "Non-Deposit Investment Product and Brokerage Service Agreement" (the "NDIP Agreement") between First Tech and RJFS-FID, attached to the Complaint as **Exhibit 9**. Such information sharing is inherent in the collaboration between First Tech and RJFS-FID since both parties are intimately involved in the servicing of First Tech's clients. Because First Tech thus has the ability to use RJFS-FID's information and vice versa, First Tech has a protectable trade secret interest in the information that relates to its credit union and its investment services customers.

Not only is the stolen information at issue clearly a trade secret under both ITSA and DTSA, it has also clearly been misappropriated. Indeed, the Ex-Employees have admitted to both stealing and then using the information contained in the Stolen Lists and Mr. Kendall has admitted to at least taking the Kendall Spousal List. (See Email from Mr. Kendall's Counsel , dated September 23, 2025 and attached as **Exhibit 30**.) There is thus zero doubt that First Tech has established a misappropriation of this information, a misappropriation that is ongoing and

---

[15] Courts applying variations of the Uniform Trade Secrets Act that are substantially similar in construction to the ITSA have recognized that one must simply lawfully *possess* a trade secret in order to bring a claim under the state trade secret statute. See e.g BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc., 2011 WL 2116989 at *21 (D. Haw. May 25, 2011), aff'd, 531 Fed. Appx. 784 (9th Cir. 2013) (analyzing the Hawaii Uniform Trade Secrets Act and finding that "[t]he Court need not… resolve the issue of whether an individual must be an owner to pursue a HUTSA claim. According to case law, at the very least a plaintiff must be a lawful possessor of the trade secrets or confidential information.") (collecting cases); Williams-Sonoma Direct, Inc. v. Arhaus, LLC, 304 F.R.D. 520, 528 (W.D. Tenn. 2015) (finding that "the focus is appropriately on the knowledge, or possession, of the trade secret, rather than on mere 'ownership' in the traditional sense of the word.").

which involves all the Defendants, who, acting in concert with the Ex-Employees, are both using First Tech's client information as well as refusing to return it.

For the reasons discussed herein and in Plaintiff's Complaint, First Tech is likely to succeed on its trade secret claims.

**b.** **First Tech is likely to succeed on its claim of breach of contract against the Ex-Employees**

First Tech is also very likely to succeed on its breach of contract claims against: a) the Ex-Employees for violations of their FA Agreements; and b) Mr. Kendall for violations of his Agreement. (See Counts 3 and 4 in the Complaint at para.s 76-90.) Under Idaho law, the elements of a claim for breach of contract are: (1) the existence of a contract; (2) a breach by the defendant; (3) that the breach caused damages; and (4) the amount of damages. Edged In Stone, Inc. v. Northwest Power Sys., LLC, 321 P.3d 726, 731 (Idaho 2014).

As discussed in the Complaint, each of the Ex-Employees entered into an FA Agreement that in no uncertain terms prohibited the Ex-Employees from disclosing information about First Tech clients as follows:

> **Financial Advisor agrees not to disclose**, either directly or indirectly, **to any person** (e.g., individual, firm or business) **any information obtained** from clients of RJFS or **customers of Institution**…

See FA Agreements at para. 20, attached to the Complaint as **Exhibits 1**, **2** and **3**. The Ex-Employees have clearly violated their FA Agreements by taking the stolen information discussed herein (i.e. the Stolen Lists, the Kendal Spousal Lists and the Kendall Client Holdings Lists) to send mass solicitation emails/letters to their former First Tech clients. First Tech is thus likely to succeed on its breach of contract action against the Ex-Employees.

Mr. Kendall's breach of the Kendall Agreement is equally clear. The Kendall Agreement

had two significant post-employment restrictions. (<u>See</u> Kendall Agreement at p. 2, para.s 7(a)-(f) and 10, **Exhibit 8** to the Complaint; <u>see also</u> Complaint at pp. 13-14, paras. 31-32.) The first prohibited Mr. Kendall from stealing or using First Tech's confidential and trade secret information for his own benefit, including clients' "names, addresses, telephone numbers, email addresses" as well as "lists of current and/or prospective clients in any form." (<u>See</u> Kendall Agreement at p. 2, para. 7(a)(i), **Exhibit 8** to the Complaint) Mr. Kendall also agreed to "keep confidential, and not disclose to any third party or to make any use of Confidential Information or Trade Secrets" except for First Tech's benefit. (<u>Id.</u>) As discussed herein and in the Complaint, Mr. Kendall undisputedly took this type of information by way of the Stolen List, the Kendall Spousal List and the Kendall Client Holdings List – in violation of this Agreement. <u>See</u> Complaint at para.s 47(B)-(C).

