Joshua D. Hurwit (ISB #9527)
Anne Henderson Haws (ISB #10412)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone:  208.342.5000
JDHurwit@hollandhart.com
AHHaws@hollandhart.com

Theodore E. Harman (*Pro Hac Vice forthcoming*)
Ryan W. Mitsos (*Pro Hac Vice forthcoming*)
LAWRENCE KAMIN LAW
300 S. Wacker Dr., Suite 500
Chicago, IL 60606
Telephone: 312.469.3204
tharman@LawrenceKaminLaw.com
rmitsos@LawrenceKaminLaw.com

Attorneys for Defendants Alfred "Jack" Jackson, Sage Kendall, Kristina Hernandez, and Jackson
Holdings, LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FIRST TECHNOLOGY FEDERAL CREDIT UNION, | Case No. 1:25-cv-00582 BLW |
| Plaintiff, | **DEFENDANTS' ALFRED JACKSON, SAGE KENDALL, KRISTINA HERNANDEZ, AND JACKSON HOLDINGS, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND TO SET LATER HEARING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| LPL FINANCIAL, LLC, OSAIC WEALTH INC., ALFRED "JACK" JACKSON, SAGE KENDALL, KRISTINA HERNANDEZ, FAMILY TREE FINANCIAL, LLC, AND JACKSON HOLDINGS LLC, | |
| Defendants. | |

Defendants Alfred "Jack" Jackson ("Jack"), Sage Kendall ("Sage"), Kristina Hernandez ("Kristina"), and Jackson Holdings LLC d/b/a Riverside Financial Planning ("Riverside") (collectively the "Defendants") hereby respond in opposition to Plaintiff's Motion for Temporary Restraining Order and to Set Later Hearing on Plaintiff's Motion for Preliminary Injunction (the "Motion" or "Plaintiff's Motion"). For the reasons stated below, Defendants respectfully request the Court deny Plaintiff's Motion in full because neither a temporary restraining order ("TRO") nor a preliminary injunction are proper or necessary.

## I.    INTRODUCTION

Plaintiff's Motion and Complaint for Preliminary Injunction (the "Complaint") lacks merit. It is Plaintiff's latest attempt to harass Defendants following their departures from First Technology Credit Union ("First Tech") and Raymond James Financial Services, Inc. ("Raymond James") to LPL Financial, LLC ("LPL") (for Jack and Kristina) and Osaic Wealth Inc. ("Osaic") (for Sage). The Court should deny Plaintiff's Motion because (i) First Tech has not suffered any irreparable harm, (ii) its claims are unlikely to be successful on the merits, (iii) the balancing of equities weighs against Plaintiff, (iv) the requested injunction is not in the public interest in that it attempts to deny clients their choice of financial advisor, and (v) Plaintiff requests improper relief for a TRO that goes beyond the status quo and would entail a seizure of Defendants' property without any consideration for handling protected information.

## II.    FACTUAL BACKGROUND

On September 9, 2025, Jack and Sage resigned from First Tech and Raymond James pursuant to the Protocol for Broker Recruiting (the "Broker Protocol") via email. *See* Ex. 18 and Ex.19 to Compl. Pursuant to the Broker Protocol, of which Raymond James, LPL, and Osaic are all signatories, Jack and Sage were permitted to take five pieces of client information with them at

their departure: client names, phone numbers, addresses, email addresses, and account titles. Jack and Sage invoked the Broker Protocol and advised First Tech and Raymond James that copies of their respective "Protocol Lists" were in locked desk drawers in their former offices.[1] Jack and Kristina then began working at Riverside and LPL and Sage began working at Family Tree Financial, LLC ("Family Tree") and Osaic.

Following their resignations, and in their new roles with Riverside and Family Tree, Jack and Sage contacted clients to inform them of their departure from First Tech via email on September 9, 2025. As part of their transition, and as permitted under the Broker Protocol, they also sought business from their former clients, who they believed trusted and respected them based on years of providing successful financial advisory services.

