NICOLE C. HANCOCK, Bar No. 6899
nicole.hancock@stoel.com
BRADLEY R. PROWANT, Bar No. 12335
bradley.prowant@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: 208.389.9000
Facsimile: 208.389.9040

SAMUEL P. MAUCH, *admitted pro hac vice*
smauch@saretsky.com
ERIC A. MICHAELS, *admitted pro hac vice*
emichaels@saretsky.com
SARETSKY HART MICHAELS + GOULD PC
995 South Eton
Birmingham, MI 48009
Telephone: 248.502.330

*Attorneys for Defendant LPL Financial LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FIRST TECHNOLOGY FEDERAL CREDIT UNION,<br><br>            Plaintiff,<br><br>    v.<br><br>LPL FINANCIAL, LLC, OSAIC WEALTH INC., ALFRED "JACK" JACKSON, SAGE KENDALL, KRISTINA HERNANDEZ, FAMILY TREE FINANCIAL, LLC, AND JACKSON HOLDINGS, LLC,<br><br>            Defendants. | Case No. 1:25-cv-00582-BLW<br><br><br>**DEFENDANT LPL FINANCIAL LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS** |

# I. INTRODUCTION

Defendant LPL Financial LLC ("LPL") moves to dismiss the complaint filed by Plaintiff First Technology Federal Credit Union ("First Tech" or "Plaintiff") because it failed to plead a foundational trade secret to support any of its claims. First Tech sought a temporary restraining order and tried to restrict its members' ability to change their financial advisor despite First Tech not being in the business of providing financial advice. This Court denied First Tech's motion because, *inter alia*, it ran against the public policy recognized in the industry that investment customers are free to choose their broker, and this Court was "skeptical" about whether First Tech's owned a trade secret that it could enforce.

Indeed, the complaint demonstrates First Tech's alleged trade secret—a client list—is not *First Tech's* trade secret. First Tech provides traditional banking services but lacks the regulatory licensure to engage in any securities investment work. First Tech therefore affiliates with Raymond James Financial Services ("RJFS"), a licensed entity which provides the investment services, and First Tech merely receives a revenue stream from RJFS based on gross profits. First Tech's complaint is an attempt to improperly restrict the movement of investment clients from RJFS to LPL so that First Tech can maintain that revenue stream—not to protect any actual trade secret. The alleged trade secret is contact information about investment clients who conducted business solely through RJFS. First Tech, as a credit union prohibited from conducting securities work, does not and cannot own the client lists for RJFS's investment clients. RJFS owns that information.

First Tech's trade secret claim fails as a matter of law because it is not the owner of the alleged trade secret. Further, First Tech fails to plausibly allege that the contact lists fall within the statutory definitions of "trade secret" and fails to plausibly allege misappropriation by LPL. Without an enforceable trade secret, the entire complaint against LPL must be dismissed.

## II. BACKGROUND

**A.    Factual Background: Allegations in Complaint**

First Tech is a "not-for-profit, member-owned financial cooperative" credit union that provides general banking services. (Dkt. 1, ¶ 1.) LPL is an independent securities trading and investment broker-dealer with over 29,000 independent financial advisors, including Defendants Alfred Jackson ("Jackson") and Kristina Hernandez ("Hernandez"). (*Id.*, ¶¶ 2-3, 5.) Jackson and Hernandez are former employees of First Tech, where they also worked as financial advisors, selling securities through RJFS. (*Id.*, ¶¶ 15, 23, 27.) Because First Tech is a credit union, and "neither a broker-dealer nor a registered investment advisor," Jackson and Hernandez could not lawfully offer investment services through First Tech. (*Id.*, ¶ 22.)

First Tech cannot directly offer investment or wealth management services to its members but must affiliate with a licensed entity that can offer those services. (*Id.*) First Tech affiliated with RJFS, which is a FINRA and SEC registered entity. (*Id.*) First Tech and RJFS entered into a Non-Deposit Investment Product and Brokerage Service Networking Agreement ("RJFS Agreement") to memorialize the nature of their affiliation. (*Id.*, ¶ 34; *see also* Dkt. 1-9.)

First Tech characterizes this relationship as an "information-share regime" (Dkt. 1, ¶ 34), but the RJFS Agreement requires the parties to share only information that is "deemed necessary to perform their respective responsibilities" (*id.*, § 9(a)). Moreover, the RJFS Agreement states that "once a customer has established a Customer relationship with Raymond James, the name and address of such Customer shall also constitute personal non-public information concerning a Customer of Raymond James." (Dkt. 1-9, § 9(a).)

