Kira Dale (ISB No. 6571)
Ashton G. Ruff (ISB No. 12220)
**KIRTON MCCONKIE**
1100 W. Idaho St., Ste. 930
Boise, ID 83702
Telephone: (208) 370-3325
Facsimile: (208) 370-3324
kdale@kmclaw.com
aruff@kmclaw.com

Amir Tadjedin (OSB No. 055613) (*pro hac vice*)
Julie Engbloom (OSB No. 066988) (*pro hac vice*)
Vera Warren (OSB No. 194747) (*pro hac vice*)
**TADJEDIN THOMAS & ENGBLOOM LAW GROUP LLP**
1211 NW Glissan St., Ste. 203
Portland, OR 97209
Telephone: (503) 224-9294
Facsimile: (503) 229-0405
amirt@ttelawgroup.com
juliee@ttelawgroup.com
veraw@ttelawgroup.com

*Attorneys for Defendants Osaic Wealth, Inc.
and Family Tree Financial LLC*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FIRST TECHNOLOGY FEDERAL CREDIT UNION,<br><br>Plaintiff,<br><br>v.<br><br>LPL FINANCIAL, LLC; OSAIC WEALTH, INC.; ALFRED "JACK" JACKSON; SAGE KENDALL; KRISTINA HERNANDEZ; FAMILY TREE FINANCIAL LLC; and JACKSON HOLDINGS, LLC,<br><br>Defendants. | Case No. 1:25-cv-00582-BLW<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS OSAIC WEALTH, INC. AND FAMILY TREE FINANCIAL LLC'S MOTION TO DISMISS** |

Defendants Osaic Wealth, Inc. ("Osaic") and Family Tree Financial, LLC ("Family Tree") (collectively the "Osaic Defendants") hereby submit this memorandum in support of their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated below, the Osaic Defendants respectfully request that the Court dismiss the Complaint with prejudice for failure to state a claim.

## <u>INTRODUCTION</u>

In the Complaint for Injunctive Relief ("Complaint"), Plaintiff First Technology Federal Credit Union ("First Tech" or "Plaintiff") brings three legally and factually deficient claims against the Osaic Defendants: (1) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 *et seq.*, and Idaho Trade Secrets Act ("ITSA"), Idaho Code §§ 48-801 *et seq.*; (2) intentional interference with contract; and (3) intentional interference with prospective economic advantage. *See Compl. for Injunctive Relief* ("Complaint"), Dkt. 1. None of these claims is supported by the speculative and conclusory allegations against the Osaic Defendants. Moreover, amendment would be futile. The contracts attached to, and relied upon in, the Complaint unambiguously reflect: (1) the investment client information at issue does not belong to First Tech and (2) the Osaic Defendants did nothing improper in acquiring that information. *Id.* at Exs. 2, 9, 10 (Dkts. 1-2, 1-9, 1-10).

First, the "trade secrets" alleged are investment client lists with basic contact information that, if it belongs to anyone, belongs to: Financial Institutions Division of Raymond James Financial Services, Inc. and Raymond James Financial Services Advisors, Inc. (collectively referred to herein as "Raymond James"). *Id*. ¶ 22 (Dkt. 1), Exs. 2, 9 (Dkts. 1-2, 1-9). This information does not belong to First Tech, because First Tech, as a credit union, cannot provide these investment clients with the investment or brokerage services they want. *Id*. ¶ 22. Further, First Tech does not own and cannot control the investment and brokerage accounts at issue. *Id.*

Moreover, First Tech does not allege that any of its credit union accounts or member information was taken. First Tech's trade secret allegations are derived entirely from the investment client lists. Because First Tech does not have an ownership interest in the alleged "trade secrets," all three claims fail as a matter of law.

Second, Osaic is a broker-dealer, registered with the Securities and Exchange Commission ("SEC") and a member of the Financial Industry Regulatory Authority, Inc. ("FINRA"). *Id.* ¶ 8. The Osaic Defendants, like Raymond James, provide investment and brokerage services. Accordingly, they are governed by certain rules they must honor and follow, including but not limited to, the "Protocol for Broker Recruiting" ("Broker Protocol") and FINRA Rule 2140. *Id.* ¶ 35, Ex. 10 (Dkt. 1-10). At all times relevant to the Complaint, the Osaic Defendants and their registered representatives complied with their legal obligations to the investment clients pursuant to the Broker Protocol and applicable FINRA Rules. This specifically includes a duty not to interfere with the investment clients' requests to transfer their accounts from Raymond James to Osaic. *See* FINRA Rule 2140. Because First Tech cannot show the Osaic Defendants acted with an improper motive or through improper means, all three claims fail as a matter of law.

