UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

FIRST TECHNOLOGY FEDERAL CREDIT UNION,

Plaintiff,

v.

LPL FINANCIAL, LLC, OSAIC WEALTH INC., ALFRED "JACK" JACKSON, SAGE KENDALL, KRISTINA HERNANDEZ, FAMILY TREE FINANCIAL, LLC, and JACKSON HOLDINGS, LLC,

Defendants.

Case No. 1:25-cv-00582-BLW

**MEMORANDUM DECISION AND ORDER**

## INTRODUCTION

Before the Court are motions by Defendant LPL Financial LLC ("LPL"), as well as Defendants Osaic Wealth, Inc., and Family Tree Financial, LLC (collectively "Osaic"), to dismiss First Technology Federal Credit Union's ("First Tech") Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkts. 58, 59). Also before the Court are First Tech's motions for leave to amend its Complaint and to seal certain exhibits to its proposed First Amended Complaint. (Dkts. 81, 83). The Court has reviewed the briefing and the record and determines that oral argument is unnecessary to decide these motions. For the reasons stated below, the Court grants in part and denies in part LPL's and Osaic's respective motions to dismiss,

denies First Tech's motion for leave without prejudice, and provisionally grants First Tech's motion to seal.

## BACKGROUND

### A. The NDIP

First Tech is a not-for-profit, member-owned financial cooperative. Compl. ¶ 1 (Dkt. 1). First Tech, through its internal division Addison Avenue Investment Services, offers its members in-house investment services under an agreement with the Financial Institutions Division of Raymond James Financial Services, Inc. ("RJFS"). *Id*. ¶ 22. RJFS is a broker-dealer registered with the Financial Industry Regulatory Authority and the Securities and Exchange Commission. *Id*.

First Tech is neither a broker-dealer, nor a registered investment advisor, and therefore cannot directly provide investment services. *Id*. Thus, in April 2022, First Tech and RJFS entered into the Non-Deposit Investment Product and Brokerage Service Networking Agreement ("the NDIP"). *Id*. at Ex. 9. First Tech would refer its members to financial advisors who were registered securities brokers. *Id*. at Ex. 9 § 1. The Financial Advisors are employees of First Tech. *Id*. at Ex. 9 Recital ¶ G. RJFS holds their securities registrations. *Id*. at ¶ 22. Members who purchased securities through those advisors would become clients of RJFS. *See id*.

at Ex. 9 § 1. Therefore, RJFS' clients obtained via the NDIP are almost exclusively First Tech credit union members. *See id*. at ¶¶ 22, 101.

Under the NDIP, RJFS would compensate First Tech for referrals, marketing assistance, and the use of First Tech's physical locations. *Id*. at Ex. 9 § 3(a). All marketing materials were required to "prominently, clearly, and conspicuously disclose" that the investment services were being provided by RJFS and not First Tech, as well as that the services purchased or sold were not deposits or other obligations of First Tech. *Id*. at Ex. 9 § 2(b)-(c). All books and records for the securities accounts would be maintained by RJFS. *Id*. at Ex. 9 § (5)(d). The NDIP ensured that First Tech would be able to access records for particular purposes, primarily for oversight, legal compliance, and clerical functions. *Id*. at Ex. 9 §§ 5, 9, 17.

**B. The Defendants**

Three of the financial advisors employed by First Tech to sell securities products pursuant to the NPID were Jack Jackson, Sage Kendall, and Kristina Hernandez (collectively "Advisors"). *Id*. at ¶ 15. As part of their employment with First Tech, all three Advisors signed contracts between themselves, First Tech, and RJFS (collectively "FA Agreements"). *Id*. at ¶ 33, Exs. 1-3. Hernandez and Jackson signed identical agreements, while Kendall's contained slight variations, but was largely similar. *Id*. Kendall was also signatory to an additional contract

that contained confidentiality agreements and a non-solicitation covenant ("Kendall Agreement"). *Id*. at ¶ 32, Ex. 8.

### C. The Alleged Misappropriation and Trade Secret

On September 9, 2025, the Advisors resigned from First Tech without prior notice. *Id*. at ¶ 15. Jackson and Hernandez affiliated with broker-dealer LPL, as well as Jackson's recently formed company, Jackson Holdings, LLC. *Id*. at ¶ 46. Kendall affiliated with Osaic and Family Tree. *Id*. First Tech alleges that the Advisors misappropriated one of its trade secrets when they left.

First Tech states that the allegedly misappropriated trade secret is a set of client lists containing "the name, phone numbers, physical address, and email address for each of [the Advisors'] respective assigned clients[]" ("Client Lists"). *Id*. at ¶¶ 45, 64. First Tech specifies four lists: one taken by Jackson that included 428 clients; one taken by Kendall that included 250 clients; one taken by Kendall that contained information "associated with both clients spouses for the 250 households" that Kendall serviced at First Tech; and the final list taken by Kendall containing information about the securities held by his clients. *Id*. at ¶¶ 45, 49(B)-(C).