Mr. Kendall also promised not to "solicit, divert, or otherwise take away" any business from the clients he serviced for First Tech for two (2) following the termination of his employment. (<u>See</u> the Kendall Agreement, at pp. 3-4, para. 10(a), attached as **Exhibit 8** to the Complaint.) Mr. Kendall's admitted use of a Mass Email to solicit all of his clients demonstrates the clear violation of this promise. Moreover, the proof shows that this violation is ongoing, given the continuing outflow of First Tech clients to Osaic/Family Tree – and exodus that now exceeds 30 clients with more than $54,000,000 in total assets. (<u>See</u> Declaration of S. Poole at para. 23 attached as **Exhibit 5** to the Complaint.) There is thus little doubt that First Tech will succeed on its breach of contract claim against Mr. Kendall.

c. **<u>First Tech is likely to succeed on its claim of tortious interference with contract and tortious interference with prospective economic advantage against LPL/Riverside and Osaic/Family Tree.</u>**

Plaintiff is also very likely to succeed on its claims of tortious interference based upon

LPL's/Riverside's and Osaic's/Family Tree's interference with: (i) the various agreements between the Ex-Employees and First Tech (including the Ex-Employee's FA Agreements and the Kendall Agreement), (ii) First Tech's prospective economic advantage with the customers the Ex-Employees former serviced for First Tech. (See Counts V and VI in the Complaint at para.s 91-106.)

In Idaho, tortious interference with a contract is established under the following elements: "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach." Wesco Autobody Supply, Inc. v. Ernest, 243 P.3d 1069, 1083 (Idaho 2010).[16] And importantly, the Idaho Supreme Court has held that actual knowledge is not required to establish a claim of tortious interference with prospective economic advantage. Highland Enterprises, Inc. v. Barker, 986 P.2d 996, 1004 (Idaho 1999). Instead, all that must be shown as to a defendant's knowledge is that "[Defendants] had knowledge of facts which would lead a reasonable person to believe that the economic advantage existed." Id.

Here, LPL/Riverside and Osaic/Family Tree have engaged in conduct that clearly meets each element of both claims. As treated more fully in the Complaint, all three Ex-Employees agreed not to improperly use or disclose First Tech's confidential information in the Ex-Employees' FA Agreements. (See FA Agreements attached to the Complaint as **Exhibits 1, 2 and 3**.) Both sets of firm defendants have been aware that the Ex-Employees owed

---

[16] Recognized as nearly identical to a claim a of tortious interference with contract, a claim for tortious interference with prospective economic advantage requires proof of the following elements: "(1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted." Wesco Autobody Supply, Inc. v. Ernest, 243 P.3d 1069, 1081-82 (Idaho 2010).

confidentiality obligations to First Tech for at least weeks.[17] Despite these notices and demands, LPL/Riverside and Osaic/Family Tree continued to interfere with the Ex-Employee's obligations to First Tech. Indeed, First Tech anticipates that expedited discovery will show that LPL and Osaic each enticed their new hires, monetarily or with other incentives, to violate their confidentiality obligations owed to First Tech in order to unfairly compete with First Tech. Osaic/Family Tree also interfered with the Kendall Agreement, inducing Mr. Kendall's on-going to breach of his confidentiality and non-solicitation restrictions therein. (See Complaint at para.s 47-52.)

As for First Tech's claim of tortious interference with its prospective economic advantage, LPL/Riverside and Osaic/Family Tree were unquestionably aware of First Tech's economic expectancy in the client relationships First Tech has with its clients from the start, since they were the very relationships these defendants were trying to co-opt by hiring the Ex-Employees. Yet, the Defendants knowingly resorted to unfair/improper competition by means of enticing/directing/tolerating and/or ratifying the acts of the Ex-Employee as they stole and used client information in violation of their respective contractual and statutory obligations.

For at least the above reasons, First Tech is likely to succeed on both of these claims.

**3.  The balance of equities here tips sharply in favor of First Tech.**

The third factor in determining if a TRO should be granted is the harm that the injunction would cause the Defendants. This factor also weighs heavily in favor of the Plaintiff.

Idaho courts (and elsewhere) have held that a defendant "[c]annot suffer harm from an injunction that merely ends an unlawful practice…" Diamond House of SE Idaho, LLC v. City of Ammon, 381 F. Supp. 3d 1262, 1279 (D. Idaho 2019) (quoting Rodriguez v. Robbins, 715

---

[17] First Tech send Cease and Desist Letters to the firm defendants on September 11th and September 13th which are attached to the Complaint as **Exhibits 40** and **41**.

F.3d 1127, 1145 (9th Cir. 2013). Further, each of the Ex-Employees has already agreed that in the event of their breach of their respective FA Agreements, First Tech shall be entitled to injunctive relief. <u>See</u> the Ex-Employee's FA Agreements at para. 23 attached to the Complaint as **Exhibits 1, 2** and **3**. Indeed, Mr. Kendall has agreed to the issuance of such an injunction twice since similar language is found in the Kendall Agreement as well. <u>See</u> Kendall Agreement at p. 3, para. 8 attached to the Complaint as **Exhibit 8**.