On September 10, 2025, at 12:50 p.m., counsel for Jack and Kristina received notice of an email from LPL, forwarding an email from Raymond James's counsel, Aaron S. Furniss. Declaration of Ryan W. Mitsos ("Mitsos Decl."),  Ex. A. The email from Mr. Furniss stated that First Tech is a part of Raymond James Financial Institutions Division, but that First Tech was not a signatory to the Broker Protocol and that First Tech contested Defendants departure under the Broker Protocol. *Id.* On September 10, 2025, at 4:35 p.m., counsel for Defendants sent a response letter to Raymond James on Jack's behalf. *Id.*, Ex. B. The response letter informed Raymond James that, despite First Tech's assertions, Jack believed (and still believes) the Broker Protocol applied to him, but that, going forward, he would not use his Protocol List and would only provide a copy to his attorneys to avoid spoliation of evidence. *Id.*

---

[1] The "smoking gun" screenshots attached to the Complaint as Ex. 28 simply show Jack and Sage making copies of their Respective Protocol Lists so that they could be left on site at First Tech. *See* Declaration of Alfered "Jack" Jackson ("Jackson Decl.") and Declaration of Sage Kendall ("Kendall Decl.").

On September 11, 2025, Sage received a Cease and Desist Demand (the "Sage Demand") from First Tech's lawyer ("Prosser") with a First Tech contract attached. Ex. 40 to Compl. Two days later, on Saturday, September 13, 2025, Jack, Kristina, and Riverside received a similar Cease and Desist Demand (the "Riverside Demand") from Prosser. Ex. 41 to Compl. No contracts were attached to the Riverside Demand. In both the Sage Demand and the Riverside Demand, Prosser demanded Defendants stop using any client list, return copies of such lists, provide an accounting of how the information had been used, and to forensically copy from Defendants' devices all information contained in Defendants' Protocol Lists and then purge such information from their devices. The Sage Demand also included reference to a non- solicitation agreement from 2012— of which Sage had no recollection prior to his departure from First Tech—and demanded Sage cease any ongoing solicitation of clients or employees.

On September 12, 2025, Sage's counsel emailed Prosser regarding the Sage Demand. Mitsos Decl., Ex. C. Sage agreed that he would not "initiate" any further contact with clients until September 15, 2025. Nothing in the exchange or any other subsequent communication suggested that Sage could not respond to client communications or accept the transfer of clients who wished to continue with Sage as their advisor. The email also requested a copy of Sage's personnel file. The request for the personnel file was not honored until October 12, 2025. Mitsos Decl., Ex. D.

In a September 15, 2025 response counsel stated  that  Sage had no recollection of signing a non-solicit agreement, and that the agreement was likely not enforceable under applicable law.. *See* Mitsos Decl., Ex. E. The response reasserted Sage's belief that the Broker Protocol applied to his resignation, but, in a good faith attempt to resolve the matter short of litigation, agreed to cease any use of and return his Protocol List to Plaintiffs and, going forward, rely solely on his memory of client names and contact information available through publicly available sources.  The

response also proposed preservation and remediation of electronically stored information ("ESI"). There was no suggestion that Sage could not continue to respond to contacts initiated by clients or accept transfers from clients who wished to follow Sage. Jack also responded to the Riverside Demand on September 15, 2025. Mitsos Decl., Ex. F. Similarly, Jack, Kristina, and Riverside reasserted their belief that the Broker Protocol applied to Jack's resignation, but made good faith attempts to resolve the dispute, stating that they neither used nor accessed any information in Jack's Protocol List since September 10, 2025. Jack also provided a copy of his Protocol List, confirmed the extent of the communications as requested, and agreed to forensically copy their devices and engage in purging discussions.

On September 17, 2025 and September 18, 2025, Prosser sent second letters to Jack (Ex. G) and Sage (Ex. H), respectively, accepting some of counsel's proposals and declining or proposing amendments to others. *See* Mitsos Decl. the next day the parties met and conferred over telephone to discuss issues still in dispute. Defendants sent a follow up email to Prosser memorializing this discussion. Mitsos Decl., Ex. I. Defendants' counsel drafted a proposed electronic remediation protocol ("Defendants' ESI Protocol") for all parties and provided these to Prosser, as requested, before 5:00 p.m. CT on September 19, 2025. *Id.*, Exs. J-L.

Despite Plaintiff's apparent urgency, Prosser waited until 7:00 p.m. on September 22, 2025 to respond. *Id.*, Ex. M. This response asked for additional information surrounding the ESI but made no objections to Defendants' ESI Protocol. *Id.*, Ex. N. Over the next few days, Prosser made additional demands on expedited timelines. *Id.* Exs. O-Q. When Defendants responded, Plaintiff expanded its demands, including by requesting the use of a consultant to conduct the forensic imaging of Defendants' devices in way that would capture attorney-client privileged information, and sought additional information regarding Defendants' proposed consultant and

*counsels'* non-party clients. *See id.*, Ex. R. Ultimately, Plaintiff refused to use a consultant simply because Defendants **counsel** had used that consultant previously. *Id.*, Ex. S.