The RJFS Agreement does not give First Tech any rights in RJFS's information. (*See generally* Dkt. 1-9.) Rather, the RJFS Agreement makes clear that First Tech has no authority or

control over investment services provided by RJFS and its Registered Representatives, such as

Jackson and Hernandez:

> Undertaking as to Performance of Duties. [First Tech] undertakes to perform its duties set forth in this Agreement set in a manner consistent with the instructions of Raymond James and with the provisions of Banking Law and Applicable Law. *Any Financial Advisor shall follow the instructions of Raymond James with respect to the performance of their duties under this Agreement*.

> Carrying Broker Prohibition. *[First Tech] will not carry the securities account of any Customer provided Investment Services under this Agreement.*

> Investment Recommendations to Customers. *[First Tech] will not make any investment recommendations to Customers*…. Any such recommendations shall be made exclusively through the Financial Advisors....

> Institution's Services to Customers. *All Investment Services shall be provided by Raymond James. [First Tech] shall only perform clerical and ministerial functions in connection with a Customer Account*, … services related to compliance with Banking Law, and only those other functions approved in writing by Raymond James.

> Discretionary Authority. *[First Tech] will not exercise any discretionary or other authority with respect to a Customer Account, except to the extent approved in writing by RJFS*.

> Handling Customer Funds. [First Tech] shall not permit its employees or independent contractor(s) who are not Financial Advisors of Raymond James to handle Customer funds or securities or to take or handle orders in connection with the services provided by Raymond James.

> \* \* \*

> Fiduciary Account Transactions by or for Institution. With respect to any trust, managing agency, or other such fiduciary account to which [First Tech] provides investment recommendations or investment advice (a "**Fiduciary Account**"), the designated fiduciary party must independently select RJFS as the broker for such Fiduciary Account. In such case, [First Tech] shall disclose to each Fiduciary Account's beneficiaries or owners the selection of RJFS as the broker for the account and the revenue sharing arrangement under this Agreement. *Neither [First Tech] nor its*

> ***employees, officers, or agents shall exercise any authority under any power of attorney with respect to any Fiduciary Account established through RJFS unless such power of attorney shall have first been delivered to RJFS by Institution, and RJFS shall have consented in writing to the existence of such power of attorney***. RJFS shall have the right to independently confirm such power of attorney authority as it deems necessary.

(Dkt. 1-9, § 6(b), (c), (d), (e), (f), (g), (i) (emphases added).)

After operating under this framework for several years, on September 9, 2025, Jackson and Hernandez resigned from First Tech (and RJFS) and became independent financial advisors for broker-dealer LPL. (*Id.*, ¶ 44.) When they left, they took four pieces of information regarding the clients they serviced through RJFS: name, phone number, address, and email address (collectively, "Client List"). (*Id.*, ¶ 45.) Jackson and Hernandez subsequently used their Client List to inform their clients they had left First Tech for LPL. (*Id.*, ¶ 47.)

Jackson and Hernandez each had tripartite Financial Advisor Agreements ("FA Agreements") with RJFS and First Tech that were effective December 24, 2018 and January 24, 2024, respectively. (*Id.*, ¶ 13; Dkt. 1-1; Dkt. 1-3.) The FA Agreements do not contain any restrictive covenants, such as non-compete or non-solicitation clauses, that would prevent Jackson or Hernandez from changing employment and advising their clients of that change. (*See generally* Dkt. 1-1; Dkt. 1-3.) Further, the FA Agreements define client-related information as proprietary information of RJFS (not First Tech), and provide that Jackson and Hernandez may retain RJFS's documents and information if authorized to do so:

> Financial Advisor agrees to not remove any of the original records or documents of RJFS from the premises of the Investment Center at which Financial Advisor is employed unless authorized to do so in advance by RJFS. Financial Advisor further acknowledges that ***any customer-related information*** provided to Financial Advisor or about which Financial Advisor may become aware during the term of this Agreement, whether written or not, ***is proprietary information***

***of RJFS*** ("RJFS Property"). RJFS Property is and shall remain the property of RJFS at all times, including during the term and after termination of this Agreement.