Fundamentally, this case is an attempt by First Tech to continue receiving revenue from its referral agreement with Raymond James—nothing more. First Tech's effort to reframe the issue in terms of trade secrets and tort claims is unsupported by the allegations in the Complaint and, by its own submissions, fails as a matter of law.

## **BACKGROUND**

The following background is based solely on the allegations in First Tech's Complaint, as well as the attachments to that Complaint. The allegations are referenced herein solely for the purpose of the motion to dismiss and are not otherwise admitted by the Osaic Defendants.

**A.    First Tech, Raymond James, and the NDIP**

The contract governing the relationship between First Tech and Raymond James is the Non-Deposit Investment Product and Brokerage Service Networking Agreement ("NDIP"). *Id.* ¶ 34, Ex. 9 (Dkt. 1-9). The NDIP unambiguously reflects that the investment client information at issue belongs to Raymond James and not to First Tech. *Id.*

First Tech is a federally chartered, member-owned credit union. *Id.* ¶ 22. First Tech is neither a broker-dealer nor a registered investment advisor. *Id.* Accordingly, it cannot provide its members investment brokerage, wealth management, or financial advice. *Id.*

Instead, First Tech refers its members who seek these investment services to a third party, Raymond James. *Id.* Raymond James is a broker-dealer, registered with FINRA and the SEC. *Id.* Raymond James, not First Tech, provided these investment clients with the brokerage and investment services at issue. *Id.*

In exchange for referring its members to Raymond James, First Tech receives a share of the revenue generated from its credit union members' separate investment accounts maintained by Raymond James. *Id.* at Ex. 9, ¶ I, § 3(a) (Dkt. 1-9). The referral arrangement, also referred to as a "Networking Arrangement," between First Tech and Raymond James is governed by the NDIP as well as applicable "federal and state credit union and securities laws and regulations, … and [FINRA] Rule 3160…". *Id.* at ¶ M, § 1.

The NDIP defines "Customers" as First Tech's credit union customers who are referred to, and become, Raymond James' investment customers. *Id.* § 1 ("'**Customer**' means (i) any customer of Institution . . . that have deposit accounts with Institution or mortgages or other loans with Institution, or any person that Institution refers or introduces to a Financial Advisor that becomes a customer of Raymond James or a Financial Advisor through said referral from Institution."). All

"Investment Services" provided to these Customers are provided by Raymond James through the Financial Advisors. *Id.* ¶ G, §§ 1 & 6(e) ("All Investment services shall be provided by Raymond James.").

Consistent with applicable federal law, the NDIP expressly prohibits First Tech from providing these customers with any investment recommendations. *Id.* § 6(d). "Institution will not make any investment recommendations to Customers, including but not limited to, making general or specific investment recommendations regarding non-deposit investment products, qualifying a Customer as eligible to purchase such products, or accepting orders for such products, even if unsolicited, with respect to a Customer Account." *Id.*

Instead, Raymond James has primary and exclusive responsibility for providing these customers with investment services through the Financial Advisors. *Id.* ("[a]ny such recommendations shall be made exclusively through the Financial Advisors"). Further, "[Raymond James] is responsible for providing securities regulatory oversight for all Investment Services provided to customers of financial institutions by Financial Advisors registered with [Raymond James]." *Id.* ¶ H. In addition, the Financial Advisors "shall be subject to the education, supervision, control, and discipline of Raymond James with respect to all services provided by Raymond James." *Id.* § 5(e).

Raymond James also has primary and exclusive responsibility for the investment customer accounts at issue. "Raymond James shall maintain books and records for the securities accounts of each Customer as required by SEC Rule 17a-3a and other Applicable Law." *Id.* § 5(d). Importantly, the NDIP clearly states that, "once a customer has established a Customer relationship with Raymond James, the name and address of such Customer shall also constitute personal non-public information concerning a Customer of Raymond James." *Id.* § 9(a).

Pursuant to the NDIP, First Tech is expressly prohibited from exercising any discretionary authority over these investment client accounts. *Id.* § 6(f) ("Institution will not exercise any discretionary or other authority with respect to a Customer Account, except to the extent approved in writing by [Raymond James].") Further, First Tech "shall not permit its employees or independent contractor(s) who are not Financial Advisors of Raymond James to handle Customer funds or securities or to take or handle orders in connection with the services provided by Raymond James." *Id.* § 6(g). In short, First Tech has no direct privity or relationship with any brokerage clients with respect to the investment and brokerage accounts and services.