First Tech alleges that Jackson and Kendall, within approximately a day of their resignations, sent out mass emails from their new work addresses to the clients on the Client Lists. *Id*. at ¶ 47. Both emails stated that the Advisors had

been provided with support staff to assist in the transfer of accounts, and both emails contained marketing materials for LPL and Osaic, respectively. *Id.*, Exs. 22-23. First Tech alleges that Osaic had approved Kendall's communication in advance. *Id.* at ¶ 47(C). Jackson allegedly followed his initial email solicitation with mailed materials. *Id.* at ¶ 47(A), Ex. 25. Kendall followed his email with personal visits, calls, texts, and subsequent emails. *Id.* at ¶ 47(C).

First Tech sent cease-and-desist letters to Kendall and Osaic on September 11, 2025, and to Jackson and LPL on September 13, 2025. *Id.* at ¶ 57, Exs. 40-41. First Tech's demands included that the Advisors comply with the confidentiality provisions of their contracts, the Defendants cease using and return the Client Lists to First Tech, and Defendants purge the information obtained from the Lists from their systems and devices. *Id.* First Tech also provided Osaic with a copy of the Kendall Agreement on September 12, 2025, and LPL with a copy of Jackson's FA Agreement on October 3, 2025. *Id.* at ¶ 95, Exs. 42-43.

First Tech alleges that LPL and Osaic have done "little more than provide lip service to First Tech's legitimate demands for a return to the status quo ante." *Id.* at ¶ 57. First Tech alleges that, as of the time of filing, the Defendants have caused more than $205 million in client assets to be moved away from First Tech's securities program, resulting in a loss of more than $1.1 million in recurring annual revenue. *Id.* at ¶ 16.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. In order to survive a motion to dismiss under Rule 12(b), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 557.

"Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## ANALYSIS

### A. LPL and Osaic's Motions to Dismiss are Granted as to First Tech's DTSA Claim, but Denied as to the Remainder of its Claims

#### 1. The Exhibits Attached to the Complaint do not Establish that the Broker Protocol Authorized the Alleged Taking of the Client Lists

Both LPL and Osaic contend that the Protocol for Broker Recruiting ("Broker Protocol") forecloses First Tech's claims because it authorized the Advisors to take the specific types of information contained in the Client Lists. The Broker Protocol is an agreement among certain brokerage firms to waive their rights to sue departing brokers and those brokers' new employers for violating restrictive covenants and leaving with client lists. Compl. ¶ 35. The Broker Protocol regulates what information a departing broker may take. *See id*. at Ex. 10. The information contained in First Tech's purported trade secret, the Client Lists,

may be taken by a broker who leaves one Broker Protocol signatory employer for another. *Id*. at Ex. 10 ¶ 2.

Although RJFS joined the Broker Protocol, it clarified that its participation does not "bind or prohibit these separate, unaffiliated, non-signatory institutions from enforcing their restrictive covenants . . . ." *Id*. at Ex. 13 ¶ 2. First Tech alleges that it is not a signatory to the Broker Protocol and therefore can pursue litigation to enforce the FA Agreements, as well as the Kendall Agreement. *Id*. at ¶¶ 38-39.

Jackson and Hernandez's FA Agreements expressly reference the Broker Protocol, requiring compliance with its terms if a financial advisor leaves a signatory employer under the Broker Protocol's framework. *Id*. at Exs. 1, 3 § 20(b). Those Agreements also prohibit the disclosure of non-public customer information and provide First Tech with enforcement rights. *Id*. at Ex. 3 §§ 20(b), (g). Considering the RJFS joinder clarification, the FA Agreements' reference to the Broker Protocol does not unambiguously authorize disclosures that would otherwise violate the confidentiality provisions.

Kendall's FA Agreement does not address the Broker Protocol. Instead, it prohibits disclosure of nonpublic information obtained from RJFS clients or First Tech members. *Id*. at Ex. 2 § 20. His FA Agreement also permits First Tech to enforce the Agreement's terms. *Id*. at § 23. Additionally, the Kendall Agreement

restricts post-employment use and disclosure of confidential information and the solicitation of clients. *Id*. at Ex. 8 §§ 7(e), 10.

The taking of the Client Lists by the advisors was not unambiguously authorized under the FA Agreements or the Kendall Agreement. Therefore, the Broker Protocol does not preclude First Tech's allegations.

### 2. First Tech has Failed to Plausibly Plead Ownership of the Alleged Trade Secret

The Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq., permits an "owner of a trade secret" to sue for misappropriation of that secret. 18 U.S.C. § 1836(b)(1). An "owner" is "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." *Id*. at § 1839(4). To succeed on a trade secret misappropriation claim under the DTSA, "a plaintiff must prove (1) that the plaintiff possessed a trade secret[;] (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020).[1]

LPL and Osaic argue that First Tech's DTSA claim fails as a matter of law because First Tech is not an owner of the Client Lists.

---

[1] Although the Ninth Circuit's formulation of the elements states that the plaintiff possesses a trade secret, the plain language of the statute demarcates who may bring suit under the DTSA. *See Tomahawk Mfg., Inc. v. Spherical Inds., Inc.*, 803 F. Supp. 3d 1112, 1118-19 (D. Nev. 2025).