Accordingly, any hardship should be borne by the Defendants because being them being enjoined from further bad acts is far outweighed by the harm suffered by First Tech from the Defendants' illegal conduct.

**4.  <u>The public interest is served through enjoining Defendants from further bad acts.</u>**

The final factor for the Court to consider is whether the public interest would be served by granting the requested injunction. This final factor also weighs heavily in First Tech's favor.

It is axiomatic that the public benefits from the deterrence of trade secret theft as well the enforcement of contracts. <u>See e.g.</u> <u>Redapt Inc. v. Parker</u>, 2020 WL 3128859 at *6 (W.D. Wash. June 11, 2020) ("[T]he public interest is served when defendant[s] [are] asked to do no more than abide by trade laws and the obligations of contractual agreements signed with [their] employer. Public interest is also served by enabling the protection of trade secrets."). Thus, the law is clear that the public would be served by granting an injunction against the Defendants.

## V.  <u>CONCLUSION</u>

Based on the foregoing and Plaintiff's Complaint, Plaintiff respectfully requests that the Court enter a Temporary Restraining Order pursuant to Fed. R. Civ. P. 65 against all Defendants and those acting in concert with them as follows:

    a)     Prohibiting Defendants Mr. Jackson, LPL and Riverside from accepting any

business – including the transfer of any client account – from any client on Mr. Jackson's Stolen List, to the extent that the client's transfer request was received by First Tech on or after the date this action was filed;

b)      Prohibiting Defendants Mr. Kendall, Osaic and Family Tree from accepting any business – including the transfer of any client account – from any client on Mr. Kendall's Stolen List, to the extent that the client's transfer request was received by First Tech on or after the date this action was filed;

c)      Requiring Mr. Kendall not to use, communicate, disclose, divulge, misappropriate, or commercially exploit any confidential non-public client information that he received relating to clients he serviced while at First Tech;

d)      Requiring Mr. Kendall not to directly or indirectly solicit, divert, or otherwise takeaway any First Tech client that he serviced for First Tech at the time of his resignation;

e)      Prohibiting Defendants Jackson, LPL, and Riverside from disclosing any information about clients that Mr. Jackson and/or Ms. Hernandez serviced at First Tech unless that information is "publicly available" as that term is used in 17 C.F.R. § 248.3(v).

f)      Prohibiting Defendants Mr. Kendall, Osaic and Family Tree from disclosing any information about clients Mr. Kendall serviced at First Tech unless that information is "publicly available" as that term is used in 17 C.F.R. § 248.3(v).

g)      Requiring return of all of Plaintiff's documents and information improperly taken or thereafter kept by Mr. Jackson, Mr. Kendall, Ms. Hernandez and/or those persons acting in concert with them, including LPL/Riverside/Osaic/Family Tree, and prohibiting any further use of such documents and information;

h)      Requiring preservation and submission to an appropriate third-party vendor of

Plaintiff's selection of all potentially relevant electronic evidence, including: (i) forensic copies of the electronic devices used by Mr. Jackson, Mr. Kendall, Ms. Hernandez and/or those persons acting in concert with them, including LPL, Riverside, Osaic and/or Family Tree; (ii) forensic copies of all documents and information on LPL, Riverside, Osaic and/or Family Tree's systems created from the documents and information improperly taken by Mr. Jackson, Ms. Hernandez and/or Mr. Kendall; and (iii) forensic copies of all email/messaging platforms outside of those monitored by LPL, Riverside, Osaic and/or Family Tree;

i)      Requiring permanent removal by an appropriate third-party vendor of Plaintiff's selection of all First Tech's documents and information improperly taken by Mr. Jackson, Mr. Kendall and/or Ms. Hernandez (or containing information derived therefrom) from any electronic devices, computer or back-up system used by any Defendant; and

j)      Setting a hearing for Preliminary Injunction at a point in the future that will allow a sufficient period for expedited discovery; and

k)      Providing such other additional or different relief to which First Tech may be entitled.

Respectfully submitted this 16th day of October, 2025.

PROSSER & JOHNSON, PLLC

*/s/ Niel Prosser*
Niel Prosser
Kyle Johnson
Alex Bunn

GIVENS PURSLEY LLP

*/s/ Robert B. White*
Alexander P. McLaughlin
Robert B. White

*Attorneys for First Technology Federal
Credit Union*

# EXHIBIT A

# Stolen List - Jack Jackson

## FILED UNDER SEAL

# EXHIBIT D

# Stolen List - Uci g''Mgpf cm

FILED UNDER SEAL

# EXHIBIT E

## Mgpf cm'Ur qwucn'Nkuv

FILED UNDER SEAL

# EXHIBIT D

# Kendall Holdings List

## FILED UNDER SEAL