Plaintiff did not provide any redlines or edits to Defendants' ESI protocol until 7:16 p.m. on September 29, 2025—ten days after receipt—when they proposed an entirely new protocol ("Plaintiff's ESI Protocol") and demanded a response in less than 48 hours. *Id.*, Exs. T-U. Plaintiff's ESI Protocol was not acceptable to Defendants, requiring forensic imaging by a consultant, who would then search for privileged materials, and, once complete, provide the forensic image to Plaintiff for its review. Plaintiff would review and choose which documents to share with Defendants. In essence, Plaintiff wanted to seize Defendants' devices and repositories and retain complete control over the review of all information contained therein without accounting for sensitive, private, non-relevant, and privileged data contained on Defendants' business and personal devices, including information relating Defendants' clients with no connection to Plaintiff.

On October 1, 2025, Defendants responded, asserting these very same concerns, and requested a telephone call to discuss. Mitsos Decl., Ex. V. Counsel also informed Prosser that they would be unavailable on October 3 and October 6 and suggested a call on October 7. On October 2, Prosser, copying LPL and Osaic, responded with additional demands, and began discussing all parties together, despite the allegedly confidential information at issue. Mitsos Decl., Ex. W. Defendants had to remove both Osaic's and LPL's counsel from their follow up email on October 2 to provide certain documents Plaintiff demanded. *Id.*, Ex. X. Despite counsels notice that they were unavailable on October 3, 2025, Prosser demanded a response before the close of business on October 3. *Id.*, Exs. V-W. On October 3, Prosser emailed more demands with a deadline of close of business on October 6. *Id.*, Ex. Y. Still, Defendants sought to meet Plaintiffs' deadlines,

providing additional documentation before the close of business on October 3—an email communication which is notably excluded from Plaintiff's Ex. 33—and again informed Prosser that they were unavailable on October 6. *Id.*, Ex. Z.

On October 6, 2025—despite having been told multiple times that counsel was unavailable on this date—Prosser canceled the planned October 7 meet and confer call because their demands had not been met in full. Mitsos Decl., Ex, AA. Many of Plaintiff's demands would have been met if and when the Parties agreed upon an ESI protocol, which Plaintiff now refused to discuss. At this point, it became clear to Defendants that Plaintiff had never intended to engage in any good faith negotiations. Instead, it sought to harass, threaten, and otherwise make Defendants' transition to their new firms as difficult as possible. Plaintiff's unreasonable demands and invented urgency were aimed at getting in front of this Court to seek a TRO and Preliminary Injunction, first requested until ten (10) days after Plaintiff elected to cease communications.

## III.    LEGAL FRAMEWORK

The standard for issuing a TRO is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001)). This means Plaintiff must show it is "'likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S 8, 20 (2008)).

"Although the standard for obtaining a temporary restraining order and a preliminary injunction is identical, they serve fundamentally different purposes." *BrightView Landscape Dev., Inc. v. Howard*, 2025 U.S. Dist. LEXIS 89181, *6 (D. Idaho 2025). "The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity

to pass upon the merits of the demand for preliminary injunction." *Id.*

## IV.    ARGUMENT

### 1.    First Tech will not be irreparably harmed without the Court's intervention.

First Tech will not be irreparably harmed without this Court's intervention. A plaintiff may obtain an injunction only where he or she can "demonstrate immediate threatened injury." *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). "A possibility of irreparable harm is insufficient. Instead, Plaintiffs must establish that irreparable harm is likely, not just possible in the absence of an injunction." *All. For the Wild Rockies v. United States Forest Serv.*, 2016 U.S. Dist. LEXIS 78984, *8 (D. Idaho 2016); *Winter*, 555 U.S. at 23. "Failure to establish this requirement is **fatal** to the request for a TRO[.]" *Id.* (emphasis added); *Winter*, 555

U.S. at 24. "Irreparable harm exists where monetary damages provide inadequate relief, for example in cases involving environmental damage or human suffering." *Sky Capital Group, LLC v. Rojas*, 2009 U.S. Dist. LEXIS 40970, *34 (D. Idaho 2009). "[A] preliminary injunction should only be granted if the movant does not have an adequate remedy at law. *Id.* (quoting *Saini v. Int'l Game Tech.*, 434 F.Supp.2d 913, 918-19 (D. Nev. 2006).