(Dkt. 1-1, § 20; Dkt. 1-3, § 20 (emphases added).) The confidentiality provision in the FA

Agreements, on which First Tech relies, pertains to RJFS's information and only when Jackson

and Hernandez were conducting business while at RJFS:

> RJFS Property shall be treated by the Financial Advisor as confidential information of RJFS. Financial Advisor is required by law to protect and keep confidential all nonpublic personal information obtained from consumers ***while conducting business as a Financial Advisor of RJFS***. Financial Advisor agrees not to disclose, either directly or indirectly, to any person (e.g., individual, firm or business) any information obtained from clients of RJFS or customers of Institution unless the information is "publicly available information" as that term is defined at Title 17, Code of Federal Regulations, section 248.3(v).

(*Id.* (emphasis added).) Finally, the FA Agreements specifically reference financial advisor

transitions conducted pursuant to the Broker Protocol:

> …If Financial Advisor's transfer is pursuant to the Protocol for Broker Recruiting, Financial Advisor understands and agrees to the terms of the Protocol and that any resulting legal action from failing to comply will be the responsibility of the Financial Advisor. Further, Financial Advisor acknowledges and agrees that if Financial Advisor transitions out of RJFS, Financial Advisor will have to comply with RJFS' Privacy Notice and all applicable Privacy Laws, including client optout elections.

(*Id.*)

The Broker Protocol is a publicly available agreement among financial firms to allow the

free movement of "Registered Representatives" (e.g., financial advisors) and respect their clients'

freedom of choice when a Registered Representative moves firms. (Dkt. 1, ¶ 35; *see also* Dkt. 1-

10.) The Broker Protocol is an agreement among financial firms not to sue each other when

Registered Representatives move between signatory firms. (Dkt. 1, ¶ 35; Dkt. 1-10.) When a

Registered Representative moves between two signatory firms, the Broker Protocol permits the Representative to take to the new firm five pieces of information for the clients the Representative serviced at the old firm: client name, address, phone number, email address, and account title. (Dkt. 1, ¶ 36; Dkt. 1-10.) The Client List contained four of those five pieces of information. (Dkt. 1, ¶ 45.)

LPL and RJFS are both signatories to the Broker Protocol. (*Id*., ¶¶ 39-40.) RJFS conditioned its joinder of the Broker Protocol: RJFS recognized that it provides support for institutions such as credit unions, which are not licensed broker-dealers, and therefore RJFS stated the Broker Protocol could not be used to supersede any restrictive covenants between financial advisors and their financial institutions, such as a credit union. (*Id*., ¶ 39.) Because neither Jackson nor Hernandez had a restrictive covenant with First Tech, the Broker Protocol applied when they left First Tech. (Dkt. 1-1; Dkt. 1-3; Dkt. 1-10.) There is no allegation in the complaint that the investment clients of Jackson and Hernandez ceased to continue their *banking* membership with First Tech. (*See generally* Dkt. 1.) First Tech does not allege LPL provides banking services.

## B. Claims and Procedural Background

First Tech alleges the investment Client List was and is its trade secret. (*Id*., ¶¶ 45, 47-53.) Notwithstanding the Broker Protocol, First Tech asserts Jackson and Hernandez had and have no right to use the Client List and, beginning on September 11, 2025, demanded they cease using the Client List. (*Id*., ¶ 57.) First Tech alleges that LPL violated the Defend Trade Secrets Act ("DTSA") and the Idaho Uniform Trade Secrets Act ("ITSA") because "upon information and belief, [LPL]: a) directed, aided, abetted and/or ratified their agents misappropriation of First Tech's trade secrets; and/or b) through their agents and employees, have ingested First Tech's trade secret information into their systems." (*Id*., ¶ 69.) First Tech also alleges LPL is vicariously

liable for the acts of Jackson and Hernandez. (*Id.*, ¶ 68.) The **only** trade secret alleged by First Tech is the investment Client List containing "names, phone numbers, email addresses, and home addresses" of securities investment clients —i.e., four out of five pieces of information permitted to be taken under the Broker Protocol, and only information pertaining to investment services that First Tech does not provide. (*Id.*, ¶ 64.)

First Tech further alleges against LPL claims of Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage. (*Id.*, ¶¶ 91-106.) For the former, First Tech alleges LPL "intentionally caused [Jackson and Hernandez] to breach [their FA Agreements] … [by] provid[ing] [Jackson and Hernandez] with monetary incentives – upon information and belief – to take First Tech's confidential and/or trade secret information and to use this information to solicit, divert, or otherwise move First Tech's client relationships to LPL." (*Id.*, ¶ 96.) For the latter, First Tech alleges LPL "intentionally and improperly interfered with First Tech's relationships with their clients by taking and thereafter using the information contained in the [Client] Lists." (*Id.*, ¶ 103.) A wrongful taking of trade secrets is required to maintain either claim.