**B.  Kendall and the FAA.**

The tripartite contract governing the relationship between Defendant Sage Kendall ("Kendall"), First Tech, and Raymond James is the Financial Advisor Agreement ("FAA"). *Id.* ¶ 13, Ex. 2 (Dkt. 1-2). The FAA also unambiguously reflects that the investment client information at issue belongs to Raymond James and not to First Tech. *Id.*

Defendant Kendall is a Financial Advisor who was a First Tech employee and also a Raymond James contractor and registered representative ("RR") pursuant to the NDIP. *Compl.*, ¶¶ 13, 22, 28. As required by law and as reflected in the parties' contracts, all of Kendall's investment advice was transacted through Raymond James. *Id.* ¶ 22. As First Tech readily admits in the Complaint, "the securities registrations of its financial advisors are held by [Raymond James] and all securities sales and investment advice are transacted through [Raymond James]." *Id.*

Under the FAA, Kendall promised to conduct his activities "in accordance with the rules and regulations of the SEC, FINRA, and any other governmental or self-regulatory organization having authority concerning [his] activities." *Id.* at Ex. 2, ¶ 6. In addition, the FAA makes clear that "any customer-related information provided to [Kendall] or about which [Kendall] may

become aware during the term of this Agreement is proprietary information of [Raymond James]." *Id.* ¶ 20.

Kendall agreed "not to disclose, either directly or indirectly, to any person . . . any information obtained from clients of [Raymond James] or customers of [First Tech] unless the information is 'publicly available information' as that term is defined at Title 17, Code of Federal Regulations, section 248.3(v)." *Id.* In addition, Kendall agreed to "keep and preserve all [Raymond James] account records, customer statements and files" and, when his relationship with Raymond James ended, Kendall agreed to "surrender to [Raymond James] all of the above such equipment and property which shall be and shall remain the property of [Raymond James]. *Id.* ¶ 21.

C.      The "Kendall Agreement"

Kendall had an additional contract with Addison Avenue Investment Services ("AAIS"), a DBA of First Tech, the "Kendall Agreement." *Compl.*, ¶¶ 28, n.7, 31, Ex. 8 (Dkt. 1-8). First Tech alleges that, pursuant to the Kendall Agreement, Kendall made "two significant and unambiguous contractual commitments to First Tech—[1] to not steal client information and [2] to not solicit/divert First Tech clients if he were to leave." *Id.* ¶ 32.

The Kendall Agreement states that "[t]he contract between Raymond James and any employee does not in any way alter the employment relationship between the Employee and First Tech." *Id.* at Ex. 8, § 3(b). In addition, the Kendall Agreement includes confidentiality and non-solicitation clauses. *Id.* §§ 7, 10. However, by their very terms, both clauses are specific to First Tech's *credit union* clients. *See id.* Section Seven applies to: "[c]onfidential information," "described as, but not limited to . . . information containing or regarding member, client or prospective clients records [*sic*] . . . and any information related to the assets and obligations carried in an account by an AAIS client." *Id.* § 7. Section Ten applies to: "Confidential Information

and Trade Secret Information regarding AAIS' clients and prospective clients." *Id.* § 10.

These provisions do not apply to clients and accounts that First Tech does not own or control. Moreover, there is no allegation in the Complaint that Kendall took any information regarding First Tech's *credit union clients*. The focus of the Complaint is solely on the investment clients—and the revenues First Tech has allegedly lost from its referral arrangement with Raymond James. The Complaint is silent as to First Tech's credit union business.

### D.  Osaic and Family Tech

On September 9, 2025, Kendall resigned from Raymond James and First Tech and affiliated with the Osaic Defendants. *Compl.*, ¶ 15 (Dkt. 1). In other words, Kendall changed his securities registration from Raymond James to Osaic. First Tech asserts that, upon his departure, Kendall took with him the names and contact information for the investment clients he served as an RR for Raymond James. *Id.* Further, First Tech also asserts Kendall contacted these investment clients to let them know of his new affiliation. *Id.* ¶ 16.

Osaic,[1] like Raymond James, is a broker-dealer, registered with FINRA and the SEC. *Id.* ¶¶ 7-8. In addition, like Raymond James, Osaic is a signatory of the Broker Protocol. *Id.* ¶¶ 17, 35, 39, 40.