First Tech does not plead facts that plausibly demonstrate it has any form of ownership listed in Section 1839(4). First Tech labels itself as the "owner, licensee and/or possessor" of the trade secret. Compl. ¶ 64. The Complaint does not plausibly allege First Tech has legal title to the Client Lists. The FA Agreements designate "any customer-related information provided to Financial Advisor or about which Financial Advisor may become aware" as proprietary information of RJFS. *Id*. at Exs. 1, 3 § 20(a); 2 § 20. Although First Tech contractually had access to information contained in the Client Lists under the NDIP, that access does not establish legal ownership in First Tech.

*a. License*

First Tech argues that it holds a license in the Client Lists. A license is "a permission, usually revocable, to commit some act that would otherwise be unlawful . . . ." . *License*, Black's Law Dictionary (5th pocket ed. 2016). In its Complaint, First Tech describes its relationship with RJFS as an "information-sharing regime" under which it and RJFS agree to not disclose the other's confidential information to unaffiliated third parties. Compl. ¶ 34, Ex. 9 § 9(b). Section 9(b) of the NDIP provides that First Tech and RJFS:

> agree not to disclose to any unaffiliated third party any non-public personal information, including customer financial information, that it receives under this Agreement regarding any customer of the other party . . . . The parties further agree not to use such information for any purpose other than as provided in this Agreement and to establish

> procedures to protect the security and confidentiality of such information.

*Id*. at Ex. 9 §9(b). From this provision, First Tech asserts that the information shared by it and RJFS is "licensed/possessed between them." *Id*. at ¶ 34. However, First Tech must plausibly allege that the permissions provided by the NDIP encompass the information constituting the asserted trade secret.

Section 9(a) of the NDIP establishes the parameters for the sharing of information between First Tech and RJFS. Under this section, First Tech and RJFS agree to:

> provide the other with information deemed necessary to perform their respective responsibilities pursuant to this Agreement, provided that the exchange of any non-public personal information, including customer financial information, shall be in compliance with the provisions of all Applicable Law related to privacy and each party's respective privacy policies, it being understood that once a customer has established a Customer relationship with [RJFS], the name and address of such Customer shall also constitute personal non-public information concerning a Customer of [RJFS].

*Id*. at Ex. 9 § 9(a). The various grants of access or sharing of information specified throughout the NDIP are related to specified contractual obligations. For instance, RJFS must provide First Tech with access to certain information, such as customer complaints, records of significant or unusual transactions, sales reports, and RJFS internal compliance reviews for the purpose of oversight. *Id*. at Ex. 9 § 5(h). First Tech may also access RJFS' pertinent records in order to evaluate compliance with the NDIP itself, as well as with applicable law. *Id*. at Ex. 9 § 17(a). First Tech was

to "only perform clerical and ministerial functions in connection with a Customer Account, the services provided in Section 4, services related to compliance with Banking Law, and only those other functions approved in writing by [RJFS]." *Id.* at Ex. 9 § 6(e).

The NDIP also includes provisions contemplating the termination of the agreement. Section 18(e) requires RJFS to cooperate in transferring the securities accounts to a successor broker-dealer and permits First Tech to retain branch copies of customer records. *Id.* at Ex. 9 § 18(e). Section 18(f) provides that RJFS will not make any proprietary claims to customer accounts "to the extent that such claim would prevent" First Tech from transferring accounts to the new broker-dealer, or to prevent First Tech and its new broker-dealer from soliciting the clients that RJFS had been servicing. *Id.* at Ex. 9 § 18(f). These provisions preserve specified rights in the event of RJFS being replaced by a successor broker-dealer. First Tech does not possess a right to accounts more than retaining records and the guarantee that RJFS will not interfere with the transfer of the accounts.

Ultimately, First Tech does not plausibly connect those permissions established in the NDIP to its assertion that it holds a license in the Client Lists. The claimed trade secrets are the compilations of information concerning the investment clients serviced by the Advisors. *Id.* at ¶¶ 45, 49, 64. First Tech's permissions provided by the NDIP to access information about individual

members, including their status as an investment customer of RJFS, do not by themselves establish that RJFS licensed the information as compiled in the Client Lists to First Tech. Although First Tech alleges that the information shared under the NDIP is "licensed/possessed" between the parties, it does not allege additional facts connecting its permitted contractual functions to authorization encompassing the claimed compilations. *Id*. at ¶ 34. Its ability to access and possess information comprising the Lists therefore does not sufficiently support the additional conclusion that it holds a license in the asserted trade secret.

*b. Equitable Title*

First Tech has also not plausibly alleged that it possesses equitable title. "Equitable title means a 'title that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title.'" *Tomahawk Mfg., Inc.*, 803 F. Supp. 3d at 1118 n.3 (quoting Black's Law Dictionary (12th ed. 2024)). First Tech argues that RJFS only temporarily holds the customer relationships and must cooperate in transferring the customer accounts to a successor broker-dealer specified by First Tech upon termination of the NDIP. But the relevant provisions of the NDIP do not give First Tech the right to acquire legal title to the Client Lists. Sections 18(e) and (f) of the NDIP protect First Tech's ability to retain records and continue its referral program with another broker-dealer. *See* Compl. Ex. 9 §§ 18(e)-(f). They do not provide First Tech with any mechanism to acquire

legal title in the claimed information. Any continuing interest that First Tech has in the customer relationships therefore does not plausibly establish equitable title to the Client Lists.