As will be discussed in more detail in Section IV, 2 below, much of the information in the Protocol Lists is publicly available information and therefore does not constitute a trade secret.

Thus, Defendants' use of their Protocol Lists does not cause irreparable harm to the Plaintiff. Even assuming that Plaintiff could prove the Protocol Lists are a trade secret (which it cannot), "[u]nlike a copyright infringement case, 'a trade secrets plaintiff who shows likely success on the merits of its claim is not entitled to a presumption of irreparable harm warranting preliminary injunctive relief.'" *Id.* (quoting *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F.Supp.2d

1188, 1198 (E.D. Wash. 2003)).[2]

While disclosure of trade secrets *could* support a finding of irreparable harm, that is not the case here. If First Tech has suffered any harm, that harm "has to a large extent, already been incurred and is recoverable through a monetary award." *Id.* First Tech acknowledges throughout its Motion and Complaint that Defendants have already contacted and transitioned clients to their new firms. This case is not about environmental harm or human suffering, it is about the loss of revenue due to the loss of clients and fees. Without conceding that Jack and Sage were prohibited from contacting clients in the manner which they did, any alleged harm First Tech suffered is easily remedied by monetary damages, making a TRO and preliminary injunction improper remedies. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *Sky Capital Group, LLC*, 2009 U.S. Dist. LEXIS 40970 at *40 (the generalized threat of lost revenue and profits can be adequately redressed by monetary relief). Indeed, Plaintiff has already filed a statement of claim seeking arbitration with FINRA and prayed for compensatory damages in an amount to be determined at final trial in their Complaint.

Plaintiff attempts to overcome this hurdle by alleging that harm is ongoing due to the "rapid and continuing transfer of accounts out of First Tech." Motion at 8. This ignores the fact that, as of September 10, 2025, Defendants Jack, Kristina, and Riverside agreed not to use any of the allegedly confidential information (Mistos Decl., Ex, B), and Defendant Sage followed suit on September 15, 2025 (Mistos Decl., Ex. E). Jack's and Sage's Declarations confirm that they have not been using such information. Failure to reach agreement as to Plaintiff's requested ESI

---

[2] Defendants do not concede that Plaintiff is likely to succeed on the merits of its claims, as discussed in Section IV, 2 of this Memorandum of Points and Authorities in support of Defendants' Response in Opposition to Plaintiff's Motion

protocol also does not amount to irreparable harm because Defendants have already agreed not to use the ESI.

Plaintiff also alleges irreparable harm in the form of the "threat of losing more clients—including the goodwill First Tech has created with those clients." Motion at 8 (quoting Decl. of S. Poole at para. 26). However, neither a TRO nor preliminary injunction are warranted "where they are based on a generalized threat of lost revenue, market value, and goodwill." *Sky Capital Group, LLC*, 2009 U.S. Dist. LEXIS 40970 at *36. To the extent Plaintiff is concerned about the possibility of additional clients transitioning away from First Tech, "[l]osses that are merely speculative are also insufficient to support a finding of irreparable harm; the injury, rather, must be actual or imminent." No such injury is at issue here.

Thus, because information contained in Defendants' Protocol Lists are not trade secrets—and are not currently being used—the prior use of such lists, which came from Raymond James, cannot cause First Tech irreparable harm. Alternatively, if this Court finds client lists are trade secrets, any harm Plaintiff suffered has either already occurred or is too speculative to warrant a finding of irreparable harm. Failure to prove irreparable harm is fatal to Plaintiff's Motion, and this Court should deny Plaintiff's Motion.

## 2. **First Tech is unlikely to succeed on the merits of its claims**

### a. *California law should apply to the claims at issue*.

Plaintiff mistakenly seeks to apply Idaho law to the claims at issue. "When exercising its diversity jurisdiction, the court follows the choice of law rules of the state in which it sits." *Fed. Ins. Co. v. TDS Metrocom, LLC*, 2022 U.S. Dist. LEXIS 230637, *8 (D. Idaho 2022). "Idaho has adopted the approach of the Restatement (Second) of Conflict of Laws § 187 (1971) that '[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied

if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." *Id.* Both Jack and Sage signed Successor Advisor Commission Agreements ("Long Term Retention Agreements" or "LTR Agreements") (Ex. AB and AC respectively), relating to the management of Bert Browne's book of business following his retirement. Indeed, Plaintiff asserts that Jack and Sage were "assigned a substantial group of clients when Bert Browen [sic] retired in approximately 2019". Decl. of Alex Assaf, ¶¶5-10; *see also* Memorandum in Support of Motion at 11 ("This is particularly true of the lion's share of Mr. Jackson's clients, as First Tech transferred those clients to him and facilitated him working with those clients after their long-time advisor Bert Browen [sic], retired back in 2020.").