With its complaint, on October 16, 2025, First Tech moved this Court for a temporary restraining order to prevent Jackson, Hernandez, and LPL from using the Client List, accepting any clients on the Client List, and ordering a return of the Client List. (Dkt. 3-1 at 18-20.) This Court denied First Tech's motion (Dkt. 46), holding First Tech had failed to show irreparable harm and that interfering with an individual's investment decisions would not be in the public interest (Dkt. 47 at 13:6-10 ("[T]here is also a broad public interest recognized by everyone in the industry and reflected in the Broker Protocol that investors should be able to freely follow their investment advisors as they move from one broker to another.").) On the irreparable harm prong, this Court held, in part, that First Tech had failed to show irreparable harm because the clients on the Client

List would be lost by RJFS, not First Tech. Further, First Tech's bare claim of loss of goodwill as a credit union was unsubstantiated. Finally, this Court was "skeptical" about whether the Client List was in fact a trade secret.

## III. ARGUMENT

### A. Legal Standard

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id*. at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Where the "facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (brackets in original) (quoting Fed. R. Civ. P. 8(a)(2)).

A court may consider documents incorporated into the complaint by reference and take judicial notice of facts not subject to reasonable dispute without turning a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) into a motion for summary judgment under Rule 56. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); Fed. R. Evid. 201.

Incorporation-by-reference treats those documents extensively referred to by plaintiff or on which plaintiff relies for its claims as though the documents were part of the complaint itself. *Khoja*, 899 F.3d at 1002. A court may give effect to and rely on an unambiguous contract when granting a motion to dismiss. *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1118-19 (9th Cir. 2018).

**B.     First Tech Fails to State a Claim on Which Relief Can Be Granted Because It Lacks Standing to Assert a Trade Secret Claim Against LPL.**

**1.     First Tech Is Not the Owner of the Alleged Trade Secret as Required by Both the DTSA and ITSA.**

A prerequisite to asserting a claim under the DTSA and ITSA is ownership of a trade secret. *See, e.g.*, *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (holding plaintiff lacked standing to sue where there were no allegations showing plaintiff could meet the DTSA definition of "owner"). Under the DTSA, only "[a]n owner of a trade secret that is misappropriated may bring a civil action." 18 U.S.C. § 1836(b)(1). "Owner" is defined as the "entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." *Id.* § 1839(4). "[T]he DTSA defines an owner in a way that does not refer to possession of the trade secret[,]" but rather the "DTSA … identifies three categories of individuals or entities that qualify as an owner of a trade secret: (1) one who has legal title, (2) one who has equitable title, and (3) one who has a license in the trade secret." *Tomahawk Mfg., Inc. v. Spherical Indus., Inc.*, No. 2:23-CV-01007-APG-NJK, 2025 WL 2639251, at *2-3 (D. Nev. May 15, 2025).

Likewise, the ITSA defines "trade secret" and "misappropriation" such that the right to sue stems from ownership of a trade secret. I.C. § 48-801(5)(a) (defining "trade secret," in part, as something that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, ***other persons who can obtain economic value from its disclosure or use***" (emphasis added)); *id.* § 48-801(2)(b) (B)(iii) (defining "misappropriation," in part, as "[d]isclosure or use of a trade secret ***of another***

without express or implied consent by a person who[] … [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was[] … [d]erived from or through a person who owed a duty *to the person seeking relief to maintain its secrecy or limit its use*" (emphases added)). Indeed, courts have interpreted the ITSA as having an implicit ownership requirement. *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010) ("The term 'use' in the context of misappropriation of a trade secret generally contemplates some type of use that reduces the value of the trade secret to the trade secret owner." (interpreting the ITSA)).

Thus, under both the DTSA and ITSA, the only person with a right to sue for misappropriation of a trade secret is the *owner* of the trade secret.