Pursuant to the Broker Protocol, an RR who moves from one signatory firm to another may take the following information to the new firm: client name, address, phone number, email address, and account title of the clients they serviced. *Id.* at Ex. 10 (Dkt. 1-10). RRs may use this information to solicit their former clients **after** joining their new firm. *Id.* In addition, they may provide other business-related information to the prospective firm **before** resignation, provided that such information does not include account statements or disclose client identities. *Id.*

---

[1] Family Tree is the designation for Osaic's branch office in Boise Idaho. *Compl*, ¶¶ 7-8 (Dkt. 1).

The "principal goal" of the Broker Protocol is "to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RRs') between firms." *Id.* This is also consistent with FINRA Rule 2140, which prohibits FINRA members, like Raymond James and Osaic, from interfering with customer accounts when an RR changes affiliations. "No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative." FINRA Rule 2140.

The policy behind these rules is to allow investment clients—not firms—to control where their accounts are maintained and with whom they work. This also minimizes potential delays in executing transactions and the associated risk of financial loss to the investment clients when their investment advisor changes affiliations.

E.    **The Client Information at Issue**

First Tech takes issue with three lists of information Kendall accessed prior to, or upon, his departure from First Tech. First Tech does not allege that any of this information was derived from sources other than Kendall's investment clients' Raymond James accounts.

First, First Tech alleges that Kendall took with him "the name, phone numbers, physical address, and email address" for each of his respective clients (the "Protocol List"). *Compl.*, ¶ 45. It cannot be disputed that this is all "Client Information" an RR may take with him to another signatory firm pursuant to the Broker Protocol. *See id.* at Ex. 10 (Dkt. 1-10).

Second, First Tech alleges that Kendall obtained a separate list of the same information— names, phone numbers, physical address, and email addresses—associated with the clients and

spouses of Kendall's investment clients (the "Spouse List."). *Id.* ¶ 49C, Ex. 31 (Dkt. 2-5).[2] First Tech admits this information was limited to "households that Mr. Kendall serviced at First Tech." *Compl.*, ¶ 49C. Moreover, there is no allegation that any of the individuals on the Spouse List were credit union clients who were not also Kendall's investment clients.

Third, First Tech alleges that Kendall accessed a "Client Holdings List" prior to his departure. *Id.* ¶ 49D, Ex. 32 (Dkt. 2-6).[3] This list does not include either account statements or customer identities. *Id.* Instead, it includes general investment information specific to Kendall's "assigned clients," including their securities holdings across accounts and product types. *Id.*

The Client Holdings List, like the Protocol List, includes information that may be shared with other investment firms pursuant to the Broker Protocol. *See id.* at Ex. 10, (Dkt. 1-10) ("It shall not be a violation of this protocol for an RR, prior to his or her resignation, to provide another firm with information related to the RR's business, other than account statements, so long as that information does not reveal client identity.").

First Tech generally contends that the Osaic Defendants are vicariously liable for Kendall's conduct. *Id.* ¶ 41. In addition, First Tech alleges that the Osaic Defendants are directly liable for "their own respective misappropriations, including having teams of transition associates available to help in the rapid transfer of accounts." *Id* However, as discussed more fully below, the Complaint is fundamentally flawed, because: (1) it does not clearly identify on what factual basis First Tech claims each of the Osaic Defendants acted improperly or with an improper purpose and (2) conflates First Tech's interests in its credit union members with that of the investment clients.

---

[2] For an unredacted version of the Spousal List, *see Pl.'s Memo. In Supp. of Mot. for TRO*, Ex. C (Dkt. 3-1).
[3] For an unredacted version of the Client Holdings List, *see Pl.'s Memo. In Supp. of Mot. for TRO*, Ex. D (Dkt. 3-1).

## LEGAL STANDARD

Pursuant to Rule 12(b)(6), dismissal is appropriate when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint "does not need detailed factual allegations;" however, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Id.*

To survive a Rule 12(b)(6) motion, a claim requires a complaint with enough factual basis which, if taken as true, states a plausible claim for relief. *Id.* at 556. A claim has facial plausibility when the plaintiff pleads factual content allowing the court to draw a reasonable inference the defendant is liable for the alleged misconduct. *Id.* The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility." *Id.* at 557.

Generally, when considering a motion to dismiss, the court cannot consider documents outside the pleading without converting the motion into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). However, the court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (cleaned up). "The Court can only do this, however, if the complaint specifically refers to the document and the document's authenticity is not questioned." *Craig H. v. Blue Cross* of Idaho, 732 F. Supp. 3d 1258, 1265 (D. Idaho 2024).