Because First Tech has not plausibly pled ownership of the trade secret allegedly misappropriated, its claim under the DTSA is dismissed without prejudice.

**3. First Tech has Plausibly Alleged a Claim Under the ITSA**

The Idaho Trade Secrets Act, I.C. §§ 48-801 to 807, provides a cause of action for a "complainant" to recover damages for the misappropriation of a trade secret. I.C. § 48-803. A claim under the ITSA requires the plaintiff to demonstrate that a trade secret existed, and that the defendant misappropriated the trade secret. *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 456 P.3d 201, 217 (Idaho 2019). This District has regularly analyzed DTSA and ITSA claims together because of the substantial similarities between each act's elements. *BigRentz, Inc. v. KGM Enters., LLC*, 2023 WL 7496726 at *2 (D. Idaho Nov. 13, 2023).

*a. Standing*

LPL and Osaic challenge First Tech's standing to maintain a claim under the ITSA. First Tech points out that, while who has the right to bring a trade secret claim under the ITSA has not directly been addressed by Idaho courts, federal courts analyzing substantially similar statutory language from other states that have

adopted the Uniform Trade Secrets Act provide persuasive reasoning that lawful possession of a trade secret may support a misappropriation claim, even if the possessor lacks ownership. *See BladeRoom Grp. Ltd. v. Facebook, Inc.*, 219 F. Supp. 3d 984, 990-91 (N.D. Cal. 2017) (Cal. Civ. Code §§ 3426 et seq.); *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 304 F.R.D. 520, 527-28 (W.D. Tenn. 2015) (Tenn. Code Ann. §§ 47-25-1701 et seq.).[2] Additionally, the statute's text does not explicitly restrict relief to an owner, but rather defines misappropriation to include the unauthorized use or disclosure obtained through an individual that owes a duty of confidentiality to "the person seeking relief." I.C. § 48-801(2)(b)(B)(iii). As stated above, ITSA provides a cause of action to a "complainant." *Id*. at § 803. Accordingly, the Court predicts that, if the Idaho Supreme Court were to address the issue, it would find that standing pursuant to the ITSA is not limited only to an owner as detailed in the DTSA, and therefore First Tech is not precluded from

---

[2] The Nevada Uniform Trade Secrets Act, NRS §§ 600A.010 et seq., also provides a useful contrast. As noted by the court in *Tomahawk Mfg., Inc.*:

> the [Nevada Act] is both alike and different from the DTSA and other states' uniform trade secrets laws. The [Nevada Act] defines an "owner" to mean "the person who holds legal or equitable title to a trade secret." Thus, like the DTSA, the [Nevada Act] defines owners to have title, although the [Nevada Act] does not include the DTSA's language about a licensee being an owner.

*Tomahawk Mfg., Inc.*, 803 F. Supp. 3d at 1120. Further, the court characterized the Nevada Act's retainment of "complainant" as a scrivener's error and concluded that the Supreme Court of Nevada would hold that only an owner could bring a claim. *Id*. at 1121. The ITSA, on the other hand, does not include "owner" as a defined term.

pursuing its ITSA claim. *See Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n.2 (9th Cir. 2000); *T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, 908 F.3d 581, 586 (9th Cir. 2018).

LPL argues that *JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010) establishes that the ITSA includes an implicit ownership requirement. However, *JustMed* does not stand for this proposition. Although *JustMed* determined ownership of the source code under federal copyright law, its ITSA analysis addressed whether the defendant's conduct, deleting the source code from company computers, constituted misappropriation under the statute. *Id*. at 1123, 1128-30. Pertinently, the Ninth Circuit examined whether that act was "use" as described in the ITSA's definition of misappropriation. *Id*. at 1130-31. Though it refers to a trade secret "owner" in its discussion of the ITSA, the Ninth Circuit does not address the scope of who may pursue a claim under the ITSA. *Id*.

First Tech alleges facts plausibly supporting its status as a possessor. The NDIP provides for the exchange of information needed to perform the parties' respective responsibilities under the contract. Compl. Ex. 9 §§ 9(a)-(b). The NDIP also grants First Tech access to the records for oversight, as well as contractual and legal compliance. *Id*. at Ex. 9 §§ 5(h), 17(a). Additionally, the Client Lists were generated and exported from First Tech's password-protected computers. *Id.* at Ex. 5 ¶¶ 10, 13. This information was accessible by the Advisors for business purposes

and protected by confidentiality provisions. *Id.* at Ex. 5 ¶ Considering this, there is a plausible allegation that First Tech lawfully possessed the information, even if it was in fact owned by RJFS.