These LTR Agreements contain explicit language stating that "[t]his Agreement shall be interpreted under the laws of the State of California" and that "with respect to the subject matters addressed" it "supersedes all prior and contemporaneous oral and written agreements and discussions." Ex. AB and AC at ¶¶J, K. Moreover, the Statement of Understanding, attached to the Complaint as Ex. 8, seeks to set the California Arbitration Act and the California Code of Civil Procedure as the standard for use in any dispute which is to be decided under arbitration before the American Arbitration Association.

In addition to the choice of law clauses within the LTR Agreements and reference to California protections in the Statement of Understanding, First Tech's principal place of business is San Jose, California. Compl. ¶1. First Tech enjoys the protection of California law, but now, in an apparent act of forum selection, seeks to deny Defendants that same protection—despite drafting contracts that require the application of California law—because Idaho law is more favorable to their claims. Non-solicitation agreements, such as the one First Tech alleges Sage violated, are void and unenforceable under California law. Cal. Bus. and Professions Code §

16600(a) (2023) ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."); Cal. Bus. and Professions Code § 16600(b)(1) (2023) ("This section shall be read broadly . . . to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter."); Cal. Bus. and Professions Code § 16600.5(b) (2023) ("An employer or former employer shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California.").

This Court should apply California law as it relates to the LTR agreement and Statement of Understanding to ensure Plaintiff does not benefit from forum selection. This Court should apply California law to all of Plaintiff's claims for uniformity and predictable outcomes.

b. _Defendants departed First Tech under the Broker Protocol_.

The Broker Protocol permits financial advisors to take certain client information when moving between signatory firms. _See_ Ex. 10 to Compl. Upon their departures from First Tech, Jack and Sage invoked the Broker Protocol,[3] of which Raymond James, LPL, and Osaic are all signatories. Raymond James Financial Institutions Division became a signatory to the Broker Protocol on September 13, 2017 through a clarification letter (Ex. 13 to Compl.), which states:

> This letter hereby clarifies the inclusion of FID within the Protocol. FID provides professional support for established financial institutions, such as banks and credit unions and their affiliated registered representatives. These registered representatives are not employees of the FID, but are employees or independent contractors of the banks, credit unions, or other financial institutions with which they are affiliated. These registered representatives may be bound by separate, restrictive covenants with their respective financial institutions. FID's participation in the Protocol is not intended to and does not bind or prohibit these separate, unaffiliated, non-signatory institutions from enforcing their restrictive covenants with these registered representatives, and FID will cooperate in such enforcement

---

[3] _See_ Jackson Decl., and Kendall Decl.

as requested and/or as required in accordance with RJFS/FID's agreements with the non-signatory financial institutions.

Further, as it relates to Jack's and Kristina's Financial Advisor Agreements (Ex. 1 and 3 respectively to Compl.), there is nothing within those agreements that implies that the Broker Protocol does not apply. Paragraph 20(b) of their Financial Advisor Agreements states that they "agree[] not to disclose, either directly or indirectly, to any person (e.g., individual, firm or business) any information obtained from clients of RJFS or customers of [First Tech] unless the information is 'publicly available information' as that term is defined at Title 17, Code of Federal Regulations, section 248.3(v)." However, that very same paragraph also contemplates the Broker Protocol, stating that "[i]f Financial Advisor's transfer is pursuant to the Protocol for Broker Recruiting, Financial Advisor understands and agrees to the terms of the Protocol . . ." Thus, there is no question that the Broker Protocol should apply to Jack and Kristina. It does not matter that First Tech is not a signatory to the Broker Protocol. There is nothing in Jack and Kristina's Financial Advisor Agreements to suggest that the Broker Protocol does not apply—in fact, the opposite is true—and all information used to create Jack's Protocol List was created using Raymond James's database. *See* Jackson Decl.