### 2. First Tech Has Not Plausibly Alleged That It Owned the Alleged Trade Secret: the Client List.

First Tech has alleged *one* trade secret: the securities investment Client List. The Client List is an amalgamation of contact information about *investment* clients of RJFS, not First Tech. There is no allegation in First Tech's complaint as to *how* First Tech came to own this information when it could not provide investment services to those on the Client List. Indeed, the RJFS Agreement makes clear that First Tech has no ownership interest in RJFS's investment clients and has no ability to direct RJFS or its financial advisors, such as Jackson and Hernandez. Further, the FA Agreements state that "any" customer information given to or obtained by Jackson and Herandez is RJFS's proprietary information, which would include all information on the Client List. As a result, the allegations, and documents in support thereof, make clear: RJFS owns the Client List.

First Tech cannot *plausibly* show that it owned the Client List when the information on the Client List is the property of RJFS. First Tech points to the RJFS Agreement and the FA Agreements as support for "its" alleged trade secret. (*See* Dkt. 1, ¶¶ 33-34, 39; Dkt. 1-1; Dkt. 1-3;

Dkt. 1-9.) But the agreements on which First Tech stakes its claim belie its allegations. The RJFS Agreement, which governs the relationship between First Tech and RJFS, does not give First Tech any rights in the Client List. (Dkt. 1-9.) The RJFS Agreement is a general agreement to share "information deemed necessary to perform their respective responsibilities." (*Id*., § 9(a).) However, sharing information "deemed necessary" to perform their respective roles is not enough to show ownership of the Client List specifically. The RJFS Agreement does not contemplate First Tech having access to any specific set of information—such as investment client information—or allow for the sharing of all information each entity maintains. Moreover, the RJFS Agreement states that First Tech has no right or ability to direct investment services provided by RJFS (*id*., § 6), and First Tech is not allowed to carry the "securities account of any Customer provided Investment Services" (*id*., § 6(c)). Because First Tech is not registered with FINRA or the SEC and cannot provide investment services, "information … necessary to perform" its responsibilities would necessarily *not* include investment client information. First Tech cannot plausibly claim to own the Client List, which contains information about *investment* clients, when First Tech cannot provide investment services, and the RJFS Agreement does not grant First Tech an ownership interest in or a license to use RJFS's investment client information for First Tech's financial benefit.

First Tech's implausible trade secret—the Client List—is an attempt to save a revenue stream, not protect a legal right. To reach this end, First Tech conflates its *banking member* information with RJFS's *investment client* information; they are not the same. Any information First Tech shared with RJFS as part of referring a member for investment services then became investment client-related information that belonged solely to RJFS. The RJFS Agreement makes this clear: "once a customer has established a Customer relationship with Raymond James, the

name and address of such Customer shall also constitute personal non-public information concerning a Customer of Raymond James." (*Id.*, § 9(a).) While there may be some overlap between members and clients, First Tech's members and RJFS's clients are not the same set of individuals. Rather, each entity has a distinct set of members or clients and separate and distinct sets of information. Whatever information each entity has regarding its members or clients is its own. Simply, RJFS's client information is not owned by First Tech.

Additionally, even if RJFS and First Tech were in a completely reciprocal information-sharing arrangement, that would not result in First Tech having an ownership interest in the Client List because First Tech contractually agreed all such information is RJFS's information. The FA Agreements state that "***any*** customer-related information" provided to or obtained by Jackson and Hernandez during the term of the FA Agreements is the proprietary information of RJFS and "is and shall remain the property of RJFS at all times, including during the term and after termination of this Agreement." (Dkt. 1-1, § 20; Dkt. 1-3, § 20 (emphasis added).) Neither the RJFS Agreement nor the FA Agreements granted First Tech a legal title, an equitable title,[1] or a license in RJFS's client information and the Client List.

In contradiction to the agreements it incorporates into its complaint and without elaboration, First Tech characterizes itself as a "licensee" of RJFS's information. (*See, e.g.*, Dkt. 1, ¶¶ 34, 45.) This allegation is not plausible. First Tech uses the verbs "possess," "own," and "license" loosely to confuse the issue (*see, e.g.*, *id.*, ¶ 17), but since First Tech has only identified one alleged trade secret—the Client List—the analysis is straightforward. First Tech must show that it owned—through legal or equitable title—or that it was a licensee of the Client List. 18

---

[1] Equitable title is a "title that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title." *Equitable Title*, *Black's Law Dictionary* (12th ed. 2024). First Tech has not alleged equitable title in the Client List.