<u>**ARGUMENT**</u>

Dismissal is appropriate because First Tech's Complaint and the relevant attachments thereto unambiguously reflect that the client information at issue does not constitute First Tech's "trade secrets." First Tech is suing the Osaic Defendants—not for taking its credit union members and their credit union accounts—but for the lost revenue associated with the investment accounts that were once maintained by Raymond James and are now maintained and serviced by Osaic. Because First Tech cannot demonstrate that the investment client information is a trade secret belonging to First Tech, all three of First Tech's claims fail as a matter of law. Additionally, the claims fail, because the Osaic Defendants acted lawfully and consistent with their legal obligations with respect to these investment clients. Accordingly, First Tech has not, and cannot, show misappropriation of an alleged trade secret or a tortious interference with a contract or economic expectancy.

**A.      First Tech's Trade Secret Misappropriation Claim Fails as a Matter of Law.**

In Count I of the Complaint, First Tech claims the Osaic Defendants misappropriated their trade secrets in violation of the DTSA and ITSA. *Compl.*, ¶¶ 59-71 (Dkt. 1). To prevail on a claim brought under either the ITSA or the DTSA, Plaintiff must show: (1) a trade secret; (2) defendant misappropriated the trade secret; and (3) defendant's conduct damaged the plaintiff. *See Trumble v. Farm Bureau Mut. Ins. Co.*, 166 Idaho 132, 148–49, 456 P.3d 201, 217–18 (2019); *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020); *see also* 18 U.S.C. §§ 1836(b)(1), 1839(3)-(5).

First Tech's allegations fail to state a plausible claim, because: (1) it cannot show it has an ownership interest in the investment client lists and information and (2) the Osaic Defendants' alleged acquisition and use of this information was not wrongful by any measure.

1.      Underline: First Tech's Claims Fail Because the Investment Client Information Does Not Constitute First Tech's "Trade Secrets."

A prerequisite to any misappropriation of trade secrets claim is an ownership interest in a trade secret. To bring a private civil action under the DTSA, a plaintiff must own the trade secret at issue. 18 U.S.C.A. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection….").[4] Further, "[o]wner" is defined as the "entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4). Thus, assuming *arguendo* that the investment account information at issue is a "trade secret," First Tech must allege a valid possessory interest in the investment account information to have statutory standing under either the DTSA or the ITSA.

First Tech asserts that it is the "owner, licensee and/or possessor of valuable information – specifically including non-public information about its clients, which includes the names, phone numbers, email addresses, and home addresses." *Compl*., ¶ 64 (Dkt. 1). However, the Complaint lacks a sufficient alleged factual basis to support this conclusion. Moreover, it is inconsistent with other allegations in the Complaint and the contracts attached to, and relied upon in, the Complaint.

The alleged "trade secrets" at issue exclusively relate to the investment clients Kendall served as a Financial Advisor registered with Raymond James. First Tech does not allege that the Osaic Defendants obtained information relating to any of First Tech's members who were not also Raymond James' brokerage clients. In addition, First Tech's allegations refer only to information specific to the investment client accounts. First Tech does not allege that the Osaic Defendants obtained any other information that did not directly relate to the investment accounts at issue.

---

[4] "Courts have analyzed claims brought under the DTSA and state trade secret acts, such as the ITSA, together because the elements are substantially similar." *Bigrentz, Inc. v. KGM Enters., LLC*, No. 1:22-cv-430-AKB, 2023 WL 7496726, at *2 (D. Idaho Nov. 13, 2023).

First Tech cannot plausibly claim a possessory interest in this investment client information because it readily admits it cannot provide these investment clients with brokerage or investment services. In the Complaint, First Tech acknowledges that it "is neither a broker-dealer nor a registered investment advisor." *Id.* ¶ 22. And, "the securities registrations of its financial advisors are held by [Raymond James] and all securities sales and investment advice are transacted through [Raymond James]." *Id.* Thus, by its own admissions, First Tech does not—and cannot—provide investment or brokerage services to these investment clients.