*b. The Trade Secret*

"In order to prevail in a misappropriation action under the [ITSA], the plaintiff must show that a trade secret actually existed." *Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1085 (Idaho 2010). A "trade secret" is defined as:

> information, including a . . . compilation . . . that:
>
> > (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> >
> > (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

I.C. § 48-801(5).

First Tech alleges that the client lists containing "the name, phone numbers, physical address, and email address for each of [the Advisors'] respective assigned clients," are a trade secret under the ITSA. Compl. ¶¶ 45, 64. While particular information, such as the addresses and contact information of the individuals on the list may be ascertainable through publicly-available means, First Tech alleges that the compilation of the information contained in the Lists—which identify First Tech members who are also investment clients—is not generally known or readily

ascertainable by proper means. *Id*. at ¶¶ 45, 65; Ex. 5 ¶¶ 11-12. The Client Lists were not ascertained from "alternative and independent sources" such as personal contacts, directories, social media, internet searches, or word of mouth. *See Trumble*, 456 P.3d at 208; Rather, they allegedly were generated and exported from First Tech's own systems and databases accessed on firm-issued computers, which Kendall and Jackson used their credentials to access. Compl. Ex. 5 ¶ 13, Ex. 34 ¶ 4.

First Tech also plausibly alleges that the Client Lists derive independent economic value from its secrecy. The Lists identify hundreds of First Tech members who are investment clients and compile those members' information in a list, making them easy to identify and contact. *See id.* at Exs. 20, 21, 31. The allegations support a reasonable inference that the lists gave LPL and Osaic a competitive advantage by enabling them to quickly and efficiently target hundreds of First Techs' members. *See id* at Ex 5. ¶¶ 11-12. Additionally, First Tech alleges that the resultant client transfers reduced its recurring revenue. *Id*. at ¶ 16.

First Tech's Complaint sufficiently alleges that it took reasonable efforts to maintain the Lists' secrecy. First Tech demonstrates that the advisors were subject to confidentiality agreements. *Id*. at ¶¶ 32, 33; Exs. 1-3, 8. Additionally, First Tech adopted workplace confidentiality policies and required its employees, including the Advisors, to annually reaffirm that they would adhere to those policies, which

were applicable to its members' identifying information, as well as client lists. Compl. Ex. 5 ¶ 17; Exs. 35-38. First Tech stored the information contained in the Client Lists in password-protected computers, maintained encryption standards for sensitive information, and used a keycard system to control access to its office premises. Compl. ¶¶ 53, 66. For the purposes of a motion to dismiss, these steps taken by First Tech plausibly demonstrate reasonable efforts to maintain the Lists' secrecy. *See Sky Capital Grp., LLC v. Rojas*, 2009 WL 1370938 at *5 (D. Idaho May 14, 2009) (reasonable security efforts where information was maintained on password-protected computer and email systems); *Serenic Software, Inc. v. Protean Techs., Inc.*, 2007 WL 1366547 at * 6 (D. Idaho Apr. 26, 2007) (requiring partner companies to execute confidentiality agreements and including a confidentiality statement in every source code product was evidence of steps to maintain secrecy).

*c. Misappropriation*

Misappropriation under ITSA can be effectuated by the:

> disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

I.C. § 48-801(2)(b)(B)(iii). "Generally, misappropriation of a trade secret occurs when a person, who knows or has reason to know the trade secret was acquired by

improper means, acquires the trade secret or when a person with the requisite knowledge of the trade secret uses or discloses it without express or implied consent." *BigRentz, Inc. v. KGM Enters., LLC*, 2023 WL 7496726 at *2 (Nov. 13, 2023) (citing I.C. § 48-801(2)).

First Tech sufficiently alleges that LPL and Osaic participated in the Advisors' use of the Client Lists to solicit clients. Jackson allegedly used the information in his list to send a mass solicitation via email with LPL promotional materials attached. Compl. ¶ 47(A); Ex. 22. Jackson further announced that LPL had provided him with a team to assist in transferring client accounts to LPL. *Id*. Likewise, Kendall allegedly used his list to circulate solicitation materials for Osaic with their advance approval, and continued his solicitation through in-person visits, calls, texts, and emails. *Id*. at ¶ 47(C). First Tech also alleges that LPL and Osaic both incorporated the information from the Client Lists into their systems and continued to use that information despite's First Techs demands to cease. *Id*. at ¶ 69. There is a reasonable inference that LPL and Osaic participated in using the information to obtain business from the clients identified on the Lists.

The Complaint also sufficiently alleges that LPL and Osaic knew, or had reason to know, that the Client Lists came from Advisors who owed First Tech a duty of confidentiality. First Tech alleges Osaic received a cease-and-desist letter on September 11, 2025, and a copy of the Kendall Agreement the following day.

*Id*. at ¶¶ 57, 95; Exs. 40, 43. LPL received a cease-and-desist letter identifying the applicable confidentiality provisions on September 13, 2025, and received Jackson's FA Agreement on October 3, 2025. *Id*. Despite First Tech's demands, LPL and Osaic continued to use the information in the Client Lists and integrate it into their systems. *Id*. at ¶¶ 57, 67, 69 While First Tech does not explicitly plead dates for this subsequent use, the allegations, considered along with the alleged solicitation campaign, support a reasonable inference that LPL and Osaic continued to use the Lists after learning of the Advisors' confidentiality obligations. First Tech therefore plausibly alleges use with the knowledge, as required by I.C. § 48-801(2)(b)(B)(iii).