While Sage's Financial Advisor Agreement and Statement of Understanding contain confidentiality clauses and, in the case of the Statement of Understanding, a non-solicitation clause, Sage had no recollection of these contracts upon his departure from First Tech and believed he departed under the protection of the Broker Protocol. As stated previously, non-solicitation agreements are void and unenforceable under California law and should not apply to Sage's departure from First Tech. *See* Cal. Bus. and Professions Code §§ 16600(a), (b)(1).

The information relied upon by Sage in reaching out to clients should be treated as "public information" within the meaning of 17 C.F.R. § 248.3(v). Sage could remember the names of his

clients and could find their contact information from public sources.[4] Further, since September 12, 2025 Sage has not relied upon his Protocol List (or any other list). *See* Kendall Decl.

Finally, Jack's and Sage's LTR Agreements fall under a specific exception to the Broker Protocol, which states that any accounts received as part of a retirement program, paying a retiring advisor trailing commissions, an advisor's ability to take client information as it relates to those accounts shall be governed by the terms of the contract. *See* Ex. 10 to Compl. The LTR Agreements do not prevent taking client information or solicitation of those clients. *See* Mistos Decl., Ex. AB and AC. Therefore, as it relates to these accounts, the Broker Protocol should also apply.

c. *First Tech is unlikely to succeed in its claims for misappropriation of trade secrets under DTSA[5] or CUTSA*.[6]

"To state a claim for trade secret misappropriation under the DTSA and the CUTSA, a plaintiff must allege that: '(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff.'" *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (quoting *Space Data Corp. v. X*, 2017 U.S. Dist. LEXIS 22571, *2 (N.D. Cal. 2017)). "The elements of misappropriation under the DTSA are similar to those under the CUTSA, except that the DTSA applies only to misappropriations that occur or continue to occur on or after its date of enactment on May 11, 2016." *Id.* "Under both the DTSA and the CUTSA, 'misappropriation' means either (1) the '[a]cquisition of a trade secret by

---

[4] The "Kendall Client Holdings List" attached to the Complaint as Ex. 32 contains no specific client information. Rather, it is a list of the types of investments held by clients such as specific mutual funds without any indication of which client held a specific investment. Sage's purpose in using such a list was to confirm that Osaic would be able to hold the types of investments held by his clients. *See* Kendall Decl.

[5] Defend Trade Secrets Act, 18 U.S.C. §1836, *et seq.*

[6] California Uniform Trade Secrets Act, Cal. Civ. Code §3426, *et seq*.

another person who knows or has reason to know that the trade secret was acquired by improper means;' or (2) the '[d]isclosure or use of a trade secret of another without express or implied consent.'" *Id.* (quoting 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)).

The information in Defendants' Protocol Lists does not constitute trade secrets to the extent that it is publicly available information. 17 C.F.R. §248.3(v) defines publicly available information as "any information that you reasonably believe is lawfully made available to the general public from: (i) Federal, State, or local government records; (ii) Widely distributed media; or (iii) Disclosures to the general public that are required to be made by federal, State, or local law." "You have a reasonable belief that an individual's telephone number is lawfully made available to the general public if you have located the telephone number in the telephone book" 17 C.F.R. §248(v)(2)(i). Widely distributed media includes "publicly available information from a telephone book, a television or radio program, a newspaper, or a web site that is available to the general public on an unrestricted basis" and is not restricted merely because a fee or password is required. 17 C.F.R. §248(v)(2)(iii). Here, many of the names and information on Defendants' Protocol List have been located through publicly available information and therefore should not be considered a trade secret.

Even if this Court finds that information on Defendants' Protocol Lists is a trade secret, Plaintiff is still unlikely to succeed on its claims because there was no misappropriation. Defendants believed—and still believe—that they departed from First Tech and Raymond James pursuant to the Broker Protocol. Therefore, they had a right to take from Raymond James the information allowed under the Broker Protocol. Further, given Raymond James' clarification letter and the contracts available to them at the time of their resignations, they had no reason to believe that taking the Protocol Lists was improper. Such lists were taken with the express consent of the

Broker Protocol. Once Plaintiff contested this understanding, Defendants immediately agreed to cease all use of the Protocol Lists in a good faith effort to resolve the matter. Plaintiff will not be able to support its claims that Defendant's "stole" the information because the Defendants acted above board in informing First Tech that they were relying on the Broker Protocol. Therefore, Plaintiff is unlikely to succeed on any misappropriation of trade secrets claims.

d. _First Tech is unlikely to succeed on its breach of contract claims_.