U.S.C. § 1839(4). First, it would be paradoxical to say First Tech "owned" RJFS's information. And, as already discussed, the RJFS Agreement and FA Agreements make clear that RJFS owns the information in the Client List. While First Tech may have "possessed" *some* information on the Client List—though whether it did or to what extent is not alleged—that possession did not amount to legal or equitable title in the entire Client List. Indeed, such an interpretation would contradict the RJFS Agreement and FA Agreements. Thus, First Tech's DTSA/ITSA claims are only plausible if it has plausibly alleged it is a licensee in the Client List. First Tech has not.

The RJFS Agreement does not grant First Tech a license in RJFS's information. It is not enough to show that RJFS and First Tech shared information as "necessary to perform their respective responsibility." (Dkt. 1-9, § 9(a).) First Tech must show it has a grant or permission to do something that one would otherwise not be able to do. *See License*, *Black's Law Dictionary* (12th ed. 2024). Thus, the nature of a licensor/licensee relationship assumes that the licensee does not have lawful access to the information absent a grant of permission from the licensor. In alleging First Tech was a "licensee" of the Client List, First Tech is alleging that RJFS granted First Tech permission to use or have access to the Client List (not that RJFS granted the exclusive right to control that information). To support this bald allegation, First Tech points to the RJFS Agreement. The RJFS Agreement does not grant a license. It permits the sharing of information, confidentially, as "necessary" to perform the entities' various functions—i.e., First Tech to offer banking services and RJFS to offer investment services. First Tech receives the information RJFS chooses to share so that First Tech can provide *banking* services. First Tech is not a licensee of the Client List, which pertains to RJFS's *investment* services and it certainly does not hold an exclusive right to control that information.

Moreover, a licensee cannot receive broader rights in a license than what the licensor has the ability to bestow. RJFS expressly allowed its financial advisors to use the information at issue if he or she transitioned out of RJFS pursuant to the Broker Protocol. First Tech's lawsuit claims that it can restrict the movement of the Client List in a way that RJFS has permitted. Thus, as an alleged licensee, First Tech is claiming that it had greater rights in the Client List than RJFS. This is not plausible nor is it supported by the language in the Agreement.

Because First Tech has not plausibly alleged it is the owner of the purported trade secret, its DTSA/ITSA claims should be dismissed.

**C.    First Tech Also Fails to Plausibly Allege the Remaining Necessary Elements of a Claim Under the DTSA and ITSA.**

First Tech treats its DTSA and ITSA claims as effectively the same because courts have analyzed claims brought under the DTSA and the ITSA together. *BigRentz, Inc. v. KGM Enters., LLC*, No. 1:22-CV-00430-AKB, 2023 WL 7496726, at *2 (D. Idaho Nov. 13, 2023), *see also* (Dkt. 1, ¶ 62). A misappropriation claim requires pleading three elements: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 907 (N.D. Cal. 2023) (citation omitted). "[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citing 18 U.S.C. §§ 1839(3), (5)). "[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993); *Basic Am., Inc. v. Shatila*, 133 Idaho 726, 734, 992 P.2d 175, 183 (1999).

Merely calling something "trade secret" does not make it so. First Tech "may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." *InteliClear*, 978 F.3d at 657. First Tech must "'describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade.'" *InteliClear*, 978 F.3d at 658 (ellipsis in original) (quoting *Imax Corp.*, 152 F.3d at 1164). First Tech must do more than merely state that the trade secret is the Client List; it must plausibly allege the Client List falls within the statutory definitions of "trade secret." This, First Tech fails to do. Accordingly, its DTSA and ITSA claims should be dismissed for this reason as well.

1.      **First Tech Has Not Plausibly Alleged That It Derived Independent Economic Value from the Client List.**

In order to plead the Client List constitutes First Tech's protectible trade secret, First Tech must plausibly allege that it derived "independent economic value" from the Client List not being generally known. 18 U.S.C. § 1839(3)(B); I.C. § 48-801(5).

No allegation or document incorporated into the complaint supports that First Tech derived *independent* economic value from RJFS's information. To be sure, First Tech generally alleges amounts of revenue generated from the Client List and that Jackson and Hernandez have substantial assets under management. But it is not the Client List that brought First Tech revenue, it is First Tech's relationship with RJFS. First Tech received revenue for sending its members to RJFS for investment services. First Tech's compensation was a portion of the gross revenue derived from those investment services, which were performed by financial advisors affiliated with and supervised by RJFS. (Dkt. 1-9, § 3(a).) First Tech derived economic value from RJFS's investment services, not a Client List specific to Jackson and Hernandez. Moreover, the Client List did not provide *independent* economic value for First Tech. Any value derived from advising

financial clients went to First Tech, RJFS, and the financial advisors. In order to demonstrate the Client List is in fact *its* trade secret, First Tech must state with particularity how the Client List provides First Tech with independent economic value. First Tech's complaint does not separate First Tech from its relationship with RJFS. Therefore, First Tech has failed to plausibly allege this definitional aspect of a trade secret.