In addition, First Tech's claimed possessory interest in these investment clients is foreclosed by the controlling agreements attached to, and relied upon in, the Complaint: (1) the NDIP, *id.* at Ex. 9 (Dkt. 1-9) and (2) the FAA, *id.* at Ex. 2 (Dkt. 1-2). First Tech specifically refers to these documents in the Complaint and concedes that they control the parties' relationship. Further, their authenticity is not disputed. Importantly, both documents unambiguously reflect that the customer information at issue belongs to Raymond James, not First Tech, for the purpose of providing investment client services. In the NDIP, First Tech promised Raymond James it would not "exercise any discretionary or other authority with respect to a Customer Account, except to the extent approved in writing by [Raymond James]." *Id.* at Ex. 9, § 6 (f) (Dkt. 1-9). Similarly, in the FAA—a tripartite agreement between First Tech, Raymond James, and Kendall—Kendall acknowledged that all customer-related information provided to him or that he otherwise became aware of while serving as a Financial Advisor registered with Raymond James was the proprietary information of Raymond James. *Id.* at Ex. 2, ¶ 20 (Dkt. 1-2) ("Financial Advisor further acknowledges that any customer-related information provided to Financial Advisor or about which Financial Advisor may become aware during the term of this Agreement is proprietary information of [Raymond James.]").

Thus, First Tech has not, and cannot, plausibly allege the requisite possessory interest in a trade secret necessary to support a misappropriation of trade secrets claim. Simply put, the investment client information at issue does not belong to First Tech, who is legally prohibited from providing these investment clients with brokerage or investment services. If anyone has statutory authority to assert this claim, it would be Raymond James. Yet, Raymond James is not a party, and First Tech has shown no authority to bring this suit on Raymond James' behalf.

2. <u>First Tech Cannot Show Misappropriation as the Osaic Defendants Obtained the Information at Issue Lawfully.</u>

First Tech alleges that "use" of the client contact information at issue "qualifies as a misappropriation under both DTSA and ITSA." *Compl.*, ¶ 67 (Dkt. 1). Further, the Osaic Defendants are vicariously liable for Kendall's "removal and/or use" of this information as Kendall was acting "within the scope of [his] employment/agency with . . . Osaic/Family Tree…and for the benefit of those firms." *Id.* ¶ 68. In addition, the Osaic Defendants are "directly liable" based on "information and belief" that the Osaic Defendants: (1) "directed, aided, abetted and/or ratified their agents [*sic*] misappropriation of First Tech's trade secrets; and/or (2) through their agents and employees, have ingested First Tech's trade secret information into their systems." *Id.* ¶ 69.

These allegations fail to state a plausible claim. They are not only speculative and conclusory, but they also ignore that the Osaic Defendants had both a right to the information at issue—names, phone numbers, email addresses, and home addresses—of Kendall's investment clients pursuant to the Broker Protocol and also an obligation to transfer these clients pursuant to FINRA Rule 2140.

"Misappropriation" is defined as:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

> A. Used improper means to acquire knowledge of the trade secret; or
>
> B. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>
> > i. Derived from or through a person who had utilized improper means to acquire it;
> >
> > ii. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> >
> > iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> C. Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

I.C. § 48-801(2); *see also* 18 U.S.C. 1839(5).

"Improper means" includes: "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." I.C. § 18-801(1); 18 U.S.C. § 1839(6)(A). "Improper means" expressly does not include: "reverse engineering, independent derivation, or **any other lawful means of acquisition**." 18 U.S.C. § 1839(6)(B) (emphasis added).

First Tech has failed to show that the Osaic Defendants improperly acquired or used First Tech's trade secret information. First, the Osaic Defendants did not obtain the investment client information at issue through any improper means. They hired Kendall, an investment advisor who was registered with Raymond James, who then switched affiliations to become a registered representative of Osaic. Kendall brought with him to his new employment his experience, his

relationships with brokerage and investment clients that he serviced through Raymond James, and basic contact information for these clients. Kendall then informed his clients he had changed affiliations—from Raymond James to First Tech. There is nothing improper about this conduct.

Second, the basic contact information Kendall brought with him is expressly permitted under the Broker Protocol. Both Osaic and Raymond James are signatories to the Broker Protocol. *Compl.*, ¶¶ 39-40, Ex. 10 (Dkt. 1-10). Pursuant to the Broker Protocol, Kendall was allowed to share the Protocol List and Holdings List with the Osaic Defendants.[5] *Id.* In addition, both Kendall and the Osaic Defendants were allowed to use that information to contact Kendall's investment clients, formerly serviced through Raymond James, to inform them of his new affiliation. *Id.*

Third, pursuant to FINRA Rule 2140, the Osaic Defendants are prohibited from interfering with "a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative." Accordingly, allegations that the Osaic Defendants transferred investment customer accounts is not evidence of wrongdoing; rather, it reflects the Osaic Defendants' compliance with their duties under FINRA. Raymond James complied with this rule by taking no action to prohibit the transfers of accounts.