The Motions are denied as to the ITSA portion of First Tech's claims contained in Count I.

**4. First Tech has Plausibly Alleged a Claim for Tortious Interference with Contract**

LPL and Osaic seek the dismissal of First Tech's fifth claim, tortious interference with contract. The elements of a claim for tortious interference with a contract are "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Wesco Autobody Supply, Inc.*, 243 P.3d at 1083 (citation omitted).

*a. Knowledge of the Contract*

LPL and Osaic both dispute that First Tech has adequately alleged they had knowledge of the FA Agreements, and additionally in Osaic's case, the Kendall Agreement. As discussed above, First Tech alleges that it sent the Defendants cease-and-desist letters, as well as copies of the applicable contracts.

First Tech alleges that LPL provided Jackson "with a team of transition associates to help bring [clients'] accounts to the new firm." Compl. ¶ 47(A); Ex. 22 at 2. Additionally, Jackson's solicitation materials include a Form ADV Brochure Supplement dated August 19, 2025—approximately three weeks before his resignation. *Id*. at Ex. 22 at 6. Finally, First Tech alleges that LPL has extensive recruiting experience in an industry where confidentiality clauses are routine. *Id*. at ¶ 95. Taken together, LPL's alleged advance participation in Jackson's transition, its preparation to assist with client transfers, and its extensive recruiting experience in the industry support a reasonable inference that LPL knew of Jackson's contractual confidentiality obligations when it allegedly assisted him in taking his Client List. There is sufficient factual basis to plausibly suggest entitlement to relief. At the pleading stage, First Tech need not establish that inference as a matter of proof—it must only allege sufficient facts to support a reasonable inference. *Iqbal*, 556 U.S. at 678. That inference, in turn, needs only to be plausible. *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011).

As to Osaic, First Tech alleges that Osaic received notice of Kendall's FA agreement on September 11, 2025, and a copy of the Kendall agreement the next day. Compl. ¶ 95. The Kendall Agreement obligates Kendall to "keep confidential, and not disclose to any third party or to make any use of Confidential Information or Trade Secrets[3] of [First Tech] . . . ." *Id*. at Ex. 8 § 7(e). It specifically prohibits Kendall from removing or otherwise transmitting any Confidential Information or Trade Secrets. *Id*. Additionally, the Kendall agreement includes a non-solicitation agreement. *Id*. at Ex. 8 § 10.

Although First Tech does not identify the dates of the purported violations committed by Kendall after Osaic received notice of both contracts by September 12, 2025, First Tech does allege that "the solicitation continued [after Kendall's September 10, 2025 mass email] and included multiple other outreaches by personal visit, call, text, and/or follow-up email[.]" *Id*. at ¶ 47(C). Additionally, First Tech levels the same allegations against Osaic that it does against LPL—that Osaic continued to use the Client Lists despite First Tech's demands to cease. *Id*. at ¶¶ 57, 69. Idaho courts have evaluated an employer's conduct after the employer learned of an employee's non-compete covenant in a tortious interference claim. *See Ins. Assocs. Corp. v. Hansen*, 782 P.2d 1230, 1234 (Idaho 1989) (affirming

[3] "Confidential Information" and "Trade Secret" are terms defined in Sections 7(a) and (b) of the Kendall Agreement.

trial court's finding that there was no intentional interference when an employer learned of a noncompete weeks after hiring an employee and directed the employee not to breach the agreement). Read together, these allegations support a reasonable inference that Kendall continued using confidential information and soliciting clients after Osaic learned of his contractual restrictions. Accordingly, Osaic's assertion of a lack of knowledge when it hired Kendall does not foreclose liability for its alleged participation in subsequent breaches.

*b. Intentional Interference Causing a Breach*

LPL and Osaic also challenge the sufficiency of First Tech's allegations as to the third element of the tort, intentional interference causing a breach. First Tech plausibly alleges this element. First Tech alleges that Jackson, Kendall, and Hernandez were parties to the respective FA Agreements, and that the Advisors breached the confidentiality provisions. Compl. ¶¶ 32-33, 93. The FA Agreements mandate that the Advisors do not disclose "any information obtained from clients of RJFS or customers of [First Tech] unless the information is 'publicly available information' . . . ." *Id*. at Exs. 1, 3 § 20(b); Ex. 2 § 20. These contracts are thus applicable to the information contained on the Client Lists, as First Tech alleges that the Advisors restricted their services "almost exclusively to First Tech members" and the Client Lists contained "non-public customer information regarding First Tech's members/customers[.]" *Id*. at ¶¶ 5, 45. Kendall also had an

additional non-solicitation agreement that prohibited him from using or disseminating confidential information, which included member identities, addresses, and contact information. *Id*. at Ex. 8 § 7(a). The terms of this agreement prohibit post-employment use and disclosure and solicitation as well. *Id*. at Ex. 8 §§ 7(e), 10.