First Tech is unlikely to succeed on its breach of contract claims against Defendants. "The elements for a California breach of contract are: '(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach.'" *Albers v. Paul Revere Ins. Grp.*, 2023 U.S. App. LEXIS 14122 (9th Cir. 2023) (quoting *CDF Firefighters v. Maldonado*, 70 Cal.Rptr.3d 667, 680 (Ct. App. 2008)). Defendants departed First Tech and Raymond James under the Broker Protocol. There is no breach relating to Defendants taking information they were permitted to take under the Broker Protocol. Jack's and Kristina's FA Agreements with Raymond James and First Tech explicitly contemplated the Broker Protocol, and they had no reason to believe that the Broker Protocol would not apply. Ex. 1 and 3 to Compl. Sage did not have access to (nor any recollection of) his Advisor Agreement with Raymond James and First Tech, and, importantly, there is nothing in Sage's FA Agreement that implies that the Broker Protocol does **not** apply to Sage's contract. Ex.

2 to Compl. Therefore, it was not unreasonable for Sage to believe that he could depart under the Protocol. Additionally, the non-solicitation clause within Sage's Statement of Understanding is void and unenforceable under California law, and so it cannot be the source of a breach of contract claim. Thus, Plaintiff's breach of contract claims against Defendants are unlikely to succeed, and Plaintiff's Motion should be denied in this respect.

e. *First Tech is unlikely to succeed on its claims of tortious interference with a contract and tortious interference with prospective economic advantage*.

First Tech is unlikely to succeed on its claims of tortious interference with a contract and tortious interference with prospective economic advantage because CUTSA preempts such claims. "The California Uniform Trade Secrets Act ("CUTSA") was intended 'to occupy the field of trade secret liability to the exclusion of other civil remedies.'" *Implicit Conversions, Inc. v. Stine*, 2025 U.S. Dist. LEXIS 154864, *6 (N.D. Cal. 2025) (quoting *Five Star Gourmet Foods, Inc. v. Fresh Express, Inc.*, 2020 U.S. Dist. LEXIS 16368, *14 (N.D. Cal. 2020)). CUTSA "preempts common law claims that are 'based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.'" *Id.* (quoting *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal.App.4th (2009)). "CUTSA supersedes other claims even when they seek 'something more' or 'require[] proof of additional elements not necessary to a trade-secret misappropriation claim.'" *Id.* (quoting *Echospan, Inc. v. Medallia, Inc.*, 2022 U.S. Dist. LEXIS 237931, *2 (N.D. Cal. 2022)). "If there is no material distinction between the wrongdoing alleged in the CUTSA claim and that alleged in a different claim, the CUTSA claim preempts the other claim." *Id.* (citing *Arthur J. Gallagher & Co. v. Tarantino*, 498 F.Supp.3d 1155, 1174 (N.D. Cal. 2020)).

Plaintiff's tortious interference claims are based on allegations that Defendants "agreed not to improperly use or disclose First Tech's confidential information in the[ir] . . . FA Agreements" (Compl. at 17), which is the same nucleus of facts as Plaintiff's misappropriation of trade secrets claim. Thus, Plaintiff's tortious interference claims are preempted by CUTSA and therefore unlikely to succeed on the merits.

**3. The balance of equities favors Defendants.**

The balance of equities favors Defendants because Plaintiff's request an extreme and overbroad remedy. When determining which way the balance of equities tips, courts "must balance

the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" *Winter* 555 U.S. at 24.

As noted, Plaintiff is not currently experiencing irreparable harm, and so it will suffer no injury in the absence of a TRO. Importantly, Defendants already agreed to address the alleged use of confidential information, including the return of such purported information. All that was required was a reasonable ESI protocol. Plaintiff's proposed ESI protocol is not reasonable in that it fails to address legitimate privilege and privacy concerns of Defendants and non-parties. . Forensic examination of a party's ESI, in the absence of consent, is an extreme remedy that even a court has limited authority to compel. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2020 U.S. Dist. LEXIS 192550, *10 (N.D. Fla. 2020); *see also In re Ford Motor Co.,* 345 F.3d 1315, 1317 (11th Cir. 2003) (district court's order allowing requesting party direct access to responding party's electronic databases without "a factual finding of some non-compliance with discovery rules" was an abuse of discretion); ; *FCA US LLC v. Bullock*, 329 F.R.D. 563, 567 (E.D. Mich. 2019) ("Courts have cautioned that they are loathe to sanction intrusive examination of an opponent's computer[.]");