> **2.      First Tech Has Not Plausibly Alleged That It Maintained the Secrecy of the Alleged Trade Secret.**

Additionally, the Client List cannot be a trade secret if First Tech did not protect it through reasonable measures. "[N]ot all proprietary information qualifies for protection as a property interest under DTSA," *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1087 (9th Cir. 2025), and "not every customer list constitutes a trade secret," *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 149, 456 P.3d 201, 218 (2019). "A trade secret derives its value from its secrecy. It stands to reason, therefore, that disclosure can extinguish a trade secret and the owner's rights therein." *Health Care Facilities Partners, LLC v. Diamond*, No. 5:21-CV-1070, 2023 WL 3847289, at *4 (N.D. Ohio June 5, 2023).

Assuming the Client List is the sort of information that can be a trade secret, First Tech has not alleged that it took the necessary steps to protect its secrecy. First Tech must show that it took "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A); I.C. § 48-801(5)(b). First Tech relies on a generic description of the business operations of any financial institution, such as use of passwords, encryption of transmitted information, keycard access to its Boise office, and an employee handbook. (Dkt. 1, ¶¶ 53-54.) There are no allegations regarding how First Tech specifically protected the secrecy of the Client List. First Tech did not put restrictive covenants in the FA Agreements, such as a non-solicitation provision, to prevent the movement or use of information after employment. Rather, First Tech generally alleges security

measures it takes to protect information. "[A]n employer's vague descriptions of exactly what it is that constitutes a trade secret renders the confidentiality agreement largely meaningless." *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 959 (C.D. Cal. 2011). Thus, First Tech's allegations are insufficient.

### 3. The Information in First Tech's Alleged Trade Secret Is Publicly Available.

Further, the information that First Tech alleges Jackson and Hernandez took cannot be a trade secret because it is publicly available. First Tech alleges that the Client List contained four pieces of information: name, phone number, address, and email address. "[C]ontact information of individuals—their names and addresses … can be determined in many ways, even if involuntarily, making it essentially public information. Such public information cannot, on its own, constitute a trade secret." *Trumble*, 166 Idaho at 150, 456 P.3d at 219 (citation omitted). "It is axiomatic that matters of public knowledge or of general knowledge in an industry cannot be appropriated by an entity as a trade secret." *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 189 (1st Cir. 2023) (citation modified); *see also id.* at 192 (considering "the degree to which the information has been placed in the public domain or rendered readily ascertainable" (citation omitted)).

### 4. First Tech Has Not Plausibly Alleged That LPL Misappropriated a Trade Secret.

Finally, First Tech fails to make any plausible allegations of misappropriation against LPL. "An employee will naturally take with her to a new company the skills, training, and knowledge she has acquired from her time with her previous employer. This basic transfer of information cannot be stopped, unless an employee is not allowed to pursue her livelihood by changing employers." *Nw. Bec-Corp v. Home Living Serv.*, 136 Idaho 835, 840, 41 P.3d 263, 268 (2002). Even if First Tech had plausibly alleged the Client List is a trade secret owned by First Tech, it has still failed to plausibly allege that LPL misappropriated that trade secret. First Tech's allegations

that LPL misappropriated the alleged trade secret are brief conjecture. The extent of First Tech's allegations against LPL for misappropriation are:

> Mr. Jackson's and Mr. Kendall's removal and/or use of First Tech's trade secrets occurred while they were acting within the scope of their employment/agency with LPL/Riverside and Osaic/Family Tree, respectively, and for the benefit of those firms. LPL/Riverside and Osaic/Family Tree are thus viciously liable to First Tech for their agent's violations of DTSA and ITSA.

> LPL/Riverside, as well as Osaic/Family Tree are also directly liable to First Tech for their own violations of DTSA and ITSA, because, **upon information and belief**, they each: a) directed, aided, abetted and/or ratified their agents misappropriation of First Tech's trade secrets; and/or b) through their agents and employees, have ingested First Tech's trade secret information into their systems (email, contact management systems, client profiles, etc.). Moreover, LPL/Riverside and Osaic/Family Tree were unquestionably on notice of the misappropriation of First Tech's trade secret when they received the Cease and Desist letters from First Tech just days after the Ex-Employees resigned.