In short, Kendall did not take any information that is not expressly allowed under the Broker Protocol and Osaic, as a signatory to the protocol, a FINRA member, and SEC-regulated broker-dealer, did nothing wrong in relying on the Broker Protocol and allowing Kendall's clients to transfer freely their accounts to follow their trusted investment advisor. Because First Tech cannot show: (1) an ownership interest in the alleged "trade secrets" or (2) the Osaic Defendants obtained the information through improper means, the trade secrets claim fails as a matter of law.

---

[5] Moreover, First Tech has not alleged that the Spouse List included any information that specifically related to First Tech's clients or trade secrets.

**B.      The Intentional Interference with Contract Claim Fails as a Matter of Law.**

A prima facie case of tortious interference with contract exists where a plaintiff establishes [1] the existence of a contract, [2] knowledge of the contract on the part of the defendant, [3] intentional interference causing breach of the contract, and [4] injury to the plaintiff resulting from the breach. *BECO Const. Co. v. J-U-B Eng'rs, Inc.*, 145 Idaho 719, 723, 184 P.3d 844, 848 (2008). In addition to being intentional, the interference must be improper. *Id.* (citing *Jensen v. Westberg*, 115 Idaho 1021, 1027, 772 P.2d 228, 234 (Ct. App. 1988)). To determine whether an interference is improper, Idaho courts look to Section 767 of the Restatement (Second) of Torts, which enumerates seven factors for the court to consider:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interest sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979), *cited BECO Const. Co., Inc.*, 145 Idaho at 723–24, 184 P.3d at 848–49.

First Tech alleges the contracts at issue are the FAA and the Kendall Agreement. *Compl.*, ¶¶ 93-94. First Tech further alleges the Osaic Defendants were made aware of these contracts on September 11, 2025, two days after Kendall began working for the Osaic Defendants. *Id.* ¶ 95. In addition, First Tech also alleges that the Osaic Defendants "intentionally caused . . . [Kendall] to

breach those agreements." *Id.* ¶ 96. Finally, First Tech claims the Osaic Defendants were able to stop Kendall's breach of these contracts but did nothing to stop him. *Id.*

This claim fails as a matter of law for three reasons. First, the contracts at issue were not breached. The contracts reflect the investment client information does not belong to First Tech. First Tech does not allege Kendall took any information that was not directly relevant to his, or, more accurately, Raymond James' investment clients. The FAA unambiguously states this customer-related information belongs to Raymond James, not First Tech. Further, First Tech cannot service these clients or exercise any control over their investment or brokerage accounts.

Second, First Tech's allegations fail to establish that the Osaic Defendants had knowledge of these contracts during the relevant timeframe. To establish knowledge, First Tech relies on an allegation that it provided the Osaic Defendants with copies of the contracts at issue on **September 11, 2025**. However, First Tech also alleges the harm occurred on **September 9, 2025**, when Kendall notified his investment clients by email and physical mail of his new affiliation. First Tech cannot rely on information it provided to the Osaic Defendants two days after the alleged breach to support a claim that the Osaic Defendants both knew about these contracts and intentionally interfered with them.

Third, these allegations fail to demonstrate that the Osaic Defendants acted with the requisite intent, as they acted consistent with the Broker Protocol and FINRA Rule 2140. Again. the allegations reflect that the Osaic Defendants hired a new financial advisor; that advisor notified his clients of his move; and the Osaic Defendants helped transition those clients who expressed a desired to move their accounts from Raymond James to Osaic. None of this conduct is improper, especially in light of the Broker Protocol (Dkt. 1-10) and the Osaic Defendants' obligations to these clients as broker-dealers.

In short and in sum, the tortious interference with contract claim fails as a matter of law and, therefore, should be dismissed.

## C. First Tech's Intentional Interference with Prospective Economic Advantage Claim Fails as a Matter of Law.

To maintain a successful claim for intentional interference with a prospective economic advantage, a plaintiff must show:

> (1) [T]he existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted.

*Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 893, 243 P.3d 1069, 1081 (2010) (quoting *Cantwell v. City of Boise*, 146 Idaho 127, 138, 191 P.3d 205, 216 (2008)).