First Tech further alleges that LPL and Osaic offered monetary incentives to the advisors to encourage them to violate their contractual obligations and use the confidential information contained in the Client Lists to facilitate the transfer of their clients to their new firms. *Id*. at ¶ 96. The intent to interfere can be inferred from evidence of conduct substantially certain to interfere with the contract. *Bybee v. Isaac*, 178 P.3d 616, 624 (Idaho 2008) (evidence to infer intentional interference where employer knew of non-compete, hired the employee bound by it, and did not limit or ask the employee to refrain from contacting customers of former employers).

Interference must also be improper. *BECO Const. Co., Inc. v. J-U-B Eng'rs, Inc.*, 184 P.3d 844, 848-49 (Idaho 2008). Courts may consider factors such as conduct, motive, the respective interests of the interferer and the affected party, the proximity or remoteness of the actor's conduct to the interference, the social interests in protecting the actor's freedom and the affected party's contractual interests, and the relationship between the parties. *Id*. (citing Restatement (2d) of

Torts § 767 (1979)). First Tech asserts that LPL and Osaic incentivized the advisors to breach their contracts to acquire and exploit protected, confidential information. LPL and Osaic purportedly encouraged the breaches in a successful effort to lure hundreds of clients away, depriving First Tech of the compensation that it would have earned under the NDIP. Here, First Tech's allegations are sufficient for the purpose of a motion to dismiss.

The Motions are denied as to Count V.

### 5. First Tech has Plausibly Alleged a Claim for Tortious Interference with Prospective Economic Advantage

LPL and Osaic also challenge First Tech's final cause of action, tortious interference with prospective economic advantage. In order to establish this claim, First Tech must demonstrate:

> (1) the existence of a valid economic expectancy, (2) knowledge of expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted.

*Wesco Autobody Supply, Inc.*, 243 P.3d 1069, 1081 (Idaho 2010) (quoting *Cantwell v. City of Boise*, 191 P.3d 205, 216 (Idaho 2008)).

First Tech identifies its "longstanding customer relationships" as the pertinent economic expectancy. Compl. ¶ 101. Under the NDIP, First Tech receives a portion of the revenue generated by the investment services provided to customer accounts by RJFS. *Id*. at Ex. 9 § 3(a). It alleges that defendants' diversion

of those clients has caused the loss of more than $1.1 million in recurring annual revenue. *Id*. at ¶ 16.

LPL and Osaic argue that First Tech's claim fails because it cannot demonstrate that their interference was wrongful. "Intent may be demonstrated if it is shown that the actor desires to bring about the interference, or knows that the interference is certain or substantially certain to occur as a result of his action." *Wesco Autobody Supply, Inc.*, 243 P.3d at 1081-82 (internal quotation omitted). First Tech has plausibly alleged intentional interference—that LPL and Osaic offered the advisors financial incentives to encourage them to solicit and divert the individuals listed in the Client Lists to their new firms. Compl. ¶¶ 96, 102-03.

Intentional interference is wrongful if "(1) the interferer had an improper motive to harm the plaintiff; or (2) the means used by the interferer to cause injury to the prospective advantage were wrongful by reason of a statute, regulation, recognized common law rule, or an established standard of a trade or profession." *Syringa Networks, LLC v. Idaho Dept. of Admin.*, 305 P.3d 499, 508-09 (Idaho 2013). As explained above, First Tech plausibly alleges that LPL and Osaic misappropriated its trade secrets under the ITSA and tortiously interfered with the advisors' contracts. It further alleges that LPL and Osaic used that misconduct to solicit and divert First Tech's clients. Compl. ¶ 103. These allegations identify

statutory and common law bases for wrongful interference. Therefore, First Tech has adequately pled this element.

Osaic also argues that its actions were consistent with industry standards, including FINRA Rule 2140's prohibition on interference with a customer's request to transfer his or her account when their registered representative changes employment. However, it does not authorize the alleged misconduct that First Tech purports Osaic undertook. First Tech's allegations are that, through incentivizing the advisors' breach of contract, LPL and Osaic interfered with First Tech's client relationships in order to solicit and divert its clients. Compl. ¶ 103. Compliance with Rule 2140 in processing the resulting transfers does not resolve the question of whether LPL or Osaic wrongfully encouraged those transfers.

The Motions are denied as to Count VI.

## B. First Tech's Motion for Leave to File an Amended Complaint is Denied Without Prejudice

After LPL and Osaic's motions to dismiss were fully briefed, including a sur-reply from First Tech, First Tech moved to amend its Complaint. Dkt. 82. Its proposed First Amended Complaint ("FAC") begins with a section titled "Necessity for Amendment" that "makes of record several additional documents that undermine many of the Defendants' positions to date, and expose their extreme lack of candor with the Court." Amd. Compl. at 4 (Dkt. 82-2).