Further, "mere suspicion or speculation that an opposing party may be withholding discoverable information is insufficient to support an intrusive examination of the opposing party's electronic devices or information system." *Belcastro v. United Airlines*, 2019 U.S. Dist. LEXIS 220317 at *6; *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2020 U.S. Dist. LEXIS 192550 at *14 ("the Court cannot order a forensic examination when the sole purpose of that examination is based on mere skepticism, suspicion, or speculation concerning the completeness of a party's discovery production."); *Mirbeau of Geneva Lake LLC v. City of Lake Geneva*, 2009 U.S. Dist. LEXIS 101104, *4 (E.D. Wisc. 2009) ("Only if the moving party can actually prove that the

responding party has concealed information or lacks the expertise necessary to search and retrieve all relevant data, . . . is it proper for the moving party to initiate the searches of the other party's ESI."). Here, Plaintiff has made no such showing. Plaintiff will receive lists of potentially responsive documents and all documents to which they are entitled after Defendants' counsels' review of the same—as is the normal discovery practice. The balance of equities tips in favor of the Defendants.

### 4.  <u>An injunction is not in the public interest</u>.

An injunction is not in the public interest due because Plaintiff's proposed relief is overboard. "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one of the favors granting or denying the temporary restraining order." *BrightView Landscape Dev., Inc.*, 2025 U.S. Dist. LEXIS 89181 at *9-10. "[C]ourts . . . should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).

Plaintiff requests that this Court order Defendants not to accept any business—including the transfer of client accounts—from any clients named on Jack's or Sage's Protocol Lists. This obviously has an impact on non-parties and should therefore be viewed with caution. "The public has a strong interest in the promotion of free and fair competition" *Fort Wash. Inv. Advisors, Inc. v. Adkins*, 2019 U.S. Dist. LEXIS 150991, *12 (S.D. Ohio 2019). "Similarly, the public has a strong interest in choosing their investment advisors." *Id.* (citing FINRA Rule 2140: "No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative"). To require Defendants not to accept new business would set a concerning

precedent, undermining clients' ability to choose who manages their finances. Thus, Plaintiff's proposed injunction is not in the public interest, and their Motion should be denied.

5. **The Court should not grant the relief First Tech seeks through a TRO because doing so would alter the status quo**.

Plaintiff seeks an improper remedy by asking the Court to order conduct beyond maintaining the status quo. *See* Motion at 19-20. "[T]he main purpose of a temporary restraining order is to maintain the status quo until the Court can hold a hearing on the motion for preliminary injunction." *BrightView Landscape Dev., Inc.*, 2025 U.S. Dist. LEXIS 89191 at *10-11.

As an initial matter, Plaintiff seeks to prevent all Defendants from using any allegedly confidential information they received relating to clients they serviced at First Tech. It also aims to prevent Sage from engaging in any direct or indirect solicitation. Defendants have already agreed not to do these things, and so Plaintiff's request is moot.

Yet, unsatisfied by Defendants' concession, Plaintiff goes further and requests that the Court order Defendants not to accept any business, including the transfer of any client accounts, from any client named on Jack's or Sage's Protocol Lists. No such non-accept restriction is contemplated under any of the Defendants' contracts with First Tech or Raymond James and such an order would prevent clients from selecting the broker they prefer (for whatever reason). The Court should therefore deny this request.

## V.    CONCLUSION

Defendants respectfully request that this Court deny Plaintiff's Motion for a Temporary Restraining Order in full because Plaintiff has not suffered any irreparable harm, its claims are unlikely to succeed on the merits, the balancing of equities weighs against Plaintiff, an injunction is not in the public interest, and Plaintiff requests relief that would improperly alter the status quo.

Respectfully submitted this 24th day of October, 2025

HOLLAND & HART LLP


By: */s/Anne Henderson Haws*
Joshua D. Hurwit
Anne Henderson Haws

Theodore E. Harman (Pro Hac Vice forthcoming)
Ryan W. Mitsos (Pro Hac Vice forthcoming)
LAWRENCE KAMIN LAW

Attorneys for Defendants Alfred "Jack" Jackson, Sage Kendall, Kristina Hernandez, and Jackson Holdings, LLC

36028091_v2