(Dkt. 1, ¶¶ 68-69 (emphasis added).)

The complaint lumps all Defendants together, which renders the complaint unclear as to how First Tech believes *LPL* misappropriated the alleged trade secret. Based on the paltry allegations against LPL, First Tech appears to allege that LPL acquired the Client List or the Client List was disclosed to LPL through improper means and without consent. *See* 18 U.S.C. § 1839(5); I.C. § 48-801(2). First Tech's allegations and documents incorporated into its complaint contradict its claim that LPL obtained the alleged trade secret through improper means.

RJFS and LPL are both signatories to the Broker Protocol. Because both are signatories, Registered Representatives—e.g., Jackson and Hernandez—moving between the two firms were allowed to take five pieces of information: client name, address, phone number, email address, and account title. The Client List, as alleged by First Tech, was composed of four of those pieces of information: name, phone number, address, and email address. Put another way, Jackson and

Hernandez only took a subset of the information they were allowed to take pursuant to the Broker Protocol, which applies because they were moving between two signatory firms. First Tech spends significant time explaining why it is not a member of the Broker Protocol, but it does not matter. The information in the Client List—information about investment clients—is expressly owned by RJFS, not by First Tech. First Tech's absence from the Broker Protocol is meaningless. RJFS's absence from this lawsuit is noticeable and telling. The Broker Protocol permits the actions Jackson and Hernandez took and therefore they did not obtain the Client List by improper means. If it were otherwise, RJFS would object to the use of its information. Since Jackson and Hernandez did not obtain the Client List by improper means, there cannot be misappropriation—directly or vicariously—by LPL. First Tech has not plausibly alleged that LPL misappropriated First Tech's trade secret.

**D.      First Tech's Tortious Interference Claims Against LPL Should Be Dismissed Because They Are Parasitic on a Plausible Misappropriation of Trade Secrets Claim.**

First Tech alleges claims for Tortious Interference with Contract (Count V) and Tortious Interference with Prospective Economic Advantage (Count IV) against LPL. (Dkt. 1, ¶¶ 91-106.) Both of these claims are dependent on First Tech's DTSA/ITSA claim and therefore fail.

The elements for a claim of tortious interference are: "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Bybee v. Isaac*, 145 Idaho 251, 259, 178 P.3d 616, 624 (2008). First Tech's claim is premised on Jackson and Hernandez sharing their Client List with LPL, allegedly in violation of the FA Agreements. This claim fails for at least two reasons. First, as alleged, the Client List only contained data points allowed to be taken pursuant to the Broker Protocol. This undermines a claim that LPL interfered with the confidentiality provisions in the FA Agreements. Second, First Tech alleges that LPL became

aware of the FA Agreements on September 13, 2025—four days after the alleged interference. First Tech alleges Jackson and Hernandez breached their FA Agreements on September 9, 2025 when they left First Tech for LPL and took their Client List. That is, First Tech alleges LPL intentionally interfered with a contract on September 9, 2025 despite not becoming aware of the contract until September 13, 2025. This is not plausible.

First Tech's other tortious interference claim also fails. The elements of tortious interference with a prospective economic advantage are:

> "(1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted."

*Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 893, 243 P.3d 1069, 1081 (2010) (citation omitted). First Tech's allegation to support the fourth element is: "The unauthorized theft of First Tech's information to use thereafter to solicit First Tech's clients and the interference with First Tech's contracts was wrongful and intentional." (Dkt. 1, ¶ 103.) This allegation has identity with First Tech's DTSA/ITSA claim. First Tech relies entirely on its misappropriation claim for the fourth element and does not point to any other wrongfulness beyond the alleged interference. Because First Tech's trade secrets claim is not plausible, this claim is not plausible.

## IV. CONCLUSION

LPL respectfully requests that this Court dismiss First Tech's complaint against LPL for failure to plausibly allege a claim on which relief can be granted.

DATED: December 12, 2025       STOEL RIVES LLP


/s/ Nicole C. Hancock
NICOLE C. HANCOCK, Bar No. 6899
nicole.hancock@stoel.com
BRADLEY R. PROWANT, Bar No. 12335
bradley.prowant@stoel.com

*Attorneys for Defendant LPL Financial LLC*