Interference is wrongful where "(1) the interferer had an improper motive to harm the plaintiff; or (2) the means used by the interferer to cause injury to the prospective advantage were wrongful by reason of a statute, regulation, recognized common law rule, or an established standard of a trade or profession." *Syringa Networks, LLC v. Idaho Dep't. of Admin.*, 155 Idaho 55, 64–65, 305 P.3d 499, 508–09 (2013). "The mere pursuit of one's own business purposes is not sufficient to support an inference of an improper motive." *Id.* at 65, 305 P.3d at 509.

First Tech claims it has "a clear economic expectancy in its longstanding customer relationships" specifically including the investment clients serviced by Kendall. *Compl.*, ¶ 101. First Tech alleges the Osaic Defendants were aware of these relationships, because they "hired [Kendall] with the expectation [he] would be taking First Tech clients" and "enticed" Kendall "with enormous financial incentives" to get Kendall to solicit First Tech's clients. *Id.* ¶ 102.

Even assuming *arguendo* these allegations are true, First Tech's intentional interference with prospective economic advantage claim also fails as a matter of law. As previously discussed, First Tech has not, and cannot, show that the Osaic Defendants acted with an improper motive or through wrongful means. Further, the allegations do not support a claim that the Osaic Defendants took any of First Tech's credit union members or accounts. The Osaic Defendants are not in the credit union business, and First Tech does not own the investment clients or their accounts.

In short, First Tech's allegations fail to show that the Osaic Defendants' conduct was wrongful by any measure. Rather, as previously discussed, the Osaic Defendants, as broker-dealers, are subject to rules and regulations that do not apply to First Tech. The Osaic Defendants acted consistent with these rules and to pursue their own business purposes.

## **CONCLUSION**

In sum, Plaintiff, First Tech, has failed to state a plausible claim against either of the Osaic Defendants. Accordingly, the Complaint should be dismissed as a matter of law—and with prejudice. In light of the contracts attached to the Complaint, amendment would be futile. First Tech cannot establish a plausible claim of trade secret misappropriation, intentional interference with contract, or intentional interference with prospective economic advantage against either of the Osaic Defendants. First Tech is not a competitor with the Osaic Defendants; they sail in different seas, and Kendall did nothing wrong when changing affiliations and securities registration from Raymond James to Osaic. He made sure he took with him the information necessary to inform his clients of where he went and what they needed to do should they wish to move their business with him. This conduct is not illegal; it is necessary to allow the investment clients to make reasoned and rational choices—protecting their freedom of choice and limiting the risk of harm a delay could cause them. Thus, dismissal with prejudice is appropriate.

DATED this 12th day of December, 2025.

KIRTON MCCONKIE

*/s/ Kira Dale*
Kira Dale

TTE LAW GROUP LLP

*/s/ Amir Tadjedin*
Amir Tadjedin
Julie Engbloom
Vera Warren

*Attorneys for Defendants Osaic Wealth, Inc. and Family Tree Financial LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 12th day of December, 2025, I electronically filed the foregoing document through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- **Alexander Rudman Bunn**
  abunn@prosserlaw.com
- **Nicole C Hancock**
  nicole.hancock@stoel.com, gina.wyner@stoel.com, maren.armbrust@stoel.com, docketclerk@stoel.com, julie.deshaw@stoel.com, hillary.bibb@stoel.com, tracy.horan@stoel.com, emina.hasanovic@stoel.com, karissa.armbrust@stoel.com
- **Theodore E Harman**
  tharman@lawrencekaminlaw.com
- **Anne Henderson Haws**
  aehenderson@hollandhart.com, intaketeam@hollandhart.com, cmcarvalho@hollandhart.com
- **Kyle Daniel Johnson**
  kjohnson@prosserlaw.com, tberry@prosserlaw.com, abunn@prosserlaw.com, np@prosserlaw.com
- **Samuel P Mauch**
  smauch@saretsky.com, skopmar@saretsky.com, kfiema@saretsky.com, mhart@saretsky.com
- **Alexander P. McLaughlin**
  alexmclaughlin@givenspursley.com, stacywardein@givenspursley.com, tmh@givenspursley.com
- **Eric A Michaels**
  emichaels@saretsky.com, skopmar@saretsky.com, smauch@saretsky.com, kfiema@saretsky.com, mhart@saretsky.com
- **Bradley R. Prowant**
  bradley.prowant@stoel.com, docketclerk@stoel.com, christina.hartman@stoel.com
- **Robert Blaine White**
  rbw@givenspursley.com, kendrah@givenspursley.com, mhw@givenspursley.com

and any others as listed on the Court's ECF Notice.

    _/s/ Kira Dale_
    Kira Dale