If a party seeks to amend its pleading outside of the circumstances that it may do so as a matter of course, amendment requires either the written consent of the opposing parties, or the Court's leave. Fed. R. Civ. P. 15(a)(1)(B). The Court is to consider five factors when assessing whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing parties, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *In re W. States Wholesale Natural Gas Antitrust Litigation*, 715 F.3d 716, 738 (9th Cir. 2013) (internal quotation omitted).

Rule 8 requires a complaint to contain "a short and plain statement of the claim" and requires each allegation to be "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1). Although length alone does not violate Rule 8, a court need not accept a pleading that is argumentative, unnecessarily repetitive, or burdened with material that does not assist the opposing parties in identifying the claims and the factual grounds upon which they rest. See *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131-32 (9th Cir. 2008); *McHenry v. Renne*, 84 F.3d 1172, 1177-80 (9th Cir. 1996).

The Court will not authorize the filing of the proposed FAC in its present form. Substantial portions of the proposed pleading do not allege facts related to First Tech's claims but instead comment on, and improperly continue to respond to, arguments made by LPL and Osaic in their motions to dismiss. Additionally, a

substantial portion of the First Amended Complaint compares agreements between First Tech and RJFS with contracts between LPL and various financial institutions. There may be contexts in which those exhibits are appropriately attached to First Tech's pleadings, but they do not belong in a complaint when they are used by First Tech to extend its opportunities to rebut LPL and Osaic's arguments.

First Tech's motion for leave to file the proposed First Amended Complaint is therefore denied without prejudice. First Tech may move for leave to file a revised amended Complaint within twenty-one (21) days of the entry of this order. The revised pleading may allege facts necessary to cure the deficiencies identified in this Order and may include other material factual allegations supporting First Tech's claims.

**C. First Tech's Motion to Seal is Provisionally Granted**

First Tech filed a redacted version of its proposed FAC and accompanying exhibits publicly as an exhibit to its motion for leave. (Dkt. 82-2). In addition, it filed an unredacted version of the FAC and exhibits under seal. It moves for an order from the Court to seal three documents: a copy of LPL's "Proposed Agreement" (Dkt. 84-1 (sealed)); a copy of the "Kendall/Osaic Promissory Note" (Dkt. 84-2 (sealed)); and the unredacted copy of the First Amended Complaint (Dkts. 84-3 to 84-5 (sealed)). First Tech stated that it had no direct interest in

protecting the confidentiality of the documents but filed the motion so that LPL and Osaic could demonstrate justification for any sealing or redaction.

LPL, in its response, argued that the Court should strike the LPL Proposed Agreement and any references to it in the FAC under Fed. R. Civ. P. 12(f) as "immaterial, impertinent, or scandalous." Osaic did not oppose the motion.

First Tech, in its reply, stated that because LPL and Osaic did not make any attempt to provide a compelling reason for the documents to remain under seal, the Court should deny First Tech's own motion to seal.

"A party seeking to file a document under seal must file a motion to seal, along with supporting memorandum and a proposed order." D. Idaho Loc. Civ. R. 5.3. "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). There is a strong presumption favoring access to court records. *Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).

The party seeking to seal bears the burden of overcoming this strong presumption by demonstrating a compelling reason to do so. *Kamakana v. City & Cnt'y of Honolulu*, 447 F.3d 1172, (9th Cir. 2006). The Court must first find a compelling reason and articulate its factual basis, then balance the interests of the public and the party seeking to keep certain records secret. *Id*. What constitutes a

"compelling reason" is "best left to the sound discretion of the trial court[.]" *Nixon*, 435 U.S. at 599.

Even though no party made such a showing, in an exercise of its inherent power to control its docket, the Court will provisionally grant the motion in order to maintain the status quo. *See Atchison, Topeka & Santa Fe Ry. v. Hercules, Inc.*, 146 F.3d 1071, 1074 (9th Cir. 1998).

The Court reviewed necessarily reviewed the documents in consideration of First Tech's motion for leave to amend. In the Court's view, the documents primarily support the FAC's improper legal argument rather than its factual allegations. Because First Tech's motion for leave to amend is denied without prejudice, the exhibits will remain under seal pending further order. If First Tech renews its motion for leave and considers the documents necessary exhibits, it may cite the existing sealed docket entries. First Tech shall not file additional copies of these documents without leave of the Court.

**ORDER**

1. Defendants' Motions to Dismiss are **GRANTED** as to Count I. Count I is **DISMISSED WITHOUT PREJUDICE**

2. Defendants' Motions to Dismiss are **DENIED** as to Counts II, V, and VI.

3. Plaintiff's Motion for Leave to Amend is **DENIED WITHOUT PREJUDICE**. Plaintiff shall have twenty-one (21) days from entry of this order to renew its motion for leave to amend its complaint.

4. Plaintiff's Motion to Seal is provisionally **GRANTED**. Docket Numbers 84-1 through 84-5 shall remain under seal pending further order of the Court. The Court reserves any final determination until Plaintiff renews its Motion for Leave to Amend, or until the time to do so expires.

UNITED STATES COURTS
DISTRICT OF IDAHO

DATED: September 22, 2026

B. Lynn Winmill
U.S. District Court Judge